**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERMAN GRAVES, *et al.*, | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No.: 1:08-CV-1140 (EGS) |
| v. | ) |
| | ) |
| AMERICAN BROKERS CONDUIT, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANT INDYMAC'S MOTION TO DISMISS**

Rawle Andrews Jr. (DC #436283)
AARP Legal Counsel for the Elderly
601 E Street, N.W., Suite A4-410
Washington, DC 20049
Telephone: 202-434-2158
Facsimile: 202-434-6464
RAndrews@aarp.org
*Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................

   I.     PRELIMINARY STATEMENT ................................................................... 1

   II.    FACTUAL BACKGROUND Verified Complaint....................................... 3

   III.   LEGAL ANALYSIS.................................................................................... 7

         A.  Applicable Legal Standards .............................................................. 7

         B.  IndyMac Profited from a Predatory Loan in direct violation of the CPPA ............ 8

         C.  To the extend Federal Rule 9(b) Applies, the Allegations Against IndyMac in the Verified Complaint are pleaded with sufficient particularity ............................. 11

         D.  The Verified Complaint pleads express violations of the CPPA ......................... 13

         E.  The Civil Action is not Preempted by Federal Law..................................14

   IV.   CONCLUSION........................................................................................ 19

# TABLE OF AUTHORITIES

## Federal Cases

*Adler v. Vision Lab Telcoms., Inc.*, 393 F. Supp. 2d 35 (D.D.C. 2005) ......................................... 9

*Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8 (D.C. Cir. 2008).............. 7

*Alicke v. MCI Communications Corporation*, 111 F.3d 909 (D.C. Cir. 1997)........................ 10-11

*Binetti v. Wash. Mut. Bank*, 446 F. Supp. 2d 217 (S.D.N.Y. 2006).............................................. 15

*Chelsea Condominium Unit Owners Association v. 1815 A St.,*
  *Condominium Group, LLC*, 468 F. Supp. 2d 136 (D.D.C. 2007)......................................... 12, 13

*Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50 (D.D.C. 2002)............. 1-2, 9

*Duren v. First Government Mortg. and Investors Corp.*, 221 F.3d 195, No. 99-7026, 2000
  U.S. App. LEXIS 15469 (C.A.D.C. June 7, 2000) ..................................................................... 14

*Family Federal Savings & Loan v. Davis (In re Davis)*, 172 B.R. 437 (Bankr. D.C. 1994)........ 10

*Fidelity Sav. & Loan Ass'n v. De LaCuesta*, 458 U.S. 141 (1982) ................................................ 18

*Fletcher v. U.S. Parole Comm'n*, 550 F. Supp.2d 30 (D.D.C. 2008)........................................ 7, 11

*In re Ocwen Loan Servicing, LLC Mortgage Servicing Litig.*,
  491 F.3d 638 (7th Cir. 2007) ............................................................................................... 14, 15

*Indep. Cmty. Bankers Ass'n of S.D. v. Bd. of Governors of the Fed. Reserve Sys.*, 820 F.2d 428
  (D.C. Cir. 1987)....................................................................................................................... 15

*Jackson v. American Sec. Bank*, No. 89-1704, 1992 U.S. Dist. LEXIS 2303 (Feb. 26, 1992
  D.D.C.)........................................................................................................................................ 8

*Jackson v. Culinary School of Washington*, 788 F. Supp. 1233 (D.D.C. 1992) .................... 10, 11

*Kopff v. World Research Group, LLC*, 519 F.Supp.2d 97 (D.D.C. 2007)....................................... 7

*Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ....................................... 12

*Lawson v. Nationwide Mortgage Corporation*, 628 F. Supp. 804 (D.D.C. 1986)................... 10, 11

*National Fair Housing Alliance v. Prudential Insurance company of America*, 208 F. Supp. 2d
  46 (D.D.C. 2002).......................................................................................................................... 7

*Reyes v. Downey Savings and Loan Association*, F.A., 541 F.Supp.2d 1108 (C.D. Cal. 2008)... 14

*United States v. Cannon*, 642 F.2d 1373 (D.C. Cir. 1981) ........................................................ 12

*Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445 (D.C. Cir. 1965) .................... 14, 16, 19

## State Cases

*Byrd v. Jackson*, 902 A.2d 778 (D.C. 2006) ...................................................................... 8

*Caulfield v. Stark*, 893 A.2d 970 (D.C. 2006) ................................................................ 12

*DeBerry v. First Gov't Morg. And Investors Corp.*, 743 A.2d 699 (D.C. 1999) ........................... 8

*Ford v. Chartone, Inc.*, 908 A.2d 72 (D.C. 2006) ............................................................ 13

*Fort Lincoln Civic Association, Inc., v. Fort Lincoln New Town Corporation*,
944 A.2d 1055 (D.C. 2008) .................................................................................. 11

*Goudreau v. Standard Fed. Sav. & Loan Ass'n.*, 51 A.2d 386 (D.C. 1986) ................................. 18

*Homecomings Financial Network v. Nellie Sprow*, No. 2000-CA-007177, slip op. (D.C. Super. Ct.
ordered Apr. 19, 2001) .................................................................................... 17-19

*Lund v. Watergate Investors Ltd. Partnership*, 728 A.2d 77 (D.C. 1999) ................................. 14

*Washkoviah v. Student Loan Marketing Ass'n*, 849 A.2d 37 (D.C. 2004) ................................. 17

## Code of Federal Regulations

12 C.F.R. § 560.2 ......................................................................................... 14, 19

## State Statutes

D.C. Code § 28-3904 .............................................................................. 4, 5, 6, 9, 13, 18

D.C. Code Ann. § 28-3901 ................................................................................. 2, 9

## Federal Rules

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1, 7

Fed. R. Civ. P. 8(a)(2) .................................................................................... 1, 7

Fed. R. Civ. P. 9(b) ..................................................................................... 11, 12

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HERMAN GRAVES, *et al.,* | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No.: 1:08-CV-1140 (EGS) |
| v. | ) |
| | ) |
| AMERICAN BROKERS CONDUIT, *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION
## TO DEFENDANT INDYMAC'S MOTION TO DISMISS

Pursuant to Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure, Plaintiffs Herman Graves and Gracie Graves (the "Graves" or "Plaintiffs") respectfully submit this Memorandum in Opposition to Defendant IndyMac Bank, F.S.B.'s ("IndyMac") Motion to Dismiss.[1]

## I. PRELIMINARY STATEMENT.

IndyMac's Motion is a benign attempt to "re-write" straightforward holder-in-due-course and consumer protection laws and disregard, well-settled precedent on the inter-play between federal and local mortgage requirements. Amidst a national home mortgage crisis, there is no legitimate basis for this Court to accept IndyMac's plea that this Court look the other way so that it can avoid liability under the D.C. Consumer Protection Procedures Act for directly participating in such a lop-sided mortgage loan. *Accord Cooper v. First Gov't Mortg. &*

---

[1] On July 11, 2008, i.e., after the filing and removal of this action and IndyMac's Motion to Dismiss, the Office of Thrift Supervision placed IndyMac in federal conservatorship and named FDIC as conservator. The FDIC has not entered an appearance in this case or otherwise ratified or weighed in on the matters raised by the subject motion. Given this development and the fact that Congress presently is evaluating national home mortgage legislation that could have a retroactive effect on this dispute, this Court has at least one additional reason to deny IndyMac's motion. A true and correct copy of the July 11, 2008 FDIC's press release regarding IndyMac's failure is attached hereto as Exhibit "1".

*Investors Corp.*, 238 F. Supp. 2d 50, 65 (D.D.C. 2002) (crediting plaintiff's argument that assignee of loan was "*directly* liable for CPPA violations"); D.C. Code Ann. §§ 28-3901 *et seq.* ("CPPA").

The Verified Complaint asserts that IndyMac was a holder of an option adjustable rate mortgage loan that was issued to the Graves in their twilight years. At the time, the "Payment Option ARM" was an IndyMac product and has been described by financial industry observers as one of the most complicated financial instruments ever devised. This Option ARM has caused and continues to cause substantial financial harm to the Graves because, among other things, it is steadily eating away at their home equity and ultimately home ownership. As a holder of the Graves' note, IndyMac was subject to all the benefits and burdens under traditional statutory and common law holder-in-due-course principles.

The Verified Complaint also properly alleges that for the period of time that IndyMac held and serviced the home loan, it profited from this abusive lending arrangement in the form of ill-gotten monthly mortgage payments and related fees. Upholding a straightforward Verified Complaint that calls for the continuing enforcement of District law to eliminate abusive lending practices by IndyMac and others similarly situated in the District, as this Court already did in *Cooper*, is entirely consistent with applicable substantive law and the administration of justice. To do otherwise would be to permit wrongdoers like IndyMac to launder misconduct through under-the-table brokerage arrangements, table funded deals and assignments which never have been the basis of our holder-in-due-course laws or the manner in which home loan origination and the so-called "Secondary Market" operate in the District and this country. The Verified Complaint merely is the initial first step in righting a wrong that never should have occurred in the first place. Accordingly, IndyMac's Motion can and should be denied in its entirety.

## II.    FACTUAL BACKGROUND.

The Graves are an elderly couple and have owned their home at 406 Division Avenue, NE, Washington, DC 20019 (the "Division Street Home") since approximately 1972. *See* Verified Complaint ("Ver. Compl.") ¶11. The Graves grew up in a rural town outside of Greensboro, North Carolina, and they only have a high school level education. *See* Ver. Compl. ¶15. Mr. Graves, who is 77 years old, worked as a stock man for Safeway for twenty-five years while Mrs. Graves, who is 74 years old, worked as a nanny for a D.C. family for many years. *See* Ver. Compl. ¶13-14. They currently receive approximately $2,005 in combined monthly income from pensions and social security benefits. *Id.*

After repeated solicitations to refinance their mortgage, the Graves were finally persuaded to refinance after speaking with a telemarketer in the fall of 2006. *See* Ver. Compl. ¶18. The telemarketer expressly advised the Graves that this loan was specially suited to their income situation. *See* Ver. Compl. ¶18. The Graves completed the application process and, on November 13, 2006, they executed the mortgage refinancing documents.[2] *See* Ver. Compl. ¶¶21-22. As part of the home loan closing, Defendant IndyMac became the holder of the note. *See* Ver. Compl. ¶23.

Unbeknownst to the Graves, the terms of this one-sided refinancing are extremely favorable to IndyMac and any subsequent holder. For example, the Graves' new adjustable rate note began with a teaser interest rate of 2.2% for the first 48 days, and then the interest rate adjusted to the amount set by the U.S. Treasury securities index plus an additional 3.650%. *See* Ver. Compl. ¶24. As the Graves discovered, because the initial monthly principal and interest payments on the note ($862.87) did not change when the interest rate adjusted, the Graves'

---

[2] Although Mr. and Mrs. Graves have owned the Division Avenue home together continuously since 1972, the note mysteriously was placed in the name of Gracie Graves only.

required monthly payment did not even cover the accruing interest.[3] *See* Ver. Compl. ¶¶25-26.
<u>Thus, even as the Graves paid the amount due each month, the principal on their loan was</u>
<u>increasing by hundreds of dollars every month.</u> *See* Ver. Compl. ¶27 (emphasis added).

In an attempt to save themselves from this debt load, a few months later the Graves
responded to another solicitation to refinance their home.    After executing the refinancing
documents with this second company, Premier Financial Company, the Graves discovered that
the IndyMac mortgage contained a prepayment penalty that increased the payoff amount by
more than $3,000 a mere three months into the transaction. *See* Ver. Compl. ¶30. The Graves
were unaware of this situation at the time of closing. *See* Ver. Compl. ¶¶55-57, 74.

When their efforts to work out the situation with the lenders fell on deaf ears, the Graves
filed the Verified Complaint in D.C. Superior Court against Defendant IndyMac and the Co-
Defendants in this action.  Among other things, the Verified Complaint expressly provides:

*       *       *

<u>**Verified Complaint**</u>

55.    Section 28-3904 of the CPPA makes it a violation for any person
to misrepresent a material fact which has a tendency to mislead a consumer or to
fail to state a material fact if such failure tends to mislead.

56.    Section 28-3904(r) of the CPPA prohibits the making of
unconscionable loans.

57.    Defendants violated the section 3904 of the CPPA in that:

a.    They misrepresented the benefits of the loans to Mr. and
Mrs. Graves, misleading them to believe that a refinance of their
existing mortgages would improve their financial situation;

---

[3] The refinancing required a monthly payment of $862.87 even though the loan application on which the refinancing
was based states that the Graves' monthly income is "$0.00".

4

b.    Savings First and Premier led the Graves failed to tell the Graves that refinancing with them subjected the Graves to a prepayment penalty on their prior mortgage;

c.    Savings First and Premier failed to inform the Graves that the mortgages they originated for them also had prepayment penalties;

d.    Savings First misrepresented that it would provide the Graves with a mortgage loan that was specially suited to their financial needs;

e.    Premier misrepresented that its refinance would lower the Note on Graves' current mortgage;

c.    [sic] They misrepresented the high costs of obtaining the mortgages.

d.    [sic] American Brokers Conduit made the mortgage loan to Herman Graves without providing him with Notice of the Right to Cancel within three business days as required by the Truth in Lending Act;

e.    [sic] *They failed to explain the complexities of the payment option ARM mortgage to Mr. and Mrs. Graves;*

f.    [sic] *Made representations to the Graves to make them believe that the payments on the new mortgages would be affordable to them.*

57.    [sic]  Defendants made unconscionable loans to Mr. and Mrs. Graves in violation of D.C. Code 28-3904(r) in that they:

a.    Charged excessive fees and other costs and imposed onerous or unfair terms;

b.    *Took advantage of Mr. and Mrs. Graves' inability to protect their own interests by reason of age, infirmities and lack of sophistication;*

c.    Made payment option adjustable rate mortgages to Mr. and Mrs. Graves with knowledge that there was no reasonable probability that they would be able to repay them;

       d.     Made payment option ARM mortgages to Mr. and Mrs. Graves under "no income, no asset" guidelines that ignored the amount of their income.

* * *

74.     *Acting in concert* with Premier and Savings First, *IndyMac* and unknown defendant Assignees, *through their actions in promoting, underwriting and ultimately funding* the plaintiffs' payment option ARM loans, violated the CPPA by:

       a.     *Paying yield spread premiums and other financial incentives to originate loans to borrowers such as plaintiffs with unconscionable prepayment penalties*;

       b.     Paying yield spread premiums and other financial incentives to originate loans under "no income, no asset" guidelines that are designed to disguise their knowledge that borrowers such as the plaintiffs would be unable to repay them;

       c.     Paying yield spread premiums and other financial incentives to brokers and lenders to originate payment option ARM's that are underwritten, if at all, to the teaser rate that expires shortly after the loan is originated so that borrowers like plaintiffs will be forced to refinance or go into default because of the inability to repay; [and]

       d.     *Paying yield spread premiums and other financial incentives to brokers and lenders to originate payment option ARM's whose negative amortization will erode the equity in the homes of borrowers such as plaintiffs.*

*See* Ver. Compl. ¶¶ 55-57, 74 (emphasis added).

*          *          *

When read together, the Verified Complaint squarely puts Defendant IndyMac and the Co-Defendants on notice of their misconduct, including direct participation in refinancing schemes in violation of D.C. Code § 28-3904, including: (a) the various misrepresentations made to and omissions kept from the Graves that have never been corrected to this day; (b) the

6

unconscionable nature of the payment option ARM loans issued to the Graves; and (c) the extremely rich financial incentives paid by lenders, like IndyMac, to encourage the use of exotic mortgage products with "no income, no asset" lending criteria, teaser interest rates and negative amortization.

## III.  LEGAL ANALYSIS.

### A.  Applicable Legal Standards

Motions to dismiss test the sufficiency of the complaint and are governed by Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 8, 12.  As this Court observed in *National Fair Housing Alliance v. Prudential Insurance Company of America*, Rule 8(a)(2) of the Federal Rules of Civil Procedure "requires *only* that a complaint include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"  208 F. Supp. 2d 46, 51 (D.D.C. 2002) (Sullivan, J.) (emphasis added).  Moreover, "at this stage of the proceedings, the Court accepts as true all of the complaint's factual allegations."  *Id.* at 52; *see also Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 15 (D.C. Cir. 2008); *Kopff v. World Research Group, LLC*, 519 F.Supp.2d 97, 99 (D.D.C. 2007).  Additionally, this Court "must not make any judgment about the probability of the plaintiff's success, for a complaint may proceed even if it appears that a recovery is very remote and unlikely. *Fame Jeans*, 525 F.3d at 17 (internal quotations and citations omitted).  As long as the "factual allegations . . . raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," the complaint must be allowed to proceed. *See Fletcher v. U.S. Parole Comm'n*, 550 F. Supp.2d 30, 36 (D.D.C. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. ___, 127 S.Ct. 1955, 1965 (2007) (citations omitted).

**B.     IndyMac Profited from a Predatory Loan in direct violation of the CPPA**

The gist of IndyMac's argument appears to be that the Verified Complaint fails to state a claim under the CPPA in both Counts I and VI for two related, albeit overly-simplistic, reasons: (1) there was no "communication" between the Graves and IndyMac; and (2) given the lack of "communication," IndyMac asserts that it could not have violated the CPPA by making false or materially misleading statements to the Graves when the home loan was made. *See* Def. IndyMac's Mot. at 4-8.

For several reasons, neither of these arguments is consistent with general holder-in-due-course principles, IndyMac's direct role in funding and servicing this loan or the manner in which the Secondary Market operates in financing home mortgages.

First, Plaintiffs note that no discovery has been conducted so it is premature for this Court to even consider the nature or extent of any dealings, *vel non*, between the parties at this stage of the litigation. Second, IndyMac's "factual" arguments about the parties' dealings carry no weight under Rule 12 analysis. Third, both of IndyMac's arguments fail under the broad interpretation courts have given to the CPPA. *See, e.g., Byrd v. Jackson*, 902 A.2d 778, 781 (D.C. 2006) (the CPPA may apply to a transaction even in the absence of a formal contract or the exchange of money); *DeBerry v. First Gov't Morg. And Investors Corp.*, 743 A.2d 699, 703 (D.C. 1999) (the CPPA section pertaining to the sale of real estate also includes mortgage financing transactions).

Indeed, this Court previously held in *Jackson v. American Security Bank* that the CPPA applies in cases involving both defendants who were directly in contact with the consumers and defendants who were third parties in a consumer transaction. No. 89-1704, 1992 U.S. Dist. LEXIS 2303, at *8 (D.D.C. 1992) (citation omitted) (a copy of *Jackson* is attached as Exhibit "2"

hereto); *see also Adler v. Vision Lab Telcoms., Inc.*, 393 F. Supp. 2d 35, 40 (D.D.C. 2005) (similar). There is no dispute that the CPPA provides relief against bad actors that play a role in the transaction. D.C. Code Ann. § 28-3904. However, the parties' disagreement about whether IndyMac was a direct or indirect wrongdoer is of no consequence under CPPA analysis because this Court has held that when bringing a CPPA claim for direct liability against a third party or assignee, a plaintiff need only show that the defendant is a "merchant" as defined in the CPPA. *Adler*, 393 F. Supp. 2d at 40. As this Court explained, "the issue is not whether defendants have had "the most direct contact" with plaintiffs, but rather whether plaintiffs "purchase[d], lease[d] ... or receive[d] ... services" from defendants." *Id.* at 40 (quoting D.C.Code § 28-3901(a)(2)). When determining if a defendant is indeed a "merchant," this Court and other federal courts have concluded that "[a] merchant need not be the actual seller of the goods or services complained of, but must be connected with the 'supply' side of the consumer transaction." *Id.* at 39 (internal quotations and citations omitted).

This Court expressly elaborated on "assignee liability" under the CPPA in *Cooper. See* 238 F. Supp. 2d at 65. In *Cooper*, the plaintiffs received a predatory loan from First Government Mortgage and Investors Corporation ("FGMIC") on January 29, 1999. *Id.* at 52. Several months later, on March 25, 1999, their loan was assigned to Altegra Credit Corporation. *Id.* at 53. Altegra sought summary judgment on the grounds that there was no basis for derivative liability pursuant to the CPPA. *Id.* at 53, 65. In denying Altegra's dispositive motion, this Court credited the plaintiff's argument that Altegra was directly liable because, like IndyMac here, Altegra "had a direct role" in the FGMIC's loan transaction. *Id.* at 65. This case is even more compelling than *Cooper* because IndyMac had dealings with the Graves in connection with this payment

Option ARM loan contemporaneously with the loan origination and thereafter. Ver. Compl., ¶¶55-57, 74.

Similarly, in *Jackson v. Culinary School of Washington*, this Court held that the Secretary of Education and various guarantors could be found liable under the CPPA for their roles in guaranteeing payment to private lenders of student loans in the event of default and coordinating collection efforts for defaulted loans. 788 F. Supp. 1233, 1240, 1253 (D.D.C. 1992). Even though the Secretary and the guarantors had not interacted directly with the plaintiffs, the CPPA could reach these entities under appropriate circumstances, like this case, because they were "*involved in the continuing extension of credit to the students*" who procured the loans. *Id.* at 1253 (emphasis added). Similarly, *Lawson v. Nationwide Mortgage Corporation*, this Court applied the CPPA to a mortgage lender who did not have direct contact with the individual plaintiff but, instead, the evidence suggests, simply purchased the loan after it was executed. 628 F. Supp. 804, 807 (D.D.C. 1986).

The cases cited by IndyMac's Motion to "support" the argument that it should be excused from liability under the CPPA because it did not have direct contact with the Graves are inapposite. *See* Def. IndyMac's Mot. at 5. In *Family Federal Savings & Loan v. Davis (In re Davis)*, for example, the plaintiff was aware of the re-assignment of her loan to a broker other than her initial broker because she signed the corresponding paperwork. 172 B.R. 437, 466 (Bankr. D.C. 1994). Additionally, in *Davis*, the Bankruptcy Court specifically found that the plaintiff was an educated person and "had a basic understanding of the terms of the transaction." *Id.* Similarly, in *Alicke v. MCI Communications Corporation*, the plaintiff never alleged that she was deceived or that a reasonable customer would likely be deceived by billing practices where the carrier rounded up to the next minute because "no reasonable customer could actually believe

that each and every phone call she made terminated at the end of a full minute." 111 F.3d 909, 912 (D.C. Cir. 1997). The facts in *Davis* and *Alicke* are radically different from the claims asserted in the Verified Complaint.

Here, the Graves' Verified Complaint expressly pleads that Plaintiffs were: (a) unaware of IndyMac's role in the loan closing; (b) extremely vulnerable because of their low level of education and advanced age; and (c) actually deceived by each of the mortgage brokers and lenders, including IndyMac. *See* Ver. Compl. ¶¶15, 55-57, 74. Like the defendants in *Culinary School* and *Lawson*, IndyMac is subject to the CPPA for its role in the Graves' refinancing, including the two years of its direct involvement in the transaction as pleaded in the Verified Complaint. The Verified Complaint survives a motion to dismiss because, at base, the allegations contained therein "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true . . . ." *Fletcher v. U.S. Parole Comm'n*, 550 F. Supp.2d 30, 36 (D.D.C. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. ---, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (citations omitted). The Federal Rules of Civil Procedure require no more under these circumstances.

## C. To the extent Federal Rule 9(b) Applies, the Allegations Against IndyMac in the Verified Complaint are pleaded with sufficient particularity

The sufficiency of the claims against IndyMac in the Verified Complaint are not subject to Rule 9(b) of the Federal Rules of Civil Procedure. Nonetheless, IndyMac's Motion argues that the Verified Complaint should be dismissed because the allegations of wrongdoing against this defendant are not pleaded with the particularity required for fraud cases under the Federal Rules. Plaintiffs are the masters of their pleading, and Defendant IndyMac's argument cannot be reconciled with the claims articulated in the Verified Complaint. *Accord Fort Lincoln Civic Association, Inc., v. Fort Lincoln New Town Corporation*, 944 A.2d 1055, 1073 & n.20 (D.C.

2008) (distinguishing claims under section 28-3904(e) and (f) from common law fraud claims; noting that state consumer protection statutes were intended to overcome the pleadings problem associated with common law fraud claims, namely the requirement to prove certain elements such as intent to deceive and scienter). It also is noteworthy that in making such arguments, Defendant IndyMac's Motion: (1) glosses over the fact that this CPPA case was removed to federal court; and (2) does not cite any precedent whatsoever in support of its Rule 9(b) argument. Indeed, one of the cases cited in Defendant IndyMac's Motion, *Caulfield v. Stark*, discusses the elements of common law fraud but does not mention Rule 9(b) in the context of the existing CPPA claims. 893 A.2d 970, 974 (D.C. 2006). The other two cases cited by IndyMac do not pertain to the CPPA at all. *See Kowal v. MCI Comms. Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) (analyzing claims under the Securities Exchange Act of 1934 and Rule 10b-5); *United States v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981) (analyzing claims under the federal False Claims Act). In other words, *both the latter cases were filed in federal court asserting claims under federal statutes*, which has nothing to do with the present action.

Even if Rule 9(b) were applicable to CPPA claims, which the Graves do not concede, the Verified Complaint more than satisfies this rule of pleading. The Rule requires the plaintiff to plead fraud with particularity, including "the time, place, and content of the false representations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud." *Chelsea Condominium Unit Owners Association v. 1815 A St., Condominium Group, LLC*, 468 F. Supp. 2d 136, 146 (D.D.C. 2007) (citations omitted). The Verified Complaint plainly alleges each action step-by-step in the refinancing saga that ensnares the Graves, identifying the bad actors by name when possible and providing great detail about each material event. *See generally* Ver. Compl. ¶¶15-29; 52-59; and 73-74. Nothing more is required

under Rule 9(b). *Cf. Chelsea Condominium*, 468 F. Supp.2d at 146.

**D.    The Verified Complaint pleads express violations of the CPPA**

IndyMac's Motion also incorrectly argues that the Graves' claims of unconscionability under the CPPA should be dismissed because the Verified Complaint does not plead, directly or indirectly, that they lacked a meaningful choice of alternatives under the local statute. Here again, however, the very case upon which IndyMac relies is inapposite to the argument that IndyMac is trying to make. *See Ford v. Chartone, Inc.*, 908 A.2d 72, 90 (D.C. 2006). Among other things, *Ford* explains that a complaint alleging a violation of D.C. Code § 28-3904(r) must (a) "establish that the price was 'unreasonably favorable' to the seller" and (b) "almost always[ must show] that the buyer did not have a meaningful choice of alternatives under the circumstances". *Id.* Notably, the court in *Ford* specified that the second prong, the question of a meaningful choice of alternatives, "often turns on whether the merchant 'has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors.'" *Id.* at 90, n. 16 (quoting D.C. Code § 28-3904(r)(5)). Simply put, the onus is on Defendant IndyMac, as a merchant, to respond the Verified Complaint by establishing that it has dealt fairly with the Graves; not vice versa.

The Verified Complaint expressly states that both that the price was unreasonably favorable to the brokers and lenders and that the brokers and lenders knowingly took advantage of the Graves' inability to protect their interests due to their advanced age and inability to understand the complexities of the transactions or the language of the agreements. *See generally* Ver. Compl. ¶¶17-29; 52-59; and 73-74. IndyMac's Motion also asserts that the Graves cannot seek rescission of the Savings First, LLC-IndyMac loan because the loan has already been

13

satisfied by a subsequent refinancing. Interestingly, this argument was expressly rejected by the D.C. Circuit in *Duren v. First Government Mortg. and Investors Corp.*, 221 F.3d 195, No. 99-7026, 2000 U.S. App. LEXIS 15469, at *7 (June 7, 2000 C.A.D.C.) (holding that rescission is available after a refinancing).

### E.    This Civil Action is not Preempted by Federal Law

The federal Home Owners' Loan Act of 1933 ("HOLA") does not preempt the CPPA because it is a "law of general application [which] does not purport to specifically regulate lending activity." *Reyes v. Downey Savings and Loan Association, F.A.*, 541 F.Supp.2d 1108, 1114 (C.D. Cal. 2008).[4] In fact, the state law claims at issue here - - misrepresentation and unconscionability[5] - - fall squarely into area expressly not preempted by federal regulations implementing HOLA. *See* 12 C.F.R. § 560.2(c)(1), (4) (exempting contract commercial and tort claims from preemption). As Judge Posner recently explained in an analogous situation: "we read subsection (c) to mean that OTS's assertion of plenary regulatory authority does *not* deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." *In re Ocwen Loan Servicing, LLC Mortgage Servicing Litig.*, 491 F.3d 638, 643 (7th Cir. 2007) (emphasis added) (Posner, J.). Accordingly, the central question here is whether the Graves' claims under the CPPA's provisions regarding unconscionability essentially are "basic state common-law-type remedies." *Id.* As set forth below, the Graves' claims of unfairness are exactly the kind of remedies not preempted by federal law.

From the outset it is noteworthy that no decision of this Court or the D.C. Circuit has

---

[4] *Reyes* summarized the various scenarios in preemption analysis and the related outcomes: (1) claims arising under state laws that specifically apply to federal savings and loan activity are preempted; (2) "when plaintiffs rely on state laws of general application, but their claims are based on federal laws, then federal law preempts;"(3) "when plaintiffs rely on state laws of general application, their claims are preempted if the state laws, as applied to federal savings and loans, require affirmative action by the federal savings and loans." *Reyes*, 541 F. Supp. 2d at 1113.

[5] *See Lund v. Watergate Investors Ltd. Partnership*, 728 A.2d 77, 84-85 (D.C. 1999) (the CPPA codifies the District's common law unconscionability doctrine first articulated in *Williams v. Walker-Thomas Furniture, Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965).

specifically addressed the scope of preemption under HOLA or the OTS regulations.  However,

the D.C. Circuit, in addressing the preemptive effect of similar federal laws, has made clear that

preemption should not be allowed to trample state laws that apply to federally chartered financial

institutions but do not impede the operation of federal law:

> "[S]tates may regulate the operations of national banks so long as the regulation is not repugnant to federal law.  A state law limiting the operation of national banks is preempted by federal law and invalid under the Supremacy Clause of the Constitution only if the state law 'expressly conflicts with the laws of the United States, and either frustrates the purpose of national legislation or impairs the efficiency of [national banks] to discharge the duties, for the performance of which they were created.'" (citation omitted)).

*Indep. Cmty. Bankers Ass'n of S.D. v. Bd. of Governors of the Fed. Reserve Sys.*, 820 F.2d 428,

436 (D.C. Cir. 1987).

Generally, state statutes are *not* preempted unless the statutes were created to expressly

conflict with federal law or to regulate an area of law controlled by federal law; state statutes

having an incidental effect on federal law shall not be preempted.  *Id.* at 1112-1115; accord

*Ocwen*, 491 F.3d at 644 (explaining that HOLA does not preempt common law claims that sound

in contract and tort, including false representations); *Binetti v. Wash. Mut. Bank*, 446 F. Supp. 2d

217, 220-221 (S.D.N.Y. 2006) (New York State's deceptive acts and practices statute is not

preempted by HOLA; "[T]he question is whether any impact on lending operations is incidental

to the *statute's* primary purpose not whether the impact of the statute on a bank's lending

operation is 'incidental' . . .").[6]

Like the aforementioned consumer protection laws, the CPPA is not be preempted by

federal law because it was not written to address federal law, nor does it directly address an area

of law that has been reserved for federal regulation.  The CPPA simply protects consumers from

misrepresentations and unconscionable contracts as an outgrowth and codification of the

---

District's common law of unconscionability first articulated in *Williams v. Walker-Thomas Furniture Company,* 350 F.2d 445, 449 (D.C. Cir. 1965) (defining unconscionability as "absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party"). Moreover, the idea of a sophisticated federal savings bank profiting from complicated financial transactions with low-income, elderly, uneducated citizens, has been expressly discouraged by the *Interagency Guidance on Nontraditional Mortgage Product Risks* (the "Interagency Guidance.").[7] *See Federal Register,* Volume 71, Number 192, October 4, 2006, at pp. 58609-58618. A copy of the Interagency Guidance is attached hereto as Exhibit "3". The Interagency Guidance was issued by federal regulators to address their growing concerns that "some borrowers may not fully understand the risks of [nontraditional mortgage] products." *See* Interagency Guidance at 58609. The Payment Option ARM is one of these high risk financial products.

The Interagency Guidance is instructive because the Verified Complaint pleads that the Graves' refinancings, for which they seek rescission, fall within this category of complicated, nontraditional mortgage products which include "interest-only" mortgages" and "adjustable rate mortgages." *Id.,* at 58609 ("nontraditional mortgages allow borrowers to exchange lower payments during an initial periods for higher payments during a later amortization period."). When these complicated financial transactions are used, the Interagency Guidance recommends that the lender communicate with customers to help them make informed decisions and clearly disclose the effects of negative amortization and prepayment penalties. *See* Interagency Guidance at 58617.

Instead of ensuring that the customers understand the transaction, IndyMac's Motion

---

[7] The Interagency Guidance is attributed to the following agencies: Office of the Comptroller of the Currency, Treasury; Board of Governors of the Federal Reserve System; Federal Deposit Insurance corporation; Office of Thrift Supervision, Treasury; and National Credit Union Administration.

seeks to escape liability by hiding behind the fact that Savings First, LLC actually negotiated the loan with the Graves, even though IndyMac purchased the loan from Savings First, LLC, *immediately* after it was executed by the Graves and then serviced the loan for over two years thereafter. In situations like this, the Interagency Guidance advises the secondary lender to take the necessary steps including corrective measures to insure that the loans that they are purchasing comply with the consumer protection guidelines discussed in the Guidance. *See* Interagency Guidance at 58618.

It also is noteworthy that in dealing with similar challenges to the CPPA under comparable circumstances, the local courts of the District of Columbia have rejected arguments like those presented in Defendant IndyMac's Motion. Specifically, the D.C. Court of Appeals has condoned the use of the CPPA against federal lenders who engage in false or materially misleading business dealings with consumers. *See Washkoviah v. Student Loan Marketing Ass'n*, 849 A.2d 37, 38-39 (D.C. 2004) (allowing the amendment of a complaint to include the claim that a lender's misrepresentation violated the CPPA and was not preempted by federal law that prohibited a state from regulating loan disclosures). Similarly, the D.C. Superior Court rejected a similar Rule 12 motion involving preemption arguments under HOLA and the CPPA in *Homecomings Financial Network v. Nellie Sprow*, No. 2000-CA-007177, *slip op.* (D.C. Super. Ct. ordered Apr. 19, 2001). A copy of the Order in *Sprow* is attached hereto as Exhibit "4". In *Sprow*, a fixed income District senior sought to retain possession of her long-time home against unscrupulous lenders that were attempting to "evict" her. *See Sprow* Order at 1-2. In Sprow, like the claims here, the claim was not that any specific term violated District law, but rather that the loan was unconscionable under the CPPA because: (1) the lender had knowledge of no reasonable probability of repayment; (2) the customer was unable to receive substantial benefits

17

from the transaction; (3) the lender had knowingly taken advantage of the consumer's inability to

protect her interest (all indicia of unconscionability under D.C. Code Ann. § 28-3904(r)). See

Slip Op. at 4.

In *rejecting* HOLA preemption arguments against lenders in favor of CPPA enforcement,

the D.C. Superior Court observed:

> [The lender] argues that the [CPPA] under which Ms. Sprow is proceeding
> has been preempted by the Federal Home Owners Loan Act of 1933, 12
> U.S.C. §§ 1462 *et seq.* ("HOLA"), and regulations implementing it, 12
> C.F.R. § 560.2(a). Ms. Sprow's counterclaim does not claim that any
> specific lending terms is contrary to state law. Rather, it claims that one or
> more of the terms used in the loan were unconscionable because the lender
> (1) had knowledge [that] 'there was no reasonable probability of payment
> in full . . . (2) [had] knowledge [that] [the customer was unable] to receive
> substantial benefits from the property sold or leased;'. . . (3) has
> knowingly taken advantage of the inability of the consumer reasonably to
> protect [her] interests by reason of age, physical or mental infirmities [sic],
> ignorance, illiteracy, or inability to understand the language of the
> agreement.
>
> * * *
>
> An actual conflict occurs "when, 'compliance with both federal and state
> regulations is a physical impossibility,' or when state law 'stands as an
> obstacle to the accomplishment and execution of the full purposes and
> objectives of Congress.' *Goudreau v. Standard Fed. Sav. & Loan Ass'n.*,
> 51 A.2d 386, 389 (D.C. 1986). The Court notes again that Ms. Sprow
> does not claim any term itself violates state law.
>
> * * *
>
> Thus the [CPPA] does not prohibit lenders from using particular terms, or
> interfere with the uniform use of those terms by lenders within this
> jurisdiction, except in the particular circumstances addressed in the
> District statute. At this, the pleading stage, the Court cannot find an actual
> conflict. It is not impossible for a lender to comply with both the federal
> regulations and the [CPPA] and, give the limited circumstances in which
> the D.C. statute will be applied, the Court cannot perceive how the
> [CPPA] stands in the way of achievement of the purposes of the federal
> scheme to permit OTS, not the states, to determine what are the best
> lending practices in order to assure viability of federal savings and loan
> institutions and thus promote thrift and assure the availability of cash to
> finance homes. *See Fidelity Sav. & Loan Ass'n v. De LaCuesta*, 458 U.S.
> 141, 159-62 (1982).

\* \* \*

[The lender] appears to argue that the regulation contained an express intent to occupy the entire field of regulation of savings and loans. . . . Nevertheless, the regulation . . . expressly states that '[the state laws of the following types are *not* preempted to the extent they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a)' 12 C.F.R. § 560.2(c). *Two such laws mentioned are contract and commercial law. See 12 C.F.R. § 560.2(c). Both the District of Columbia common law of contracts and its commercial code recognize that a court should refuse to enforce an unconscionable contract. See Williams v. Walker-Thomas Furniture,* 121 U.S. App. D.C. 315; 350 F.2d 445 (1965); D.C. Code § 28:2-302.

\* \* \*

This Court is of the view that if Ms. Sprow can sustain a claim of unconscionability under that CPPA, and that same claim would be sufficient to prevent enforcement of a contract under either common law or the Uniform Commercial Code, she will have invoked a law that is *not* preempted because it would a law would be 'of [a] ... type' of a state law that is expressly not preempted under 12 C.F.R. § 560.2(a). *The Court is of the opinion that such a law would "only incidentally affect the lending operations of the lender]" and would not be inconsistent with [the federal regulations] because the [CPPA] does not regulate terms of the contracts themselves, but only the knowing use of such terms to take advantage of a person incompetent to understand the terms.*

*Homecomings Financial Network v. Nellie Sprow,* No. 2000-CA-007177, *slip op.* at 3 – 10 (D.C. Super. Ct. ordered Apr. 19, 2001).

In sum, the Graves' claims are not preempted by federal law.  The time-honored prohibitions on misrepresentation and unconscionability in the CPPA are common-law type claims that do not conflict with HOLA's purposes.  Federal law does not condone fraud or deceptive trade practices.  Consequently, Defendant IndyMac cannot use HOLA as a shield and sword to avoid liability for its unconscionable and deceptive mortgage lending practices. *Accord* Interagency Guidance at 58613-14.

## IV.    CONCLUSION.

For the foregoing reasons, plaintiffs Herman and Gracie Graves respectfully request that this Court enter an order denying Defendant IndyMac's Motion to Dismiss, together with such

other relief favoring the Graves as this Court deems proper.

Respectfully submitted,

/s/

Rawle Andrews Jr., Esq. (DC 436283)
AARP Legal Counsel for the Elderly
601 E Street, NW, Suite A4-410
Washington, DC 20049
Office: (202) 434-2158
Fax: (202) 434-6464
Email: RAndrews@aarp.org
*Attorneys for Plaintiffs*

Dated: August 4, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of *"Plaintiffs' Memorandum in Opposition to Defendant IndyMac's Motion to Dismiss"* was served on this 4th day of August 2008 via PACER electronic case filing system upon the following:

Andrew C. Bernasconi, Esq.
REED SMITH LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, D.C. 20005
Telephone: (202) 414-9200
Facsimile: (202) 414-9299
abernasconi@reedsmith.com
*Counsel for Defendant IndyMac Bank, FSB*

Catherine A. Bledsoe, Esq.
GORDON, FEINBLATT, ROTHMAN,
  HOFFBERGER & HOLLANDER
233 East Redwood Street
Baltimore, MD 21202
Telephone: (410) 576-4198
Facsimile: (410) 576-4246
cbledsoe@grflaw.com
*Counsel for Premier Financial Company*

John A. McCauley, Esq.
VENABLE LLP
750 East Pratt Street
Suite 900
Baltimore, MD 21202
Telephone: (410) 244-7400
Facsimile: (410) 244-7742
jamccauley@venable.com
*Counsel for Savings First Mortgage, LLC*

/s/

Rawle Andrews, Jr., Esq.
*Counsel for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HERMAN GRAVES, *et al.*,  )
)
)
        Plaintiffs,  )
) Civil Action No.: 1:08-CV-1140 (EGS)
    v.  )
)
AMERICAN BROKERS CONDUIT, *et al.*,  )
)
        Defendants.  )
)

## <u>ORDER DENYING MOTION TO DISMISS</u>

Upon consideration of Defendant IndyMac, F.S.B.'s Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), Plaintiffs' Herman and Gracie Graves' Memorandum in Opposition thereto and the record herein, it is hereby:

ORDERED that Defendant's Motion shall be, and hereby is, DENIED.

                                                _____
                                                Honorable Emmit G. Sullivan
                                                U.S. District Judge

Dated: _____

Copies to:

All Counsel of Record

# EXHIBIT "1"

Home > News & Events > Press Releases

## Press Releases

### FDIC Establishes IndyMac Federal Bank, FSB as Successor to IndyMac Bank, F.S.B., Pasadena, California

**Media Contact:**
**In Washington: Andrew Gray (202) 898-7192,**
**Cell: 202-494-1049**
**angray@fdic.gov**
**In California: David Barr**
**Cell: 703-622-4790**
**dbarr@fdic.gov**

**FOR IMMEDIATE RELEASE**
**July 11, 2008**

En Español

IndyMac Bank, F.S.B., Pasadena, CA, was closed today by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation (FDIC) was named conservator. The FDIC will transfer insured deposits and substantially all the assets of IndyMac Bank, F.S.B., Pasadena, CA, to IndyMac Federal Bank, FSB. Brokered deposits will be held by the FDIC and those insured deposits will be paid off when the insurance determination is complete. IndyMac Bank, FSB had total assets of $32.01 billion and total deposits of $19.06 billion as of March 31, 2008. As conservator, the FDIC will operate IndyMac Federal Bank, FSB to maximize the value of the institution for a future sale and to maintain banking services in the communities formerly served by IndyMac Bank, F.S.B.

Insured depositors and borrowers will automatically become customers of IndyMac Federal, FSB and will continue to have uninterrupted customer service and access to their funds by ATM, debit cards and writing checks in the same manner as before. Depositors of IndyMac Federal Bank, FSB will have no access to on-line and phone banking services this weekend. These services will be operational again on Monday. Loan customers should continue making loan payments as usual.

Beginning on Monday, July 14, IndyMac Federal Bank, FSB's 33 branches will observe normal operating hours and will continue to offer full banking services, including on-line banking. For additional information, the FDIC has established a toll-free number for customers of IndyMac Federal Bank, FSB. The toll-free number is 1-866-806-5919 and will operate today from 3:00 p.m. to 9:00 p.m. (PDT), and then daily from 8:00 a.m. to 8:00 p.m. thereafter, except Sunday, July 13, when the hours will be 8:00 a.m. to 6:00 p.m. Customers also may visit the FDIC's Web site at http://www.fdic.gov/bank/individual/failed/IndyMac.html for further information.

At the time of closing, IndyMac Bank, F.S.B. had about $1 billion of potentially uninsured deposits held by approximately 10,000 depositors. The FDIC will begin contacting customers with uninsured deposits to arrange an appointment with an FDIC claims agent on Monday. Customers can contact the FDIC for an appointment using the toll-free number above. The FDIC will pay uninsured depositors an advance dividend equal to 50 percent of the uninsured amount.

Based on preliminary analysis, the estimated cost of the resolution to the Deposit Insurance Fund is between $4 and $8 billion. IndyMac Bank, F.S.B. is the fifth FDIC-insured failure of the year. The last FDIC-insured failure in California was the Southern Pacific Bank, Torrance, on February 7, 2003.

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,494 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring

and addressing risks to which they are exposed.

FDIC press releases and other information are available on the Internet via the World Wide Web at www.fdic.gov and may also be obtained through the FDIC's Public Information Center 1-877-275-3342 or (703) 562-2200. **PR-56-2008**

Last Updated 7/14/2008

communications@fdic.gov

**Home    Contact Us    Search    Help    SiteMap    Forms**
Freedom of Information Act (FOIA) Service Center    Website Policies    USA.gov
FDIC Office of Inspector General

*Graves v. American Brokers Conduit, Et al.*, No. 1:08-CV-1140 (EGS)
**Plaintiff's Memorandum in Opposition to Defendant IndyMac's Motion to Dismiss**

# EXHIBIT "2"

LEXSEE 1992 U.S. DIST. LEXIS 2303

**ERNEST JACKSON, Plaintiff, v. AMERICAN SECURITY BANK, Defendant.**

**Civil Action No. 89-1704 (JHG)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

*1992 U.S. Dist. LEXIS 2303*

**February 26, 1992, Decided
February 26, 1992, Filed**

**JUDGES:** [*1]  GREEN

**OPINION BY:** JOYCE HENS GREEN

**OPINION**

*MEMORANDUM OPINION AND ORDER*

Plaintiff Ernest Jackson ("Jackson") initiated this action against the American Security Bank ("ASB"), alleging violations of the Truth in Lending Act ("TILA"), *15 U.S.C. §§ 1601 et seq.*, and the District of Columbia Consumer Protection Procedures Act ("CPPA"), *D.C. Code § 28-3904*, and conversion. Presently pending are defendants' motion to dismiss and motion for summary judgment. For the following reasons, Count I, alleging a federal cause of action, is dismissed with prejudice, and the remaining claims are dismissed without prejudice to renew in the Superior Court of the District of Columbia.

*I. BACKGROUND*

On July 15, 1985, Jackson entered into a Security Line American Express Gold Card Agreement with ASB, and on October 16, 1985, he entered into a $ 2,000 Ready-Reserve Loan Agreement, which established overdraft protection for his ASB checking account.

On April 30, 1986, Jackson also executed and delivered to ASB an Automobile Loan Note and Security Agreement in the principal sum of $ 6,785.28. Pursuant to the Note and Security Agreement, Jackson granted ASB a security interest in a 1979 BMW, Serial No. 5340989,  [*2]  to protect ASB in the event of "default on this or on any other present or future debt" to ASB. Exhibit A ("Def. Exh. A") to Defendant's Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted and Lack of Subject Matter Jurisdiction ("Def. Motion to Dismiss").

Although the Agreement explicitly provided that Jackson "must maintain property insurance on any Collateral for its full insurable value," [1] plaintiff failed to maintain the property insurance on the BMW. Consequently, ASB purchased an insurance policy covering the collateral and posted the cost of the insurance to plaintiff's loan. Jackson accepted and concurred in the foregoing insurance agreement. See Complaint, P.4.

1 Def. Exh. A.

Jackson had an automobile accident in which the BMW was damaged. After subtracting the $ 175.00 deductible, the insurance company submitted to ASB a check in the amount of $ 555.22 to cover the costs of repairs to ASB's collateral. ASB, however, credited the $ 555.22 to the auto loan, rather than  [*3]  refunding the money directly to the plaintiff.

1992 U.S. Dist. LEXIS 2303, *

In July and August, 1988, Jackson failed to make his monthly installment payments on both the Security Line and Ready-Reserve Account. On August 22, 1988, ASB contends that it informed Jackson that if he failed to pay within ten days the past due balance for his Security Line and Ready-Reserve Account, ASB would repossess the 1979 BMW.

On September 27, 1988, ASB mailed a Notice of Repossession advising Jackson that he could cure his monetary default if he paid $ 348.87 to bring the accounts current. The letter further advised plaintiff that if he failed to redeem, the BMW would be offered for sale at public auction. Plaintiff contends that he never received the letter and that he had been told by a representative of ASB that he had to, instead, pay the entire sum due on the three loans.

The BMW was eventually sold at auction, leaving a small deficiency balance. Plaintiff alleges that the bank has neither accounted for the proceeds of sale nor declared any deficiency.

*I. DISCUSSION*

In viewing a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove [*4] no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson, 355 U.S. 41, 45-46 (1957)*. The factual allegations of the complaint must be presumed true and liberally construed in favor of plaintiff. *Shear v. National Rifle Association, 606 F.2d 1251, 1253 (D.C. Cir. 1979)*; 5A C. Wright & A. Miller, Federal Practice and Procedure, § 1357, p. 304 (1990). The plaintiff is entitled to all favorable inferences which may be drawn from those allegations. *Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)*.

In contrast, summary judgment is appropriate when there is "no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "The inquiry performed is the threshold inquiry of determining whether there is a need for trial--whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)*. In considering a motion for summary judgment, the "evidence [*5] of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id. at 255*. At the same time, however, *Rule 56* places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)*.

In Count I of his complaint, Jackson appears to argue that ASB violated TILA by failing to provide him with revised disclosure documents containing written affirmation of the increased loan amount, and added interest charged, resulting from the addition of the insurance premium to the loan balance, and by failing to give him the insurance proceeds in cash upon his demand. Specifically, he alleges that ASB violated *12 C.F.R. §§ 226.8, 226.9, and 226.10*, which set forth the disclosure requirements for open-end credit transactions, i.e., plans "in which credit terms are initially established with the opening of the account, but no fixed amount of debt is incurred at that time." [2]

> 2  *Goldman v. First National Bank of Chicago, 532 F.2d 10, 17 n. 11 (7th Cir.)*, cert. denied, *429 U.S. 870 (1976)*. The regulations define open-end credit as
>
> consumer credit extended by a creditor under a plan in which:
>
> (i) The creditor reasonably contemplates repeated transactions;
>
> (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and
>
> (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid.
>
> *12 C.F.R. § 226.2(a)(20)*.

[*6] Plaintiff fails to recognize, however, that the Note and Security Agreement involve a closed-end credit transaction. [3] Specifically, the Agreement involves fixed payments for a fixed period of time. Therefore, the regulations concerning disclosure requirements for open-end credit transactions, which were referenced by Jackson in his pleadings, do not apply.

> 3  The regulations define closed-end credit as "consumer credit other than open-end credit as defined in this section." *12 C.F.R. § 226.2(a)(10)*.

1992 U.S. Dist. LEXIS 2303, *

Under the regulations governing closed-end transactions, the addition of the insurance premium to the loan balance is not an event requiring ASB to issue revised disclosures. New disclosures are only required "if a disclosure becomes inaccurate because of an event that occurs after the creditor delivers the required disclosures," [4] and the annual percentage rate is affected by the subsequent event or a refinancing is involved. *12 C.F.R. §§ 226.17(e), 226.19, 226.20.* In the instant case, the annual percentage rate [*7] was not affected by the addition of the insurance premium to the loan balance. Similarly, a refinancing, in which an existing obligation was satisfied and replaced by a new obligation, [5] was not involved here. Rather, the cost of the loan premium was simply added to the balance of the existing loan. Because the transaction at issue falls squarely within the exception for disclosure, no new written disclosures were required, and judgment shall be entered in favor of ASB as to Count I. [6]

4   *12 C.F.R. § 226.17(e).*
5   See *12 C.F.R. § 226.20(a).*
6   While Jackson maintains that the insurance proceeds should have been returned to him upon demand rather than credited to his account, he cites no authority for his position.

In Count II of his complaint, plaintiff alleges that ASB violated the CPPA by claiming an after-acquired security interest in his BMW, by purchasing insurance coverage for plaintiff's car, and by charging plaintiff for those additional costs. It is unclear, however, whether ASB is even subject [*8] to the CPPA.

The caselaw is explicit that the CPPA was designed to police trade practices arising only out of consumer-merchant relationships. *Howard v. Riggs National Bank, 432 A.2d 701, 709 (D.C. App. 1981).* The Act contemplates complaints against "merchants" who "supply the goods or services which are or would be the subject matter of a trade practice." *CPPA § 2(a)(3).* While a merchant is not limited to the actual seller of the goods or services complained of, "he must be a 'person' connected with the 'supply' side of a consumer transaction." *Howard, 432 A.2d at 709.*

In the instant action, the question of whether ASB is connected with the supply side of a consumer transaction depends on whether the transaction is viewed as one for the purchase of a car or as one for the purchase of consumer credit. [7] If the Court were to consider the loan a transaction for the purchase of a car, then ASB is not a "merchant" for purposes of the CPPA, for it is on the demand side of the transaction. If, however, the Court were to view the loan as a transaction for consumer credit, then ASB might well be considered a merchant of that credit.

7   Under the CPPA, consumer credit is a "good" or "service." *D.C. Code § 28-3901.*

[*9] The District of Columbia Court of Appeals has not yet addressed the applicability of the CPPA to loans of this type. Moreover, it appears that the issue of whether banks can be held liable under the CPPA in connection with loan notes and security agreements could have a tremendous impact on innumerable banks and District of Columbia residents who have entered into agreements of this type. "Because there are important questions of law, which the local court should decide in the first instance, and because the certification process is not the appropriate vehicle for securing such a determination," [8] Count II and Count III shall be dismissed without prejudice to renew in the Superior Court of the District of Columbia.

8   3307 M Street Partners v. Commonwealth Land Title Insurance Company, No. 91-2994, slip op. at 6 (D.D.C. January 21, 1992).

*III. CONCLUSION*

Accordingly, for the reasons expressed above, it is hereby

ORDERED that judgment is entered in favor of the defendant as to Count I; it is

FURTHER ORDERED [*10] that Count II and Count III are dismissed without prejudice to renew in the Superior Court of the District of Columbia.

IT IS SO ORDERED.

February 26, 1992.

JOYCE HENS GREEN

United States District Judge

1992 U.S. Dist. LEXIS 2303, *

*JUDGMENT* - February 26, 1992, Filed

In accordance with the Memorandum Opinion and Order issued this date, judgment as to Count I of plaintiff's complaint is hereby entered in favor of defendant American Security Bank and against plaintiff Ernest Jackson.

IT IS SO ORDERED.

February 26, 1992.

JOYCE HENS GREEN

United States District Judge

*Graves v. American Brokers Conduit, Et al.*, No. 1:08-CV-1140 (EGS)
**Plaintiff's Memorandum in Opposition to Defendant IndyMac's Motion to Dismiss**

# EXHIBIT "3"

7. To determine whether Terry Keith Hammond willfully and/or repeatedly violated § 73.1015 of the Commission's rules by failing to provide full and complete responses and documents as directed by letters of inquiry issued by the staff of the Enforcement Bureau on June 14, 2004, and August 10, 2004; and

8. To determine, in light of the evidence adduced pursuant to the foregoing designated issues, whether the captioned application for renewal of the license for Station KBKH(FM) should be granted, or denied.

Copies of the Order to Show Cause, Notice of Opportunity for Hearing, and Hearing Designation Order are being sent by certified mail, return receipt requested, to Terry Keith Hammond. To avail himself of the opportunity to be heard, Terry Keith Hammond, pursuant to § 1.91(c) and § 1.221 of the Commission's rules, 47 CFR 1.91(c) and 47 CFR 1.221, in person or by his attorney, must within 30 days of the release of this Order, file in triplicate a written notice of appearance stating an intention to appear on the date fixed for the hearing and present evidence on the issues specified in this Order. Terry Keith Hammond pursuant to § 73.3594 of the Commission's rules, 47 CFR 73.3594, shall give notice of the hearing within the time and in the manner prescribed in 47 CFR 73.3594, and shall advise the Commission of the publication of such notice as required by 47 CFR 73.3594(g).

Federal Communications Commission.

**Marlene H. Dortch,**

*Secretary.*

[FR Doc. E6–16217 Filed 10–3–06; 8:45 am]

**BILLING CODE 6712–01–P**

**DEPARTMENT OF THE TREASURY**

**Office of the Comptroller of the Currency**

[Docket No. 06–11]

**BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM**

[Docket No. OP–1246]

**FEDERAL DEPOSIT INSURANCE CORPORATION**

**DEPARTMENT OF THE TREASURY**

**Office of Thrift Supervision**

[No. 2006–35]

**NATIONAL CREDIT UNION ADMINISTRATION**

**Interagency Guidance on Nontraditional Mortgage Product Risks**

**AGENCIES:** Office of the Comptroller of the Currency, Treasury (OCC); Board of Governors of the Federal Reserve System (Board); Federal Deposit Insurance Corporation (FDIC); Office of Thrift Supervision, Treasury (OTS); and National Credit Union Administration (NCUA).

**ACTION:** Final guidance.

**SUMMARY:** The OCC, Board, FDIC, OTS, and NCUA (the Agencies), are issuing final Interagency Guidance on Nontraditional Mortgage Product Risks (guidance). This guidance has been developed to clarify how institutions can offer nontraditional mortgage products in a safe and sound manner, and in a way that clearly discloses the risks that borrowers may assume.

**FOR FURTHER INFORMATION CONTACT:**
*OCC:* Gregory Nagel, Credit Risk Specialist, Credit and Market Risk, (202) 874–5170; or Michael S. Bylsma, Director, or Stephen Van Meter, Assistant Director, Community and Consumer Law Division, (202) 874–5750.

*Board:* Brian Valenti, Supervisory Financial Analyst, (202) 452–3575; or Virginia Gibbs, Senior Supervisory Financial Analyst, (202) 452–2521; or Sabeth I. Siddique, Assistant Director, (202) 452–3861, Division of Banking Supervision and Regulation; Kathleen C. Ryan, Counsel, Division of Consumer and Community Affairs, (202) 452–3667; or Andrew Miller, Counsel, Legal Division, (202) 452–3428. For users of Telecommunications Device for the Deaf ("TDD") only, contact (202) 263–4869.

*FDIC:* Suzy S. Gardner, Examination Specialist, (202) 898–3640, or April Breslaw, Chief, Compliance Section,

(202) 898–6609, Division of Supervision and Consumer Protection; or Ruth R. Amberg, Senior Counsel, (202) 898–3736, or Richard Foley, Counsel, (202) 898–3784, Legal Division.

*OTS:* William Magrini, Senior Project Manager, Examinations and Supervision Policy, (202) 906–5744; or Fred Phillips-Patrick, Director, Credit Policy, (202) 906–7295; or Glenn Gimble, Senior Project Manager, Compliance and Consumer Protection, (202) 906–7158.

*NCUA:* Cory Phariss, Program Officer, Examination and Insurance, (703) 518–6618.

**SUPPLEMENTARY INFORMATION:**

**I. Background**

The Agencies developed this guidance to address risks associated with the growing use of mortgage products that allow borrowers to defer payment of principal and, sometimes, interest. These products, referred to variously as "nontraditional", "alternative", or "exotic" mortgage loans (hereinafter referred to as nontraditional mortgage loans), include "interest-only" mortgages and "payment option" adjustable-rate mortgages. These products allow borrowers to exchange lower payments during an initial period for higher payments during a later amortization period.

While similar products have been available for many years, the number of institutions offering them has expanded rapidly. At the same time, these products are offered to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgages. The Agencies are concerned that some borrowers may not fully understand the risks of these products. While many of these risks exist in other adjustable-rate mortgage products, the Agencies concern is elevated with nontraditional products because of the lack of principal amortization and potential for negative amortization. In addition, institutions are increasingly combining these loans with other features that may compound risk. These features include simultaneous second-lien mortgages and the use of reduced documentation in evaluating an applicant's creditworthiness.

In response to these concerns, the Agencies published for comment proposed Interagency Guidance on Nontraditional Mortgage Products, 70 FR 77249 (Dec. 29, 2005). The Agencies proposed guidance in three primary areas: "Loan Terms and Underwriting Standards", "Portfolio and Risk Management Practices", and "Consumer Protection Issues". In the first section, the Agencies sought to ensure that loan terms and underwriting standards for

nontraditional mortgage loans are consistent with prudent lending practices, including credible consideration of a borrower's repayment capacity. The portfolio and risk management practices section outlined the need for strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses (ALLL) that reflects the collectibility of the portfolio. Finally, the consumer protection issues section recommended practices to ensure consumers have clear and balanced information prior to making a product choice. Additionally, this section described control systems to ensure that actual practices are consistent with policies and procedures.

The Agencies together received approximately 100 letters in response to the proposal.[1] Comments were received from financial institutions, trade associations, consumer and community organizations, state financial regulatory organizations, and other members of the public.

**II. Overview of Public Comments**

The Agencies received a full range of comments. Some commenters applauded the Agencies' initiative in proposing the guidance, while others questioned whether guidance is needed.

A majority of the depository institutions and industry groups that commented stated that the guidance is too prescriptive. They suggested institutions should have more flexibility in determining appropriate risk management practices. A number observed that nontraditional mortgage products have been offered successfully for many years. Others opined that the guidance would stifle innovation and result in qualified borrowers not being approved for these loans. Further, many questioned whether the guidance is an appropriate mechanism for addressing the Agencies' consumer protection concerns.

A smaller subset of commenters argued that the guidance does not go far enough in regulating or restricting nontraditional mortgage products. These commenters included consumer organizations, individuals, and several community bankers. Several stated these products contribute to speculation and unsustainable appreciation in the housing market. They expressed concern that severe problems will occur if and when there is a downturn in the economy. Some also argued that these products are harmful to borrowers and

that borrowers may not understand the associated risks.

Many commenters voiced concern that the guidance will not apply to all lenders, and thus federally regulated financial institutions will be at a competitive disadvantage. The Agencies note that both State financial regulatory organizations that commented on the proposed guidance—the Conference of State Bank Supervisors (CSBS) and the State Financial Regulators Roundtable (SFRR)—committed to working with State regulatory agencies to distribute guidance that is similar in nature and scope to the financial service providers under their jurisdictions.[2] These commenters noted their interest in addressing the potential for inconsistent regulatory treatment of lenders based on whether or not they are supervised solely by state agencies. Subsequently, the CSBS, along with a national organization representing state residential mortgage regulators, issued a press release confirming their intent to offer guidance to State regulators to apply to their licensed residential mortgage brokers and lenders.[3]

**III. Final Joint Guidance**

The Agencies made a number of changes to the proposal to respond to commenters' concerns and to provide additional clarity. Significant comments on the specific provisions of the proposed guidance, the Agencies'' responses, and changes to the proposed guidance are discussed as follows.

*Scope of the Guidance*

Many financial institution and trade group commenters raised concerns that the proposed guidance did not

adequately define "nontraditional mortgage products". They requested clarification of which products would be subject to enhanced scrutiny. Some suggested that the guidance focus on products that allow negative amortization, rather than interest-only loans. Others suggested excluding certain products with nontraditional features, such as reverse mortgages and home equity lines of credit (HELOCs). Those commenting on interest-only loans noted that they do not present the same risks as products that allow for negative amortization. Those that argued that HELOCs should be excluded noted that they are already covered by interagency guidance issued in 2005. They also noted that the principal amount of these loans is generally lower than that for first mortgages. As for reverse mortgages, the commenters pointed out that they were developed for a specific market segment and do not present the same concerns as products mentioned in the guidance.

To address these concerns, the Agencies are clarifying the types of products covered by the guidance. In general, the guidance applies to all residential mortgage loan products that allow borrowers to defer repayment of principal or interest. This includes all interest-only products and negative amortization mortgages, with the exception of HELOCs. The Agencies decided not to include HELOCs in this guidance, other than as discussed in the Simultaneous Second-Lien Loans section, since they are already covered by the May 2005 Interagency *Credit Risk Management Guidance for Home Equity Lending.* The Agencies are amending the May 2005 guidance, however, to address the consumer disclosure recommendations included in the nontraditional mortgage guidance.

The Agencies decided against focusing solely on negative amortization products. Many of the interest-only products pose risks similar to products that allow negative amortization, especially when combined with high leverage and reduced documentation. Accordingly, they present similar concerns from a risk management and consumer protection standpoint. The Agencies did, however, agree that reverse mortgages do not present the types of concerns that are addressed in the guidance and should be excluded.

*Loan Terms and Underwriting Standards*

Qualifying Borrowers

The Agencies proposed that for all nontraditional mortgage products, the analysis of borrowers' repayment

---

[1] Nine of these letters requested a thirty-day extension of the comment period, which the Agencies granted.

[2] Letter to J. Johnson, Board Secretary, *et al.* from N. Milner, President & CEO, Conference of State Bank Supervisors (Feb. 14, 2006); Letter to J. Johnson, Board Secretary, *et al.*, from B. Kent, Chair, State Financial Regulators Roundtable.

[3] Media Release, CSBS & American Association of Residential Mortgage Regulators, "CSBS and AARMR Consider Guidance on Nontraditional Mortgage Products for State-Licensed Entities" (June 7, 2006), available at *http://www.csbs.org/Content/NavigationMenu/PublicRelations/PressReleases/News_Releases.htm.* The press release stated:

The guidance being developed by CSBS and AARMR is based upon proposed guidance issued in December 2005 by the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration.

The Federal guidance, when finalized, will only apply to insured financial institutions and their affiliates. CSBS and AARMR intend to develop a modified version of the guidance which will primarily focus on residential mortgage underwriting and consumer protection. The guidance will be offered to State regulators to apply to their licensed residential mortgage brokers and lenders.

capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. In addition, the proposed guidance stated that for products that permit negative amortization, the repayment analysis should include the initial loan amount plus any balance increase that may accrue from negative amortization. The amount of the balance increase is tied to the initial terms of the loan and estimated assuming the borrower makes only the minimum payment.

Generally, banks and industry groups believed that the proposed underwriting standards were too prescriptive and asked for more flexibility. Consumer groups generally supported the proposed underwriting standards, warning that deteriorating underwriting standards are bad for individual borrowers and poor public policy.

A number of commenters suggested that industry practice is to underwrite payment option adjustable-rate mortgages at the fully indexed rate, assuming a worst-case scenario. Yet several commenters argued that this standard should not be required when risks are adequately mitigated. Moreover, many commenters opposed assuming a fully amortizing payment for interest-only loans with extended interest-only periods. They argued that the average life span of most mortgage loans makes it unlikely that many borrowers will experience the higher payments associated with amortization. Additionally, many commenters opposed the assumption of minimum payments during the deferral period for products that permit negative amortization on the ground that this assumption suggests that lenders assume a worst-case scenario.

The Agencies believe that institutions should maintain qualification standards that include a credible analysis of a borrower's capacity to repay the full amount of credit that may be extended. That analysis should consider both principal and interest at the fully indexed rate. Using discounted payments in the qualification process limits the ability of borrowers to demonstrate sufficient capacity to repay under the terms of the loan. Therefore, the proposed general guideline of qualifying borrowers at the fully indexed rate, assuming a fully amortizing payment, including potential negative amortization amounts, remains in the final guidance.

Regarding interest-only loans with extended interest-only periods, the Agencies note that since the average life of a mortgage is a function of the housing market and interest rates, the average may fluctuate over time. Additionally, the Agencies were concerned that excluding these loans from the underwriting standards could cause some creditors to change their market offerings to avoid application of the guidance. Accordingly, the final guidance does not exclude interest-only loans with extended interest-only periods.

Finally, regarding the assumption for the amount that the balance may increase due to negative amortization, the Agencies have revised the language to respond to commenters' requests for clarity. The basic standard, however, remains unchanged. The Agencies expect a borrower to demonstrate the capacity to repay the full loan amount that may be advanced.[4] This includes the initial loan amount plus any balance increase that may accrue from the negative amortization provision. The final document contains guidance on determining the amount of any balance increase that may accrue from the negative amortization provision, which does not necessarily equate to the full negative amortization cap for a particular loan.

The Agencies requested comment on whether the guidance should address consideration of future income or other future events in the qualification standards. The commenters generally agreed that there is no reliable method for considering future income or other future events in the underwriting process. Accordingly, the Agencies have not modified the guidance to address these issues.

Collateral-Dependent Loans

Commenters that specifically addressed this aspect of the guidance concurred that it is unsafe and unsound to rely solely on an individual borrower's ability to sell or refinance once amortization commences. However, many expressed concern about the possibility that the term "collateral-dependent", as it is used in the guidance, would be interpreted to apply to stated income and other reduced documentation loans.

To address this concern, the Agencies provided clarifying language in a footnote to this section. The final guidance provides that a loan will not be determined to be collateral-dependent solely because it was underwritten using reduced documentation.

Risk Layering

Financial institution and industry group commenters were generally critical of the risk layering provisions of the proposed guidance on the grounds that they were too prescriptive. These commenters argued that institutions should have flexibility in determining factors that mitigate additional risks presented by features such as reduced documentation and simultaneous second-lien loans. A number of commenters, however, including community and consumer organizations, financial institutions, and industry associations, suggested that reduced documentation loans should not be offered to subprime borrowers. Others questioned whether stated income loans are appropriate under any circumstances, when used with nontraditional mortgage products, or when used for wage earners who can readily provide standard documentation of their wages. Several commenters argued that simultaneous second-lien loans should be paired with nontraditional mortgage loans only when borrowers will continue to have substantial equity in the property.

The Agencies believe that the guidance provides adequate flexibility in the methods and approaches to mitigating risk, with respect to risk layering. While the Agencies have not prohibited any of the practices discussed, the guidance uniformly suggests strong quality control and risk mitigation factors with respect to these practices.

The Agencies declined to provide guidance recommending reduced documentation loans be limited to any particular set of circumstances. The final guidance recognizes that mitigating factors may determine whether such loans are appropriate but reminds institutions that a credible analysis of both a borrower's willingness and ability to repay is consistent with sound and prudent lending practices. The final guidance also cautions that institutions generally should be able to readily document income for wage earners through means such as W–2 statements, pay stubs, or tax returns.

*Portfolio and Risk Management Practices*

Many financial institution and industry group commenters opposed provisions of the proposed guidance for the setting of concentration limits. Some commenters advocated active monitoring of concentrations of diversification strategies as more

---

[4] This is similar to the standard in the Agencies' May 2005 *Credit Risk Management Guidance for Home Equity Lending* recommending that, for interest-only and variable rate HELOCs, borrowers should demonstrate the ability to amortize the fully drawn line over the loan term.

appropriate approaches. The intent of the guidance was not to set hard concentration limits for nontraditional mortgage products. Instead, institutions with concentrations in these products should have well-developed monitoring systems and risk management practices. The guidance was clarified to reiterate this point.

Additionally, a number of financial institution and industry association commenters opposed the provisions regarding third-party originations. They argued that the proposal would force lenders to have an awareness and control over third-party practices that is neither realistic nor practical. In particular, many of these commenters argued that lenders should not be responsible for overseeing the marketing and borrower disclosure practices of third parties.

Regarding controls over third-party practices, the Agencies clarified their expectations that institutions should have strong systems and controls for establishing and maintaining relationships with third parties. Reliance on third-party relationships can significantly increase an institution's risk profile. The guidance, therefore, emphasizes the need for institutions to exercise appropriate due diligence prior to entering into a third-party relationship and to provide ongoing, effective oversight and controls. In practice, an institution's risk management system should reflect the complexity of its third-party activities and the overall level of risk involved.

A number of commenters urged the Agencies to remove language in the proposed guidance relating to implicit recourse for loans sold in the secondary market. They expressed concern that the proposal added new capital requirements. The Agencies clarified the language in the guidance addressing this issue. The Agencies do not intend to establish new capital requirements. Instead, the Agencies' intent is to reiterate existing guidelines regarding implicit recourse in the Agencies' risk-based capital rules.

*Consumer Protection Issues*

Communications With Consumers

Many financial institution and trade group commenters suggested that the Agencies' consumer protection goals would be better accomplished through generally applicable regulations, such as Regulation Z (Truth in Lending)[5] or Regulation X (Real Estate Settlement Procedures).[6] Some commenters stated that the proposed guidance would add

burdensome new disclosure requirements and cause a confusing overlap with current Regulation Z requirements. They also expressed concern that the guidance would contribute to an overload of information currently provided to consumers. Additionally, some argued that implementing the disclosure provisions might trigger Regulation Z requirements concerning advertising.[7] Some commenters also urged the Agencies to adopt model disclosure forms or other descriptive materials to assist in compliance with the guidance.

Some commenters voiced concern that the Agencies are attempting to establish a suitability standard similar to that used in the securities context. These commenters argued that lenders are not in a position to determine which products are most suitable for borrowers, and that this decision should be left to borrowers themselves.

Finally, several community and consumer organization commenters questioned whether additional disclosures are sufficient to protect borrowers and suggested various additional measures, such as consumer education and counseling.

The Agencies carefully considered the commenters' argument that consumer protection issues—particularly, disclosures—would be better addressed through generally applicable regulations. The Agencies determined, however, that given the growth in this market, guidelines are needed now to ensure that consumers will receive the information they need about the material features of nontraditional mortgages as soon as possible.

The Agencies also gave careful consideration to the commenters' concerns that the guidelines will overlap with Regulation Z, add to the disclosure burden on lenders, and contribute to information overload. While the Agencies are sensitive to these concerns, we do not believe they warrant significant changes to the guidance. The guidance focuses on providing information to consumers during the pre-application shopping phase and post-closing with any monthly statements lenders choose to provide to consumers. Moreover, the Agencies do not anticipate that the information outlined in the guidance will result in additional lengthy disclosures. Rather, the Agencies contemplate that the information can be provided in brief narrative format and through the use of examples based on

hypothetical loan transactions.[8] We have, however, revised the guidance to make clear that transaction-specific disclosures are not required. Institutions will still need to ensure that their marketing materials promoting their products comply with Regulation Z, as applicable.

As previously discussed, some commenters, including industry trade associations, asked the Agencies to include model or sample disclosures or other descriptive materials as part of the guidance to assist lenders, including smaller institutions, in following the recommended practices for communications with consumers. The Agencies have determined not to include required model or sample disclosures in the guidance. Instead, the guidance provides a set of recommended practices to assist institutions in addressing particular risks raised by nontraditional mortgage products.

The Agencies have determined that it is desirable to first seek public comment on potential model disclosures, and in a **Federal Register** notice accompanying this guidance are seeking comment on proposed illustrations of consumer information for nontraditional mortgage products that are consistent with the recommendations contained in the guidance. The Agencies appreciate that some institutions, including community banks, following the recommendations set forth in the guidance may prefer not to incur the costs and other burdens of developing their own consumer information documents. The Agencies are, therefore, requesting comment on illustrations of the type of information contemplated by the guidance.

The Agencies disagree with the commenters who expressed concern that the guidance appears to establish a suitability standard, under which lenders would be required to assist borrowers in choosing products that are suitable to their needs and circumstances. It was not the Agencies' intent to impose such a standard, nor is there any language in the guidance that does so. In any event, the Agencies have revised certain statements in the proposed guidance that could have been interpreted to suggest a requirement to ensure that borrowers select products appropriate to their circumstances.

Control Systems

Several commenters requested more flexibility in designing appropriate control systems. The Agencies have

---

[5] 12 CFR part 226 (2006).
[6] 24 CFR part 3500 (2005).

[7] See 12 CFR part 226.24(c) (2006).

[8] See elsewhere in today's issue of the **Federal Register**. (Proposed Illustrations of Consumer Information for Nontraditional Mortgage Products).

revised the "Control Systems" portion of the guidance to clarify that we are not requiring any particular means of monitoring adherence to an institution's policies, such as call monitoring or mystery shopping. Additional changes have also been made to clarify that the Agencies do not expect institutions to assume an unwarranted level of responsibility for the actions of third parties. Rather, the control systems that are expected for loans purchased from or originated through third parties are consistent with the Agencies' current supervisory policies. As previously discussed, the Agencies have also made changes to the portfolio and risk management practices portion of the final guidance to clarify their expectations concerning oversight and monitoring of third-party originations.

## IV. Text of Final Joint Guidance

The text of the final Interagency Guidance on Nontraditional Mortgage Product Risks follows:



### Interagency Guidance on Nontraditional Mortgage Product Risks

Residential mortgage lending has traditionally been a conservatively managed business with low delinquencies and losses and reasonably stable underwriting standards. In the past few years consumer demand has been growing, particularly in high priced real estate markets, for closed-end residential mortgage loan products that allow borrowers to defer repayment of principal and, sometimes, interest. These mortgage products, herein referred to as nontraditional mortgage loans, include such products as "interest-only" mortgages where a borrower pays no loan principal for the first few years of the loan and "payment option" adjustable-rate mortgages (ARMs) where a borrower has flexible payment options with the potential for negative amortization.[1]

While some institutions have offered nontraditional mortgages for many years with appropriate risk management and sound portfolio performance, the market for these products and the number of institutions offering them has expanded rapidly. Nontraditional mortgage loan products are now offered by more lenders to a wider spectrum of borrowers who may not otherwise qualify for more traditional mortgage loans and may not fully understand the associated risks.

Many of these nontraditional mortgage loans are underwritten with less stringent income and asset verification requirements ("reduced documentation") and are increasingly combined with simultaneous second-lien loans.[2] Such risk layering, combined with the broader marketing of nontraditional mortgage loans, exposes financial institutions to increased risk relative to traditional mortgage loans.

Given the potential for heightened risk levels, management should carefully consider and appropriately mitigate exposures created by these loans. To manage the risks associated with nontraditional mortgage loans, management should:
• Ensure that loan terms and underwriting standards are consistent with prudent lending practices, including consideration of a borrower's repayment capacity;
• Recognize that many nontraditional mortgage loans, particularly when they have risk-layering features, are untested in a stressed environment. As evidenced by experienced institutions, these products warrant strong risk management standards, capital levels commensurate with the risk, and an allowance for loan and lease losses that reflects the collectibility of the portfolio; and
• Ensure that consumers have sufficient information to clearly understand loan terms and associated risks prior to making a product choice.

The Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System (Board), the Federal Deposit Insurance Corporation (FDIC), the Office of Thrift Supervision (OTS) and the National Credit Union Administration (NCUA) (collectively, the Agencies) expect institutions to effectively assess and manage the risks associated with nontraditional mortgage loan products.[3]

Institutions should use this guidance to ensure that risk management practices adequately address these risks. The Agencies will carefully scrutinize risk management processes, policies, and procedures in this area. Institutions that do not adequately manage these risks will be asked to take remedial action.

The focus of this guidance is on the higher risk elements of certain nontraditional mortgage products, not the product type itself. Institutions with sound underwriting, adequate risk management, and acceptable portfolio performance will not be subject to criticism merely for offering such products.

### Loan Terms and Underwriting Standards

When an institution offers nontraditional mortgage loan products, underwriting standards should address the effect of a substantial payment increase on the borrower's capacity to repay when loan amortization begins. Underwriting standards should also comply with the agencies' real estate lending standards and appraisal regulations and associated guidelines.[4]

Central to prudent lending is the internal discipline to maintain sound loan terms and underwriting standards despite competitive pressures. Institutions are strongly cautioned against ceding underwriting standards to third parties that have different business objectives, risk tolerances, and core competencies. Loan terms should be based on a disciplined analysis of potential exposures and compensating factors to ensure risk levels remain manageable.

*Qualifying Borrowers*—Payments on nontraditional loans can increase significantly when the loans begin to amortize. Commonly referred to as payment shock, this increase is of particular concern for payment option ARMs where the borrower makes minimum payments that may result in negative amortization. Some institutions manage the potential for excessive negative amortization and payment shock by structuring the initial terms to limit the spread between the introductory interest rate and the fully indexed rate. Nevertheless, an institution's qualifying standards should recognize the potential impact of payment shock, especially for borrowers

---

[1] Interest-only and payment option ARMs are variations of conventional ARMs, hybrid ARMs, and fixed rate products. Refer to the Appendix for additional information on interest-only and payment option ARM loans. This guidance does not apply to reverse mortgages; home equity lines of credit ("HELOCs"), other than as discussed in the Simultaneous Second-Lien Loans section; or fully amortizing residential mortgage loan products.

[2] Refer to the Appendix for additional information on reduced documentation and simultaneous second-lien loans.

[3] Refer to Interagency Guidelines Establishing Standards for Safety and Soundness. For each Agency, those respective guidelines are addressed in: 12 CFR part 30 Appendix A (OCC); 12 CFR part 208 Appendix D–1 (Board); 12 CFR part 364 Appendix A (FDIC); 12 CFR part 570 Appendix A (OTS); and 12 U.S.C. 1786 (NCUA).

[4] Refer to 12 CFR part 34—Real Estate Lending and Appraisals, OCC Bulletin 2005–3—Standards for National Banks' Residential Mortgage Lending, AL 2003–7—Guidelines for Real Estate Lending Policies and AL 2003–9—Independent Appraisal and Evaluation Functions (OCC); 12 CFR 208.51 subpart E and Appendix C and 12 CFR part 225 subpart G (Board); 12 CFR part 365 and Appendix A, and 12 CFR part 323 (FDIC); 12 CFR 560.101 and Appendix and 12 CFR part 564 (OTS). Also, refer to the 1999 Interagency Guidance on the "Treatment of High LTV Residential Real Estate Loans" and the 1994 "Interagency Appraisal and Evaluation Guidelines." Federally Insured Credit Unions should refer to 12 CFR part 722—Appraisals and NCUA 03–CU–17—Appraisal and Evaluation Functions for Real Estate Related Transactions (NCUA).

with high loan-to-value (LTV) ratios, high debt-to-income (DTI) ratios, and low credit scores. Recognizing that an institution's underwriting criteria are based on multiple factors, an institution should consider these factors jointly in the qualification process and may develop a range of reasonable tolerances for each factor. However, the criteria should be based upon prudent and appropriate underwriting standards, considering both the borrower's characteristics and the product's attributes.

For all nontraditional mortgage loan products, an institution's analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate,[5] assuming a fully amortizing repayment schedule.[6] In addition, for products that permit negative amortization, the repayment analysis should be based upon the initial loan amount plus any balance increase that may accrue from the negative amortization provision.[7]

Furthermore, the analysis of repayment capacity should avoid over-reliance on credit scores as a substitute

[5] The fully indexed rate equals the index rate prevailing at origination plus the margin that will apply after the expiration of an introductory interest rate. The index rate is a published interest rate to which the interest rate on an ARM is tied. Some commonly used indices include the 1-Year Constant Maturity Treasury Rate (CMT), the 6-Month London Interbank Offered Rate (LIBOR), the 11th District Cost of Funds (COFI), and the Moving Treasury Average (MTA), a 12-month moving average of the monthly average yields of U.S. Treasury securities adjusted to a constant maturity of one year. The margin is the number of percentage points a lender adds to the index value to calculate the ARM interest rate at each adjustment period. In different interest rate scenarios, the fully indexed rate for an ARM loan based on a lagging index (e.g., MTA rate) may be significantly different from the rate on a comparable 30-year fixed-rate product. In these cases, a credible market rate should be used to qualify the borrower and determine repayment capacity.

[6] The fully amortizing payment schedule should be based on the term of the loan. For example, the amortizing payment for a loan with a 5-year interest only period and a 30-year term would be calculated based on a 30-year amortization schedule. For balloon mortgages that contain a borrower option for an extended amortization period, the fully amortizing payment schedule can be based on the full term the borrower may choose.

[7] The balance that may accrue from the negative amortization provision does not necessarily equate to the full negative amortization cap for a particular loan. The spread between the introductory or "teaser" rate and the accrual rate will determine whether or not a loan balance has the potential to reach the negative amortization cap before the end of the initial payment option period (usually five years). For example, a loan with a 115 percent negative amortization cap but a small spread between the introductory rate and the accrual rate may only reach a 109 percent maximum loan balance before the end of the initial payment option period, even if only minimum payments are made. The borrower could be qualified based on this lower maximum loan balance.

for income verification in the underwriting process. The higher a loan's credit risk, either from loan features or borrower characteristics, the more important it is to verify the borrower's income, assets, and outstanding liabilities.

*Collateral-Dependent Loans*— Institutions should avoid the use of loan terms and underwriting practices that may heighten the need for a borrower to rely on the sale or refinancing of the property once amortization begins. Loans to individuals who do not demonstrate the capacity to repay, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound.[8] Institutions that originate collateral-dependent mortgage loans may be subject to criticism, corrective action, and higher capital requirements.

*Risk Layering*—Institutions that originate or purchase mortgage loans that combine nontraditional features, such as interest only loans with reduced documentation or a simultaneous second-lien loan, face increased risk. When features are layered, an institution should demonstrate that mitigating factors support the underwriting decision and the borrower's repayment capacity. Mitigating factors could include higher credit scores, lower LTV and DTI ratios, significant liquid assets, mortgage insurance or other credit enhancements. While higher pricing is often used to address elevated risk levels, it does not replace the need for sound underwriting.

*Reduced Documentation*—Institutions increasingly rely on reduced documentation, particularly unverified income, to qualify borrowers for nontraditional mortgage loans. Because these practices essentially substitute assumptions and unverified information for analysis of a borrower's repayment capacity and general creditworthiness, they should be used with caution. As the level of credit risk increases, the Agencies expect an institution to more diligently verify and document a borrower's income and debt reduction capacity. Clear policies should govern the use of reduced documentation. For example, stated income should be accepted only if there are mitigating factors that clearly minimize the need for direct verification of repayment capacity. For many borrowers, institutions generally should be able to readily document income using recent

[8] A loan will not be determined to be "collateral-dependent" solely through the use of reduced documentation.

W–2 statements, pay stubs, or tax returns.

*Simultaneous Second-Lien Loans*— Simultaneous second-lien loans reduce owner equity and increase credit risk. Historically, as combined loan-to-value ratios rise, so do defaults. A delinquent borrower with minimal or no equity in a property may have little incentive to work with a lender to bring the loan current and avoid foreclosure. In addition, second-lien home equity lines of credit (HELOCs) typically increase borrower exposure to increasing interest rates and monthly payment burdens. Loans with minimal or no owner equity generally should not have a payment structure that allows for delayed or negative amortization without other significant risk mitigating factors.

*Introductory Interest Rates*—Many institutions offer introductory interest rates set well below the fully indexed rate as a marketing tool for payment option ARM products. When developing nontraditional mortgage product terms, an institution should consider the spread between the introductory rate and the fully indexed rate. Since initial and subsequent monthly payments are based on these low introductory rates, a wide initial spread means that borrowers are more likely to experience negative amortization, severe payment shock, and an earlier-than-scheduled recasting of monthly payments. Institutions should minimize the likelihood of disruptive early recastings and extraordinary payment shock when setting introductory rates.

*Lending to Subprime Borrowers*— Mortgage programs that target subprime borrowers through tailored marketing, underwriting standards, and risk selection should follow the applicable interagency guidance on subprime lending.[9] Among other things, the subprime guidance discusses circumstances under which subprime lending can become predatory or abusive. Institutions designing nontraditional mortgage loans for subprime borrowers should pay particular attention to this guidance. They should also recognize that risk-layering features in loans to subprime borrowers may significantly increase risks for both the institution and the borrower.

*Non-Owner-Occupied Investor Loans*—Borrowers financing non-owner-occupied investment properties should qualify for loans based on their ability to service the debt over the life of the

[9] Interagency Guidance on Subprime Lending, March 1, 1999, and Expanded Guidance for Subprime Lending Programs, January 31, 2001. Federally insured credit unions should refer to 04–CU–12—Specialized Lending Activities (NCUA).

loan. Loan terms should reflect an appropriate combined LTV ratio that considers the potential for negative amortization and maintains sufficient borrower equity over the life of the loan. Further, underwriting standards should require evidence that the borrower has sufficient cash reserves to service the loan, considering the possibility of extended periods of property vacancy and the variability of debt service requirements associated with nontraditional mortgage loan products.[10]

*Portfolio and Risk Management Practices*

Institutions should ensure that risk management practices keep pace with the growth and changing risk profile of their nontraditional mortgage loan portfolios and changes in the market. Active portfolio management is especially important for institutions that project or have already experienced significant growth or concentration levels. Institutions that originate or invest in nontraditional mortgage loans should adopt more robust risk management practices and manage these exposures in a thoughtful, systematic manner. To meet these expectations, institutions should:

• Develop written policies that specify acceptable product attributes, production and portfolio limits, and securitization practices, and risk management expectations;

• Design enhanced performance measures and management reporting that provide early warning for increasing risk;

• Establish appropriate ALLL levels that consider the credit quality of the portfolio and conditions that affect collectibility; and

• Maintain capital at levels that reflect portfolio characteristics and the effect of stressed economic conditions on collectibility. Institutions should hold capital commensurate with the risk characteristics of their nontraditional mortgage loan portfolios.

*Policies*—An institution's policies for nontraditional mortgage lending activity should set acceptable levels of risk through its operating practices, accounting procedures, and policy exception tolerances. Policies should reflect appropriate limits on risk layering and should include risk management tools for risk mitigation purposes. Further, an institution should set growth and volume limits by loan type, with special attention for products

and product combinations in need of heightened attention due to easing terms or rapid growth.

*Concentrations*—Institutions with concentrations in nontraditional mortgage products should have well-developed monitoring systems and risk management practices. Monitoring should keep track of concentrations in key portfolio segments such as loan types, third-party originations, geographic area, and property occupancy status. Concentrations also should be monitored by key portfolio characteristics such as loans with high combined LTV ratios, loans with high DTI ratios, loans with the potential for negative amortization, loans to borrowers with credit scores below established thresholds, loans with risk-layered features, and non-owner-occupied investor loans. Further, institutions should consider the effect of employee incentive programs that could produce higher concentrations of nontraditional mortgage loans. Concentrations that are not effectively managed will be subject to elevated supervisory attention and potential examiner criticism to ensure timely remedial action.

*Controls*—An institution's quality control, compliance, and audit procedures should focus on mortgage lending activities posing high risk. Controls to monitor compliance with underwriting standards and exceptions to those standards are especially important for nontraditional loan products. The quality control function should regularly review a sample of nontraditional mortgage loans from all origination channels and a representative sample of underwriters to confirm that policies are being followed. When control systems or operating practices are found deficient, business-line managers should be held accountable for correcting deficiencies in a timely manner. Since many nontraditional mortgage loans permit a borrower to defer principal and, in some cases, interest payments for extended periods, institutions should have strong controls over accruals, customer service and collections. Policy exceptions made by servicing and collections personnel should be carefully monitored to confirm that practices such as re-aging, payment deferrals, and loan modifications are not inadvertently increasing risk. Customer service and collections personnel should receive product-specific training on the features and potential customer issues with these products.

*Third-Party Originations*—Institutions often use third parties, such as mortgage brokers or correspondents, to originate

nontraditional mortgage loans. Institutions should have strong systems and controls in place for establishing and maintaining relationships with third parties, including procedures for performing due diligence. Oversight of third parties should involve monitoring the quality of originations so that they reflect the institution's lending standards and compliance with applicable laws and regulations.

Monitoring procedures should track the quality of loans by both origination source and key borrower characteristics. This will help institutions identify problems such as early payment defaults, incomplete documentation, and fraud. If appraisal, loan documentation, credit problems or consumer complaints are discovered, the institution should take immediate action. Remedial action could include more thorough application reviews, more frequent re-underwriting, or even termination of the third-party relationship.[11]

*Secondary Market Activity*—The sophistication of an institution's secondary market risk management practices should be commensurate with the nature and volume of activity. Institutions with significant secondary market activities should have comprehensive, formal strategies for managing risks.[12] Contingency planning should include how the institution will respond to reduced demand in the secondary market.

While third-party loan sales can transfer a portion of the credit risk, an institution remains exposed to reputation risk when credit losses on sold mortgage loans or securitization transactions exceed expectations. As a result, an institution may determine that it is necessary to repurchase defaulted mortgages to protect its reputation and maintain access to the markets. In the agencies' view, the repurchase of mortgage loans beyond the selling institution's contractual obligation is

---

[10] Federally insured credit unions must comply with 12 CFR part 723 for loans meeting the definition of member business loans.

[11] Refer to OCC Bulletin 2001–47—Third-Party Relationships and AL 2000–9—Third-Party Risk (OCC). Federally insured credit unions should refer to 01–CU–20 (NCUA), Due Diligence over Third Party Service Providers. Savings associations should refer to OTS Thrift Bulletin 82a—Third Party Arrangements.

[12] Refer to "Interagency Questions and Answers on Capital Treatment of Recourse, Direct Credit Substitutes, and Residual Interests in Asset Securitizations", May 23, 2002; OCC Bulletin 2002–22 (OCC); SR letter 02–16 (Board); Financial Institution Letter (FIL–54–2002) (FDIC); and CEO Letter 163 (OTS). *See* OCC's Comptroller Handbook for Asset Securitization, November 1997. *See* OTS Examination Handbook Section 221, Asset-Backed Securitization. The Board also addressed risk management and capital adequacy of exposures arising from secondary market credit activities in SR letter 97–21. Federally insured credit unions should refer to 12 CFR Part 702 (NCUA).

58616     **Federal Register** / Vol. 71, No. 192 / Wednesday, October 4, 2006 / Notices

implicit recourse. Under the agencies' risk-based capital rules, a repurchasing institution would be required to maintain risk-based capital against the entire pool or securitization.[13] Institutions should familiarize themselves with these guidelines before deciding to support mortgage loan pools or buying back loans in default.

*Management Information and Reporting*—Reporting systems should allow management to detect changes in the risk profile of its nontraditional mortgage loan portfolio. The structure and content should allow the isolation of key loan products, risk-layering loan features, and borrower characteristics. Reporting should also allow management to recognize deteriorating performance in any of these areas before it has progressed too far. At a minimum, information should be available by loan type (*e.g.*, interest-only mortgage loans and payment option ARMs); by risk-layering features (*e.g.*, payment option ARM with stated income and interest-only mortgage loans with simultaneous second-lien mortgages); by underwriting characteristics (*e.g.*, LTV, DTI, and credit score); and by borrower performance (*e.g.*, payment patterns, delinquencies, interest accruals, and negative amortization).

Portfolio volume and performance should be tracked against expectations, internal lending standards and policy limits. Volume and performance expectations should be established at the subportfolio and aggregate portfolio levels. Variance analyses should be performed regularly to identify exceptions to policies and prescribed thresholds. Qualitative analysis should occur when actual performance deviates from established policies and thresholds. Variance analysis is critical to the monitoring of a portfolio's risk characteristics and should be an integral part of establishing and adjusting risk tolerance levels.

*Stress Testing*—Based on the size and complexity of their lending operations, institutions should perform sensitivity analysis on key portfolio segments to identify and quantify events that may increase risks in a segment or the entire portfolio. The scope of the analysis should generally include stress tests on key performance drivers such as interest rates, employment levels, economic growth, housing value fluctuations, and other factors beyond the institution's immediate control. Stress tests typically

assume rapid deterioration in one or more factors and attempt to estimate the potential influence on default rates and loss severity. Stress testing should aid an institution in identifying, monitoring and managing risk, as well as developing appropriate and cost-effective loss mitigation strategies. The stress testing results should provide direct feedback in determining underwriting standards, product terms, portfolio concentration limits, and capital levels.

*Capital and Allowance for Loan and Lease Losses*—Institutions should establish an appropriate allowance for loan and lease losses (ALLL) for the estimated credit losses inherent in their nontraditional mortgage loan portfolios. They should also consider the higher risk of loss posed by layered risks when establishing their ALLL.

Moreover, institutions should recognize that their limited performance history with these products, particularly in a stressed environment, increases performance uncertainty. Capital levels should be commensurate with the risk characteristics of the nontraditional mortgage loan portfolios. Lax underwriting standards or poor portfolio performance may warrant higher capital levels.

When establishing an appropriate ALLL and considering the adequacy of capital, institutions should segment their nontraditional mortgage loan portfolios into pools with similar credit risk characteristics. The basic segments typically include collateral and loan characteristics, geographic concentrations, and borrower qualifying attributes. Segments could also differentiate loans by payment and portfolio characteristics, such as loans on which borrowers usually make only minimum payments, mortgages with existing balances above original balances, and mortgages subject to sizable payment shock. The objective is to identify credit quality indicators that affect collectibility for ALLL measurement purposes. In addition, understanding characteristics that influence expected performance also provides meaningful information about future loss exposure that would aid in determining adequate capital levels.

Institutions with material mortgage banking activities and mortgage servicing assets should apply sound practices in valuing the mortgage servicing rights for nontraditional mortgages. In accordance with interagency guidance, the valuation process should follow generally accepted accounting principles and use

reasonable and supportable assumptions.[14]

*Consumer Protection Issues*

While nontraditional mortgage loans provide flexibility for consumers, the Agencies are concerned that consumers may enter into these transactions without fully understanding the product terms. Nontraditional mortgage products have been advertised and promoted based on their affordability in the near term; that is, their lower initial monthly payments compared with traditional types of mortgages. In addition to apprising consumers of the benefits of nontraditional mortgage products, institutions should take appropriate steps to alert consumers to the risks of these products, including the likelihood of increased future payment obligations. This information should be provided in a timely manner—before disclosures may be required under the Truth in Lending Act or other laws—to assist the consumer in the product selection process.

*Concerns and Objectives*—More than traditional ARMs, mortgage products such as payment option ARMs and interest-only mortgages can carry a significant risk of payment shock and negative amortization that may not be fully understood by consumers. For example, consumer payment obligations may increase substantially at the end of an interest-only period or upon the "recast" of a payment option ARM. The magnitude of these payment increases may be affected by factors such as the expiration of promotional interest rates, increases in the interest rate index, and negative amortization. Negative amortization also results in lower levels of home equity as compared to a traditional amortizing mortgage product. When borrowers go to sell or refinance the property, they may find that negative amortization has substantially reduced or eliminated their equity in it even when the property has appreciated. The concern that consumers may not fully understand these products would be exacerbated by marketing and promotional practices that emphasize potential benefits without also providing clear and balanced information about material risks.

In light of these considerations, communications with consumers,

---

[13] Refer to 12 CFR part 3 Appendix A, Section 4 (OCC); 12 CFR parts 208 and 225, Appendix A, III.B.3 (FRB); 12 CFR part 325, Appendix A, II.B (FDIC); 12 CFR 567 (OTS); and 12 CFR part 702 (NCUA) for each Agency's capital treatment of recourse.

[14] Refer to the "Interagency Advisory on Mortgage Banking", February 25, 2003, issued by the bank and thrift regulatory agencies. Federally Insured Credit Unions with assets of $10 million or more are reminded they must report and value nontraditional mortgages and related mortgage servicing rights, if any, consistent with generally accepted accounting principles in the Call Reports they file with the NCUA Board.

including advertisements, oral statements, promotional materials, and monthly statements, should provide clear and balanced information about the relative benefits and risks of these products, including the risk of payment shock and the risk of negative amortization. Clear, balanced, and timely communication to consumers of the risks of these products will provide consumers with useful information at crucial decision-making points, such as when they are shopping for loans or deciding which monthly payment amount to make. Such communication should help minimize potential consumer confusion and complaints, foster good customer relations, and reduce legal and other risks to the institution.

*Legal Risks*—Institutions that offer nontraditional mortgage products must ensure that they do so in a manner that complies with all applicable laws and regulations. With respect to the disclosures and other information provided to consumers, applicable laws and regulations include the following:

• Truth in Lending Act (TILA) and its implementing regulation, Regulation Z.

• Section 5 of the Federal Trade Commission Act (FTC Act). TILA and Regulation Z contain rules governing disclosures that institutions must provide for closed-end mortgages in advertisements, with an application,[15] before loan consummation, and when interest rates change. Section 5 of the FTC Act prohibits unfair or deceptive acts or practices.[16]

Other Federal laws, including the fair lending laws and the Real Estate Settlement Procedures Act (RESPA), also apply to these transactions. Moreover, the Agencies note that the sale or securitization of a loan may not affect an institution's potential liability for violations of TILA, RESPA, the FTC

Act, or other laws in connection with its origination of the loan. State laws, including laws regarding unfair or deceptive acts or practices, also may apply.

### Recommended Practices

Recommended practices for addressing the risks raised by nontraditional mortgage products include the following:[17]

*Communications with Consumers*— When promoting or describing nontraditional mortgage products, institutions should provide consumers with information that is designed to help them make informed decisions when selecting and using these products. Meeting this objective requires appropriate attention to the timing, content, and clarity of information presented to consumers. Thus, institutions should provide consumers with information at a time that will help consumers select products and choose among payment options. For example, institutions should offer clear and balanced product descriptions when a consumer is shopping for a mortgage—such as when the consumer makes an inquiry to the institution about a mortgage product and receives information about nontraditional mortgage products, or when marketing relating to nontraditional mortgage products is provided by the institution to the consumer—not just upon the submission of an application or at consummation.[18] The provision of such information would serve as an important supplement to the disclosures currently required under TILA and Regulation Z or other laws.[19]

*Promotional Materials and Product Descriptions.* Promotional materials and other product descriptions should provide information about the costs,

terms, features, and risks of nontraditional mortgages that can assist consumers in their product selection decisions, including information about the matters discussed below.

• *Payment Shock.* Institutions should apprise consumers of potential increases in payment obligations for these products, including circumstances in which interest rates or negative amortization reach a contractual limit. For example, product descriptions could state the maximum monthly payment a consumer would be required to pay under a hypothetical loan example once amortizing payments are required and the interest rate and negative amortization caps have been reached.[20] Such information could also describe when structural payment changes will occur (*e.g.*, when introductory rates expire, or when amortizing payments are required), and what the new payment amount would be or how it would be calculated. As applicable, these descriptions could indicate that a higher payment may be required at other points in time due to factors such as negative amortization or increases in the interest rate index.

• *Negative Amortization.* When negative amortization is possible under the terms of a nontraditional mortgage product, consumers should be apprised of the potential for increasing principal balances and decreasing home equity, as well as other potential adverse consequences of negative amortization. For example, product descriptions should disclose the effect of negative amortization on loan balances and home equity, and could describe the potential consequences to the consumer of making minimum payments that cause the loan to negatively amortize. (One possible consequence is that it could be more difficult to refinance the loan or to obtain cash upon a sale of the home).

• *Prepayment Penalties.* If the institution may impose a penalty in the event that the consumer prepays the mortgage, consumers should be alerted to this fact and to the need to ask the lender about the amount of any such penalty.[21]

• *Cost of Reduced Documentation Loans.* If an institution offers both reduced and full documentation loan programs and there is a pricing premium attached to the reduced documentation program, consumers should be alerted to this fact.

---

[15] These program disclosures apply to ARM products and must be provided at the time an application is provided or before the consumer pays a nonrefundable fee, whichever is earlier.

[16] The OCC, the Board, and the FDIC enforce this provision under the FTC Act and section 8 of the FDI Act. Each of these agencies has also issued supervisory guidance to the institutions under their respective jurisdictions concerning unfair or deceptive acts or practices. *See* OCC Advisory Letter 2002-3—Guidance on Unfair or Deceptive Acts or Practices, March 22, 2002; Joint Board and FDIC Guidance on Unfair or Deceptive Acts or Practices by State-Chartered Banks, March 11, 2004. Federally insured credit unions are prohibited from using any advertising or promotional material that is inaccurate, misleading, or deceptive in any way concerning its products, services, or financial condition. 12 CFR 740.2. The OTS also has a regulation that prohibits savings associations from using advertisements or other representations that are inaccurate or misrepresent the services or contracts offered. 12 CFR 563.27. This regulation supplements its authority under the FTC Act.

[17] Institutions also should review the recommendations relating to mortgage lending practices set forth in other supervisory guidance from their respective primary regulators, as applicable, including guidance on abusive lending practices.

[18] Institutions also should strive to: (1) Focus on information important to consumer decision making; (2) highlight key information so that it will be noticed; (3) employ a user-friendly and readily navigable format for presenting the information; and (4) use plain language, with concrete and realistic examples. Comparative tables and information describing key features of available loan products, including reduced documentation programs, also may be useful for consumers considering the nontraditional mortgage products and other loan features described in this guidance.

[19] Institutions may not be able to incorporate all of the practices recommended in this guidance when advertising nontraditional mortgages through certain forms of media, such as radio, television, or billboards. Nevertheless, institutions should provide clear and balanced information about the risks of these products in all forms of advertising.

[20] Consumers also should be apprised of other material changes in payment obligations, such as balloon payments.

[21] Federal credit unions are prohibited from imposing prepayment penalties. 12 CFR 701.21(c)(6).

*Monthly Statements on Payment Option ARMs.* Monthly statements that are provided to consumers on payment option ARMs should provide information that enables consumers to make informed payment choices, including an explanation of each payment option available and the impact of that choice on loan balances. For example, the monthly payment statement should contain an explanation, as applicable, next to the minimum payment amount that making this payment would result in an increase to the consumer's outstanding loan balance. Payment statements also could provide the consumer's current loan balance, what portion of the consumer's previous payment was allocated to principal and to interest, and, if applicable, the amount by which the principal balance increased. Institutions should avoid leading payment option ARM borrowers to select a non-amortizing or negatively-amortizing payment (for example, through the format or content of monthly statements).

*Practices to Avoid.* Institutions also should avoid practices that obscure significant risks to the consumer. For example, if an institution advertises or promotes a nontraditional mortgage by emphasizing the comparatively lower initial payments permitted for these loans, the institution also should provide clear and comparably prominent information alerting the consumer to the risks. Such information should explain, as relevant, that these payment amounts will increase, that a balloon payment may be due, and that the loan balance will not decrease and may even increase due to the deferral of interest and/or principal payments. Similarly, institutions should avoid promoting payment patterns that are structurally unlikely to occur.[22] Such practices could raise legal and other risks for institutions, as described more fully above.

Institutions also should avoid such practices as: Giving consumers unwarranted assurances or predictions about the future direction of interest rates (and, consequently, the borrower's future obligations); making one-sided representations about the cash savings or expanded buying power to be realized from nontraditional mortgage products in comparison with amortizing mortgages; suggesting that initial minimum payments in a payment option ARM will cover accrued interest (or principal and interest) charges; and making misleading claims that interest rates or payment obligations for these products are "fixed."

*Control Systems*—Institutions should develop and use strong control systems to monitor whether actual practices are consistent with their policies and procedures relating to nontraditional mortgage products. Institutions should design control systems to address compliance and consumer information concerns as well as the safety and soundness considerations discussed in this guidance. Lending personnel should be trained so that they are able to convey information to consumers about product terms and risks in a timely, accurate, and balanced manner. As products evolve and new products are introduced, lending personnel should receive additional training, as necessary, to continue to be able to convey information to consumers in this manner. Lending personnel should be monitored to determine whether they are following these policies and procedures. Institutions should review consumer complaints to identify potential compliance, reputation, and other risks. Attention should be paid to appropriate legal review and to using compensation programs that do not improperly encourage lending personnel to direct consumers to particular products.

With respect to nontraditional mortgage loans that an institution makes, purchases, or services using a third party, such as a mortgage broker, correspondent, or other intermediary, the institution should take appropriate steps to mitigate risks relating to compliance and consumer information concerns discussed in this guidance. These steps would ordinarily include, among other things, (1) Conducting due diligence and establishing other criteria for entering into and maintaining relationships with such third parties, (2) establishing criteria for third-party compensation designed to avoid providing incentives for originations inconsistent with this guidance, (3) setting requirements for agreements with such third parties, (4) establishing procedures and systems to monitor compliance with applicable agreements, bank policies, and laws, and (5) implementing appropriate corrective actions in the event that the third party fails to comply with applicable agreements, bank policies, or laws.

## Appendix: Terms Used in This Document

*Interest-only Mortgage Loan*—A nontraditional mortgage on which, for a specified number of years (*e.g.*, three or five years), the borrower is required to pay only the interest due on the loan during which time the rate may fluctuate or may be fixed. After the interest-only period, the rate may be fixed or fluctuate based on the prescribed index and payments include both principal and interest.

*Payment Option ARM*—A nontraditional mortgage that allows the borrower to choose from a number of different payment options. For example, each month, the borrower may choose a minimum payment option based on a "start" or introductory interest rate, an interest-only payment option based on the fully indexed interest rate, or a fully amortizing principal and interest payment option based on a 15-year or 30-year loan term, plus any required escrow payments. The minimum payment option can be less than the interest accruing on the loan, resulting in negative amortization. The interest-only option avoids negative amortization but does not provide for principal amortization. After a specified number of years, or if the loan reaches a certain negative amortization cap, the required monthly payment amount is recast to require payments that will fully amortize the outstanding balance over the remaining loan term.

*Reduced Documentation*—A loan feature that is commonly referred to as "low doc/no doc", "no income/no asset", "stated income" or "stated assets". For mortgage loans with this feature, an institution sets reduced or minimal documentation standards to substantiate the borrower's income and assets.

*Simultaneous Second-Lien Loan*—A lending arrangement where either a closed-end second-lien or a home equity line of credit (HELOC) is originated simultaneously with the first lien mortgage loan, typically in lieu of a higher down payment.

Dated: September 25, 2006.

**John C. Dugan,**

*Comptroller of the Currency.*

By order of the Board of Governors of the Federal Reserve System, September 27, 2006.

**Jennifer J. Johnson,**

*Secretary of the Board.*

Dated at Washington, DC, this 27th day of September, 2006.

Federal Deposit Insurance Corporation.

**Robert E. Feldman,**

*Executive Secretary.*

Dated: September 28, 2006.

By the Office of Thrift Supervision.

**John M. Reich,**

*Director.*

By the National Credit Union Administration on September 28, 2006.

**JoAnn M. Johnson,**

*Chairman.*

[FR Doc. 06–8480 Filed 10–3–06; 8:45 am]

**BILLING CODE 4810–33–P, 6210–01–P, 6714–01–P, 6720–01–P, 7535–01–P**

---

[22] For example, marketing materials for payment option ARMs may promote low predictable payments until the recast date. Such marketing should be avoided in circumstances in which the minimum payments are so low that negative amortization caps would be reached and higher payment obligations would be triggered before the scheduled recast, even if interest rates remain constant.

# EXHIBIT "4"

54568A

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

CIVIL DIVISION

HOMECOMINGS FINANCIAL
  NETWORK

             Plaintiff,

    v.

NELLIE SPROW AND ALL OTHER
  OCCUPANTS

          Defendants.

: Civil Case No.  OOca7177

## MEMORANDUM AND ORDER

Before the Court are plaintiffs' Motion for
Judgment on the Pleadings on Counts II and III of the
Counterclaim, defendant's opposition, and plaintiff's
reply.

The Court first addresses the issue of whether
Ms. Sprow's counterclaim for money damages under the
Federal Truth in Lending Act is barred by the statute
of limitations.  The issue is whether this suit for
possession is an "action to collect a debt." 15
U.S.C. 5 1640(e).  If it is, Ms. Sprow is not barred
from asserting a violation of the FLTA "as a matter
of defense by recoupment or set-off." Id.

The Court agrees with the plaintiff that its
action for possession is not an Vaction to collect a
debt." Plaintiff's action literally does not seek to
collect a debt; it seeks to gain possession of
premises, which it owns by virtue of a foreclosure.
The Court need not here reach the issue of whether a
counterclaim could be asserted beyond the one-year
limit as a defense to a foreclosure action. New York
Guardian Mortg. Corp. v. Dietzel, 524 A.2d 951, 953-
54 (Pa. Super 1987), criticized among other places in
In Re Dangler, 75 B.R. 931, 931-35 (E-D. Pa. 1987),
held that no such counterclaim should be asserted.
Here, plaintiff seeks not to gain title to a property
in lieu of collecting the debt secured by such
property, but rather to gain possession of property
it already owns. If plaintiff wins on its
counterclaim, there will be nothing from or against
which its money damages can be "recoup[ed]" or "set
off." The Court is of the opinion that plaintiff's
argument that possession is but a last step in an
effort to collect a debt fails to deal not only with
the language "action to collect a debt," but with the

language "as a matter of defense by recoupment or set-off."

Turning to the counterclaim under the D.C. Consumer Protection Act (DCCPPA), the court first addresses plaintiff's argument that plaintiff's claim must fail because she "has failed to make allegations . . . concerning any of the factors the Court is to consider in determining whether some other term of the loan is unconscionable." (Motion at 5.) Under notice pleading principles, plaintiff need not allege all the factors that make a contract unconscionable. She need only put the opposition on notice of her claim. See Nelson v. Covington, 519 A.2d 177, 177 (D-C. 1986). Plaintiff's counterclaim accomplishes this task. (E.g., paras. 15, 16, 7, 18, 24, 25, 26, 36). The Court does not agree with plaintiff's argument (pp. 3-4 of the reply) that Ms. Sprow must allege, beyond reciting the statute, that the lender knew of her infirmities. That she may have to prove knowledge does not mean she has to plead it more specifically than she has.

Plaintiff argues that the statute under which Ms. Sprow is proceeding has been preempted by the

Federal Home Owners Loan Act of 1933, 12 U.S.C.
55 1462 et seq. ("HOLA"), and regulations
implementing it, 12 C.F.R. § 560.2(a). Ms. Sprow's
counterclaim does not claim that any specific lending
term is contrary to state law.  Rather, it claims
that one or more of the terms used in the loan were
unconscionable because the lender (1) [had] knowledge
[that] "there was no reasonable probability of
payment in full . . . .i$^{rr}$ (2) \\ [had] knowledge [that]
. . . [the customer was unable] to receive
substantial benefits from the property sold or
leased;" . . . [or] (3) ". . . has knowingly taken
advantage of the inability of the consumer reasonably
to protect [her] interests by reasons of age,
physical or mental infirmit **es**, ignorance,
illiteracy, or inability to understand the language
of the agreement . . . ."  The issue thus is whether
Congress or the Office of Thrift Supervision (OTS)
intended the statute or regulation to preempt a state
law forb'idding such knowing conduct, or whether that
state law actually conflicts with any provision of
the federal statute or regulation.

An actual conflict occurs "when ',compliance with both federal and state regulations is a physical impossibility,' or when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."' Goudreau v. Standard Fed. Sav. & Loan Ass'n, 5 1 A.2d 386, 389 (D.C. 1986) (citations omitted). The Court notes again that Ms. Sprow does not claim that any term itself violates state law. Thus the statute at issue does not prescribe terms different from those allowed or proscribed by the regulations cited at page nine of plaintiff's brief. Only when a term is considered in conjunction with the lender's knowing use of it to take advantage of the customer's vulnerability because of ignorance, illiteracy or like weakness (to take factor (3) above, for example) does the term become unenforceable. Thus the D.C. statute does not prohibit lenders from using particular terms, or interfere with uniform use of those terms by lenders within this jurisdiction, except in the particular circumstances addressed in the District statute. At this, the pleading stage of the case, the Court cannot find an actual conflict.

It is not impossible for a lender to comply with both the federal regulations and the District statute and, given the limited circumstances in which the D-C. statute will be applied, the Court cannot perceive how the District statute stands in the way of achievement of the purposes of the federal scheme to permit OTS, not the states, to determine what are the best lending practices in order to assure viability of federal savings and loans institutions and thus promote thrift and assure the availability of cash to finance homes. See Fidelity Sav. & Loan Ass'n De La Cuesta, 458 U.S. 141, 159-62 (1982).

The Court next turns to whether or not it can find an express or implied intent to occupy the entire field of regulation of savings and loans institutions. See Goudreau, supra, 511 A.2d at 389. The Supreme Court in De La Cuesta observed that it did not need to decide whether the HOLA or the regulations occupied the entire field of federal savings and loan regulation. See, supra, 458 U.S. at 159 n. 14. See also id. at 171--72 and n.* (O'Connor, concurring, and noting examples, such as zoning, which are "not directly related to savings and loan

practices" and thus not preempted).  Plaintiff
appears to argue that the regulation contained an
express intent to occupy the entire field of
regulation of savings and loans.  Plaintiff cites in
particular 12 C.F.R. § 560.2(a), which does offer
support for plaintiff's position.  It states in part
that "OTS hereby occupies the entire field of lending
regulation for federal savings associations." It
also states:  "Accordingly, federal savings
associations may extend credit as authorized under
federal law, including this part, without regard to
state laws purporting to regulate or otherwise affect
their credit activities." Id.  Nevertheless, the
regulation, as the defendant observes, expressly
states that "[s]tate laws of the following types are
not preempted to the extent that they only
incidentally affect the lending operations of Federal
savings associations or are otherwise consistent with
the purposes of paragraph (a) _ . . -"  12 C.F.R.
§ 560.2(c).  Two of such laws mentioned are contract
and commercial law.  See 12 C.F.R. § 560.2(c)(1).

Both the District of Columbia common law of
contracts and its commercial code recognize that a

court should refuse to enforce an unconscionable contract. See Williams v. Walker-Thomas Furniture p&t 121 U.S. App. D.C. **315; 350** F.Zd 445 (1965); D.C. Code § 28:2-302. One part of the test for unconscionability under the common law of contracts is whether the terms are grossly unreasonable in light of commercial practices and mores existing at the time the contract was made. See Williams v. Walker-Thomas Furniture Co., supra, 121 U.S. App. D-C. at 319-20; **350** F.2d at 449-50. If the test focused just on the terms, such a law might conflict with "best practices" as determined by the OTS. The test for unconscionability in contract law also, however, focuses on whether the party asserting unconscionability had a "meaningful choice," and in determining whether the party had such a choice the court may consider among other things the party's lack of bargaining power, and the manner in which the contract was entered, including the party's lack of education and the party's opportunity to understand the terms of the contract. See Id., 129 U.S. App. D.C. at 319-20, **350** F.2d at 449-50. See Patterson v. Walker-Thomas Furniture Co., 277 A.2d 111, 114 (D.C.

1971).  The combination of so-called procedural and
substantive unconscionability underlies the decisions
under the Uniform Commercial Code as well.  See
generally, 1 J. White and R. Summers., Uniform
Commercial Code, §§ 4-3-4-5, 4-7 (4th ed. 1995).

In the present case, Ms. Sprow alleges, among
other things, that the lender "knowingly [took]
advantage of [her] inability . . . reasonably to
protect [her] interests by reason of age [and] mental
infirmit[y]."  This is one of the factors that may be
considered in determining unconscionability under the
CPPA.  See D.C. Code § 28-3904(r)(5); Williams v.
First Gov't Mortgage & Investors Corp., 2000 U.S.
APP. LEXIS 18294, **7-8; 225 F.3d 738, 744 (D.C. Cir.
2000).  It is also one of the factors that may be
considered in determining unconscionability under the
Uniform Commercial Code.  See J. Calamari and J.
Perillo, Contracts, § 9-40 at 327 (2d ed. 1977)
(citing similar provision of the Uniform Consumer
Sales Practices Act).  This Court is of the view that
if Ms. Sprow can sustain a claim of unconscionability
under that CPPA, and that same claim would be
sufficient to prevent enforcement of a contract under

either the common law or the Uniform Commercial Code,
she will have invoked a law that is not preempted
because it would be a law that would be "of [a] . . .
type 13" of a state law that is expressly not
preempted under 12 C.F.R. s 560.2(c).  The Court is
of the opinion that such a law would "only
incidentally affect the lending operations of [the
lender]" and would not be inconsistent with the
purposes of 12 C.F.R. § 560.2(a) because the law does
not regulate terms of contracts themselves, but only
the knowing use of such terms to take advantage of a
person incompetent to understand the terms.

For the foregoing reasons, the Court **ORDERS** that
the Motion for Judgment on the Pleadings is **GRANTED**
**IN PART AND DENIED IN PART** and the Court **FURTHER**
**ORDERS** that Court III o'f the counterclaim be and
hereby is **DISMISSED WITH PREJUDICE.**

SIGNED IN CHAMBERS      1
**April 19, 2001**

DOCKETED  APR 2 rs2a[1]

MAILED  APR 2 3 2001

10

Copies mailed to:

Christine W. Carmody, Esquire
Charles H. Carpenter, Esquire
Pepper Hamilton LLP
600 Fourteenth Street, N.W.
Washington, D.C.  -20oo5  --

James T. Sugarman, Esquire
Legal Counsel for the Elderly
601 E Street, N.W.
Room A4-450
Washington, D.C.  20049