**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HERMAN GRAVES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:08-1140 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN BROKERS CONDUIT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### FDIC'S MOTION TO INTERVENE, SUBSTITUTE, AND STAY

The Federal Deposit Insurance Corporation ("FDIC"), as the duly appointed Conservator ("FDIC-Conservator" or "FDIC-C") for IndyMac Federal Bank, F.S.B. ("Indymac Federal"), and the FDIC, as Receiver ("FDIC-Receiver" or "FDIC-R") for Defendant IndyMac Bank, F.S.B. ("Indymac"), seeks to intervene in this case, to substitute itself for Indymac as the real party in interest, and to stay these proceedings. The reasons in support of the Motion are more fully set forth in the accompanying Memorandum of Law, which is incorporated by reference herein.

In accordance with Local Civil Rule 7(m), undersigned counsel conferred with counsel for the Plaintiffs, and Plaintiffs' counsel consents to the relief requested in this Motion.

Dated: August 14, 2008

Respectfully submitted,

*/s/ Andrew C. Bernasconi*
Andrew C. Bernasconi
D.C. Bar No. 484614
REED SMITH, LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, D.C. 20005
Telephone: (202) 414-9200
Facsimile: (202) 414-9299
abernasconi@reedsmith.com

Attorney for Defendant IndyMac Bank, F.S.B. and
Federal Deposit Insurance Corporation as
Conservator for IndyMac Federal Bank, F.S.B. and
Receiver for IndyMac Bank, F.S.B.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of FDIC's Motion to Intervene, Substitute, and Stay, and

Memorandum In Support and attached exhibits, and Proposed Order, were served on this 14th

day of August, 2008, via first class mail, postage prepaid, upon the following:

> Rawle Andrews, Jr., Esq.
> AARP Legal Counsel for the Elderly
> 601 E Street NW, Suite A4-400
> Washington, DC  20049
> *Attorney for Plaintiffs*
> *(also served electronically via* CM/ECF)
>
> John McCauley, Esq.
> Venable LLP
> 750 E. Pratt Street
> Suite 900
> Baltimore, MD 21202
> *Attorney for Defendant Savings First Mortgage LLC*
> *(also served electronically via* CM/ECF)
>
> Catherine A. Bledsoe, Esq.
> Gordon, Feinblatt, Rothman, Hoffberger & Hollander LLC
> 233 East Redwood Street
> Baltimore, MD 21202
> *Attorney for Defendant Premier Financial Co.*
> *(also served electronically via* CM/ECF)
>
> American Brokers Conduit
> 538 Broadhollow Road
> Mellville, NY 11747
>
> American Home Mortgage Corp.
> 538 Broadhollow Road
> Mellville, NY 11747

> /s/ *Andrew C. Bernasconi*
> Andrew C. Bernasconi

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HERMAN GRAVES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:08-1140 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN BROKERS CONDUIT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF FDIC-RECEIVER'S AND FDIC-CONSERVATOR'S MOTION TO INTERVENE, SUBSTITUTE, AND STAY**

The Federal Deposit Insurance Corporation ("FDIC"), as the duly appointed Conservator ("FDIC-Conservator" or "FDIC-C") for IndyMac Federal Bank, F.S.B. ("Indymac Federal"), and the FDIC, as Receiver ("FDIC-Receiver" or "FDIC-R") for Defendant IndyMac Bank, F.S.B. ("Indymac"), seek to intervene in this case, to substitute themselves for Indymac as the real parties in interest, and to stay these proceedings.

**BACKGROUND**

Plaintiffs Herman and Gracie Graves filed this action in the District of Columbia Superior Court on May 23, 2008. Defendant Indymac timely filed a Notice of Removal with this Court on June 30, 2008, and subsequently filed a Motion to Dismiss the Complaint on July 8, 2008. Following two extensions of time, on August 4, 2008, the Plaintiffs filed an Opposition to Defendant Indymac's Motion to Dismiss the Complaint.

In the intervening period between the filing of Indymac's Motion to Dismiss the Complaint (July 8, 2008) and Plaintiffs' Opposition to Indymac's Motion to Dismiss (August 4, 2008), Indymac on July 11, 2008 was closed by the Office of Thrift Supervision ("OTS"), and the Federal Deposit Insurance Corporation was appointed as Conservator and Receiver. *See*

Exhibit A to the Declaration of Andrew C. Bernasconi ("Bernasconi Decl.").[1]  The assets of

Indymac were allocated to FDIC-C and FDIC-R, both of whom now hold an interest in this

proceeding.  Bernasconi Decl. ¶ 6 & Exhibit C to the Bernasconi Decl.  As a result, FDIC-R and

FDIC-C are now the real parties in interest in this proceeding and seek to intervene and substitute

on that basis.  Pursuant to statute, FDIC-R also seeks a stay of this action as further explained

below.[2]

## ARGUMENT

**I.    FDIC Can Intervene Under Rule 24(a).**

FDIC seeks to intervene in this case under Federal Rule of Civil Procedure 24(a), which

provides that:

> On timely motion, the court must permit anyone to intervene who . . .
> claims an interest relating to the property or transaction that is the subject
> of the action, and is so situated that disposing of the action may as a
> practical matter impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent that interest.

Under Rule 24(a), a proposed intervenor must show that:  (1) its motion to intervene is

timely; (2) it has a legally protected interest in the subject matter of the case; (3) its ability to

protect its interests may be impaired in the absence of intervention; and (4) the current parties

cannot adequately protect its interests.  *See Karsner v. Lothian,* --- F.3d ---, No. 07-7080, 2008

WL 2727402 at *6 (D.C. Cir. July 15, 2008).  FDIC-C and FDIC-R meet these requirements and

are entitled to intervene in this case as of right.  First, FDIC-C and FDIC-R have timely sought to

---

[1]    The Declaration of Andrew C. Bernasconi is attached hereto as Exhibit 1.

[2]    FDIC-C also seeks a 45-day stay, but because FDIC-R is entitled to a 90-day stay under
the applicable statute, the 45-day stay requested by FDIC-C is subsumed within the 90-
day stay being requested by FDIC-R.

intervene, since they have only been acting as Conservator of Indymac Federal and Receiver of Indymac since July 11, 2008. Further, this case is in its procedural infancy as it remains at the pleadings stage. Beyond their preliminary investigation and drafting its Opposition to Indymac's Motion to Dismiss the Complaint, Plaintiffs have incurred little litigation expense and will suffer no prejudice if FDIC-C and FDIC-R are permitted to intervene.

Second, FDIC-C and FDIC-R each have a substantial legal interest in the subject matter of this case because, by express operation of law, FDIC-C and FDIC-R assume all rights, titles, powers, privileges, and operations of Indymac, as further specified in the Insured Deposit Purchase and Assumption Agreement. *See* 12 U.S.C. § 1821(d)(2); Bernasconi Decl., Ex. C. Accordingly, Plaintiffs' claim against Indymac is really against FDIC-C and FDIC-R for all intents and purposes and, as discussed below, FDIC-C and FDIC-R should be substituted for Indymac as the real parties in interest.

Third, FDIC-C's and FDIC-R's abilities to protect their interests as Conservator of Indymac Federal and Receiver of Indymac will be impaired unless they are permitted to intervene in this case. That is, FDIC-C and FDIC-R seek to intervene in this case so that they can substitute themselves for Indymac and stay these proceedings. They cannot move this Court for that relief without first being granted the right to intervene, however. Thus, FDIC-C's and FDIC-R's intervention in this case is necessary to protect their interests in substituting themselves for Indymac and staying this case.

Fourth, the current parties cannot adequately protect FDIC-C's or FDIC-R's interests. Only FDIC-C and FDIC-R can substitute themselves for Indymac. Likewise, only FDIC-R can seek a 90-day stay of the legal proceedings against Indymac. *See*

12 U.S.C. § 1821(d)(12)(A)(ii).[3]  Even if the current parties could assert these rights, there is no indication that they would do so.  Indymac is insolvent and ceased operations on July 11, 2008. *See* Exhibit B to the Bernasconi Decl. (FDIC Press Release).  As such, none of the current parties can adequately protect FDIC-C's or FDIC-R's interests.  FDIC intervention is ordinarily granted where it has been appointed conservator or receiver of a failed financial institution.  *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 293 (3d Cir. 2005) (observing that the FDIC was granted leave to intervene, substitute for the failed bank as the true party in interest, and granted a stay).  Because requests to intervene under Federal Rule of Civil Procedure 24 should be "broadly construed in favor of potential intervenors," *Purnell v. City of Akron*, 925 F.2d 941, 950 (6th Cir. 1991), and given that the requirements of that Rule are easily satisfied in this case, FDIC-C's and FDIC-R's request to intervene is reasonable and appropriate.  *See Kleissler v. United States Forest Serv.*, 157 F.3d 964, 970 (3d Cir. 1998) (noting the "pragmatic" and "elastic" approach to Rule 24(a) as compared to the rigidity of prior practice).  Therefore, this Court should grant FDIC-C's and FDIC-R's request to intervene as of right under Rule 24(a).

## II.    FDIC-C And FDIC-R Can Substitute Themselves For Indymac Under Rule 25(c).

Under Federal Rule of Civil Procedure 25(c), when there has been a transfer of an interest from a party to the litigation to a nonparty, "the action may be continued by or against the original party, unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party."  In this case, Indymac has failed, no longer operates as a bank, and FDIC-C and FDIC-R have assumed complete control of it as Conservator and Receiver. Bernasconi Decl., Ex. B (FDIC Press Release).  Once FDIC became Conservator of Indymac

---

[3]    As noted above, FDIC-C is entitle to a 45-day stay upon request pursuant to 12 U.S.C. § 1821(d)(12)(A)(i).

Federal and Receiver for Indymac, all of Indymac's interests were transferred to FDIC-C and FDIC-R, as further specified in the Insured Deposit Purchase and Assumption Agreement. 12 U.S.C. § 1821(d)(2). Accordingly, Plaintiff's claim for declaratory judgment against Indymac is really against FDIC-C and FDIC-R as the real parties in interest. Therefore, this Court should substitute FDIC-C and FDIC-R for Indymac and re-caption this case to reflect the same.

## III.    FDIC-R Can Stay This Case Under Section 1821.

FDIC-R may request a 90-day stay of any civil action or legal proceeding to which an insured depository institution has become a party. *Id.* § 1821(d)(12)(A)(ii). The reviewing court has no discretion to assess FDIC-R's stay request and must grant it as to all parties with claims against the failed bank in FDIC receivership. *Id.* § 1821(d)(12)(B). As discussed above, Indymac became insolvent, failed, and the FDIC was appointed as Conservator and Receiver. Therefore, and in accordance with Section 1821, FDIC-R requests that this Court stay this case for 90 days. Additionally, FDIC-R and FDIC-C request that upon expiration of the stay, they be given an additional 14 days within which to respond to Plaintiffs' Opposition to Indymac's Motion to Dismiss the Complaint.

**CONCLUSION**

Because FDIC-C and FDIC-R (1) have timely sought to intervene in this case, (2) where they have a substantial legal interest in the subject matter, (3) they cannot protect their interests without intervention and (4) since the current parties cannot assert the relief sought, this Court should grant FDIC-C's and FDIC-R's request to intervene under Federal Rule of Civil Procedure 24(a). Further, because FDIC-C and FDIC-R are the real parties in interest in this case, they should be allowed to substitute themselves for Indymac under Rule 25(c). Finally, this Court

should stay this case for 90 days in accordance with Title 12 of the United States Code, Section 1821(d)(12)(A)(ii).

Accordingly, FDIC-C and FDIC-R respectfully requests that this Court grant their Motion and enter an order that:

- FDIC-C and FDIC-R are entitled to intervene as of right in this case;

- FDIC-C and FDIC-R are entitled to substitute themselves for Indymac as the real parties in interest and re-caption this case to reflect the same; and

- This case is stayed for 90 days and upon expiration of the stay, FDIC-C and FDIC-R may respond to Plaintiffs' Opposition to Indymac's Motion to Dismiss the Complaint within 14 days, from the date of the expiration of the stay.

Dated: August 14, 2008

Respectfully submitted,

*/s/ Andrew C. Bernasconi*
Andrew C. Bernasconi
D.C. Bar No. 484614
REED SMITH, LLP
1301 K Street, N.W.
Suite 1100, East Tower
Washington, D.C. 20005
Telephone:  (202) 414-9200
Facsimile:  (202) 414-9299
abernasconi@reedsmith.com

Attorney for Defendant IndyMac Bank, F.S.B. and Federal Deposit Insurance Corporation as Conservator for IndyMac Federal Bank, F.S.B. and Receiver for IndyMac Bank, F.S.B.

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HERMAN GRAVES, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 1:08-1140 (EGS) |
| ) | |
| v. ) | |
| ) | |
| AMERICAN BROKERS CONDUIT, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF ANDREW C. BERNASCONI IN SUPPORT OF**
**FDIC'S MOTION TO INTERVENE, SUBSTITUTE, AND STAY**

I, Andrew C. Bernasconi, do hereby state and declare as follows:

1.      I am an attorney admitted to practice in the federal district court of the District of Columbia. I am associated with the law firm of Reed Smith LLP.

2.      I have been retained to represent IndyMac Bank, F.S.B. ("Indymac") and Federal Deposit Insurance Corporation ("FDIC") as Conservator for IndyMac Federal Bank, F.S.B. ("FDIC-C") and Receiver for IndyMac Bank, F.S.B. ("FDIC-R") in the above-captioned action. I am familiar with the circumstances of this case and the matters set forth herein.

3.      I submit this Declaration in support of FDIC-R's and FDIC-C's Motion to Intervene, Substitute, and Stay.

4.      On July 11, 2008, Indymac was closed by the Office of Thrift Supervision ("OTS") and the FDIC was appointed as Conservator and Receiver. Attached hereto as Exhibit A is a true and correct copy of Order No. 2008-24 issued by the Director of OTS establishing Indymac's Conservatorship and Receivership.

5.    On the same date, July 11, 2008, Indymac announced that it was insolvent and ceased its operations.  Attached hereto as Exhibit B is a true and correct copy of FDIC's July 11, 2008 press release announcing Indymac's insolvency.

6.    Pursuant to Section 3.1, 3.4, and 3.6 of the Insured Deposit Purchase and Assumption Agreement, a true and correct copy of which is attached as Exhibit C, both FDIC-C and FDIC-R hold an interest in these proceedings.

7.    On July 8, 2008, Indymac has filed a Motion to Dismiss the Complaint, and on August 4, 2008, Plaintiffs filed an Opposition to Indymac's Motion to Dismiss the Complaint.

8.    I declare under penalty of perjury and 28 U.S.C. § 1746 that the foregoing is true to the best of my information, knowledge, and belief.

Dated: August 14, 2008

Andrew C. Bernasconi

# EXHIBIT A

### OFFICE OF THRIFT SUPERVISION

### Pass-Through Receivership Of A Federal Savings Association
### Into A De Novo Federal Savings Association
### That is Placed Into Conservatorship
### With the FDIC


**Date:  July //, 2008**


**Order No.: 2008-24**

The Director of the Office of Thrift Supervision ("OTS"), or his designee, in cooperation with the Federal Deposit Insurance Corporation ("FDIC"), has determined: (1) to appoint the FDIC as receiver for the savings association specified below ("OLD THRIFT"); (2) to approve the FDIC's request for the issuance of a new federal mutual savings association charter ("NEW THRIFT") as a successor to OLD THRIFT; (3) to approve the transfer of such assets and liabilities of OLD THRIFT to its successor NEW THRIFT, as the FDIC has determined to be appropriate; and (4) to appoint the FDIC as conservator of NEW THRIFT.  Collectively, numbers 2 through 4 of the foregoing are referred to herein as the "APPLICATIONS."

"OLD THRIFT," refers to:

| Name | Location | OTS No. |
|------|----------|---------|
| IndyMac Bank, F.S.B. | Pasadena, California. | 03970 |

### I.  GROUNDS FOR ACTIONS TAKEN IN THIS ORDER:

### RECEIVERSHIP;
### GROUNDS FOR APPOINTMENT OF FDIC AS
### RECEIVER FOR OLD THRIFT

The Director, or his designee, based upon the administrative record finds and determines that:

OLD THRIFT has insufficient cash and liquid assets convertible to cash necessary to pay the expected withdrawal demands of its depositors.  OLD THRIFT has suffered significant deposit outflows, exceeding $1 billion since June 26, 2008, in part because of adverse publicity.  Further, because OLD THRIFT is not well capitalized, it cannot renew its large volume of brokered deposits, which will create an additional deposit outflow.  In addition, OLD THRIFT has limited and diminishing liquidity sources available to it. There has been significant disruption in the markets for the types of assets, mortgage backed securities and mortgage servicing rights, held by OLD THRIFT.  Therefore, those

assets that are not already subject to liens may not be marketable or only can be sold at prices that would result in OLD THRIFT failing to meet its capital requirements. Moreover, OLD THRIFT's mortgage servicing rights are the major source of OLD THRIFT's current earnings. In addition, the consequences of OLD THRIFT's top-tier holding company's July 7, 2008 public disclosure of adverse information, and the curtailment of forward mortgage lending and resulting downsizing, place OLD THRIFT in a precarious position and OLD THRIFT has been unable to find anyone who is willing and able to invest sufficient capital to alleviate its problems.

OLD THRIFT has suffered losses amounting to approximately $842 million from the third quarter of 2007 to the first quarter of 2008 and projects to report another $354 million loss for the second quarter of 2008. OLD THRIFT is in an unsafe and unsound condition as a result of its severe liquidity strain, deteriorating asset quality, continuing significant negative operating earnings, and declining capital with no realistic prospects for raising capital to ensure that it can repay all of its liabilities, including deposits.

OLD THRIFT has been unsuccessful in its attempts to find investors who are willing and able to recapitalize OLD THRIFT, given OLD THRIFT's current financial condition, ongoing deposit outflows, lack of liquidity, and continued asset quality deterioration. Further, OLD THRIFT projected that it would be undercapitalized as of June 30, 2008. In addition to other asset write-down's which OLD Thrift should be taking, OLD THRIFT is likely to be unable to meet its depositors' demands and other obligations in the normal course of business, and therefore, OLD THRIFT should immediately recognize additional losses on assets held for sale. The losses OLD THRIFT should recognize will result in OLD THRIFT being classified as undercapitalized. Moreover, because efforts to raise capital have proven unsuccessful, there is no reasonable prospect of OLD THRIFT becoming adequately capitalized without Federal assistance.

Therefore, the Director, or his designee, has concluded that:

(a) OLD THRIFT is likely to be unable to pay its obligations or meet its depositors' demands in the normal course of business because it does not have sufficient liquid assets to fund expected withdrawals;

(b) OLD THRIFT is in an unsafe and unsound condition to transact business due to its lack of capital and its illiquid condition;

(c) OLD THRIFT is undercapitalized as defined in section 38(b) of the FDIA, and has no reasonable prospect of becoming adequately capitalized as defined in section 38(b) of the FDIA.

The Director, or his designee, therefore, has determined that grounds for the appointment of a receiver for OLD THRIFT exist under section 5(d)(2) of the Home Owners' Loan Act ("HOLA"), 12 U.S.C. § 1464(d)(2) and section 11(c)(5) of the FDIA, 12 U.S.C. § 1821(c)(5).

3                    **OTS ORDER No.: 2008-24**

## TRANSFER INTO A NEW FEDERAL CHARTER:
## GROUNDS FOR ISSUANCE OF NEW FEDERAL CHARTER AND
## APPROVAL OF TRANSFER OF ASSETS AND LIABILITIES OF
## OLD THRIFT TO NEW THRIFT

The FDIC, as receiver of OLD THRIFT, has applied for authority to organize a new Federal mutual savings association, NEW THRIFT, that is to take over such assets and such liabilities of OLD THRIFT as the FDIC has determined to be appropriate, pursuant to section 11(d)(2)(F)(i) of the FDIA, 12 U.S.C. §1821(d)(2)(F)(i). The FDIC would insure the accounts of NEW THRIFT.

The Director, or his designee: (i) has considered the factors set forth in section 5(e) of HOLA, 12 U.S.C. § 1464(e), with regard to granting a new federal savings association charter, has determined that the charter should be issued, that NEW THRIFT is authorized to transact business as a savings association, and that the charter and bylaws to be issued for NEW THRIFT are in a form consistent with the material provisions of the applicable regulations; and (ii) has considered the factors set forth in section 18(c) of the FDIA, 12 U.S.C. § 1828(c), and 12 C.F.R. § 563.22 with respect to the acquisition of certain assets and assumption of certain liabilities of OLD THRIFT by NEW THRIFT. Immediate action is necessary given the seriously adverse financial condition of OLD THRIFT and in order to permit NEW THRIFT to acquire certain assets and assume certain liabilities of OLD THRIFT and continue to serve OLD THRIFT's community and customers.

For the foregoing reasons, the Director, or his designee, has determined that, pursuant to 12 C.F.R. §§ 563.22 (e) and 543.7-1, public notice of the APPLICATIONS shall not be required. In addition, the Director, or his designee, finds that OTS must act immediately in order to prevent the probable default of OLD THRIFT. Therefore, the publication of notice required by section 18(c)(3) of the FDIA, the reports on the competitive factors of the acquisition required by section 18(c)(4) of the FDIA, and the delayed consummation required by section 18(c)(6) of the FDIA, shall be dispensed with. Accordingly, NEW THRIFT may immediately acquire the assets and assume the liabilities determined to be appropriate by the FDIC.

## CONSERVATORSHIP:

## GROUNDS FOR APPOINTMENT OF FDIC AS
## CONSERVATOR FOR NEW THRIFT

The FDIC has indicated that, immediately upon the completion of the organization of NEW THRIFT (which will be federally chartered) and completion of the transfer of the aforesaid assets and liabilities of OLD THRIFT to NEW THRIFT, it will, in the exercise of its authority to act as the board of directors of NEW THRIFT pursuant to section 11(d)(2)(B) of the FDIA, 12 U.S.C. § 1821(d)(2)(B), consent to the OTS

4                            **OTS ORDER No.: 2008-24**

appointing the FDIC as conservator for NEW THRIFT. Moreover, NEW THRIFT will have virtually the same capital and liquidity as OLD THRIFT had immediately prior to the appointment of a receiver for OLD THRIFT and, therefore, the grounds set forth in Section I above for appointment of the receiver for OLD THRIFT, are also applicable as grounds for the appointment of a conservator for NEW THRIFT.

## II. ACTIONS ORDERED OR APPROVED:

### APPOINTMENT OF A RECEIVER

The Director, or his designee, hereby appoints the FDIC as receiver for OLD THRIFT, for the purpose of liquidation, pursuant to section 5(d)(2) of HOLA, 12 U.S.C. §1464(d)(2), and section 11(c)(6)(B) of the FDIA, 12 U.S.C. § 1821(c)(6)(B).

### ISSUANCE OF A FEDERAL CHARTER AND
### APPROVAL OF THE PASS-THROUGH OF ASSETS AND LIABILITIES

The Director, or his designee, hereby approves: (1) the application of the FDIC to organize NEW THRIFT as a federal mutual savings association (and hereby authorizes the issuance of an appropriate charter and bylaws for NEW THRIFT in form and content approved by the Chief Counsel's Office); (2) the transfer of such assets and liabilities of OLD THRIFT to its successor, NEW THRIFT, as the FDIC has determined to be appropriate; and (3) the retention of the home and branch offices of OLD THRIFT by its successor, NEW THRIFT. Prior to the appointment or election of a board of directors for NEW THRIFT, the FDIC may, in addition to any other powers granted by applicable law, exercise the powers of the board of directors pursuant to section 11(d)(2)(B) of the FDIA, 12 U.S.C. § 1821(d)(2)(B).

### APPOINTMENT OF A CONSERVATOR
### FOR NEW THRIFT

The Director, or his designee, hereby appoints the FDIC as conservator for NEW THRIFT pursuant to sections 5(d)(2)(A) and (E) of the HOLA, 12 U.S.C. §§ 1464(d)(2)(A), 1464(d)(2)(E), effective upon receipt of the consent of NEW THRIFT to such appointment. That consent must be contained in a resolution of its board of directors issued by the FDIC in exercise of its power, as the organizer of NEW THRIFT, to act as its interim board of directors pursuant to section 11(d)(2)(B) of the FDIA, 12 U.S.C. § 1821(d)(2)(B).

5          **OTS ORDER No.: 2008-24**

## DELEGATION OF AUTHORITY TO ACT FOR OTS

The Director, or his designee, hereby authorizes the OTS West Region Director, or his designee, and the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to: (1) certify orders; (2) sign, execute, attest or certify other documents of OTS issued or authorized by this Order; (3) designate the person or entity that will give notice of the appointment of a receiver for OLD THRIFT and serve OLD THRIFT with a copy of this Order pursuant to 12 C.F.R. § 558.2; (4) designate the person or entity that will give notice of the appointment of a conservator for NEW THRIFT and serve NEW THRIFT with a copy of this Order pursuant to 12 C.F.R. § 558.2; and (5) perform such other functions of OTS necessary or appropriate for implementation of this Order. All documents to be issued under the authority of this Order must be first approved, in form and content, by the Chief Counsel's Office. In addition, the Director, or his designee, hereby authorizes the Deputy Chief Counsel for the Business Transactions Division of the Chief Counsel's office, or his designee, to make any subsequent technical corrections, that might be necessary, to this Order or any documents issued under the authority of this Order.

By Order of the Director of OTS, effective July _11_, 2008.

_____
John M. Reich
Director

# EXHIBIT B

## Press Releases

### FDIC Establishes IndyMac Federal Bank, FSB as Successor to IndyMac Bank, F.S.B., Pasadena, California

**Media Contact:**
**In Washington: Andrew Gray (202) 898-7192,**
**Cell: 202-494-1049**
**angray@fdic.gov**
**In California: David Barr**
**Cell: 703-622-4790**
**dbarr@fdic.gov**

**FOR IMMEDIATE RELEASE**
**July 11, 2008**

En Español

IndyMac Bank, F.S.B., Pasadena, CA, was closed today by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation (FDIC) was named conservator. The FDIC will transfer insured deposits and substantially all the assets of IndyMac Bank, F.S.B., Pasadena, CA, to IndyMac Federal Bank, FSB. Brokered deposits will be held by the FDIC and those insured deposits will be paid off when the insurance determination is complete. IndyMac Bank, FSB had total assets of $32.01 billion and total deposits of $19.06 billion as of March 31, 2008. As conservator, the FDIC will operate IndyMac Federal Bank, FSB to maximize the value of the institution for a future sale and to maintain banking services in the communities formerly served by IndyMac Bank, F.S.B.

Insured depositors and borrowers will automatically become customers of IndyMac Federal, FSB and will continue to have uninterrupted customer service and access to their funds by ATM, debit cards and writing checks in the same manner as before. Depositors of IndyMac Federal Bank, FSB will have no access to on-line and phone banking services this weekend. These services will be operational again on Monday. Loan customers should continue making loan payments as usual.

Beginning on Monday, July 14, IndyMac Federal Bank, FSB's 33 branches will observe normal operating hours and will continue to offer full banking services, including on-line banking. For additional information, the FDIC has established a toll-free number for customers of IndyMac Federal Bank, FSB. The toll-free number is 1-866-806-5919 and will operate today from 3:00 p.m. to 9:00 p.m. (PDT), and then daily from 8:00 a.m. to 8:00 p.m. thereafter, except Sunday, July 13, when the hours will be 8:00 a.m. to 6:00 p.m. Customers also may visit the FDIC's Web site at http://www.fdic.gov/bank/individual/failed/IndyMac.html for further information.

At the time of closing, IndyMac Bank, F.S.B. had about $1 billion of potentially uninsured deposits held by approximately 10,000 depositors. The FDIC will begin contacting customers with uninsured deposits to arrange an appointment with an FDIC claims agent on Monday. Customers can contact the FDIC for an appointment using the toll-free number above. The FDIC will pay uninsured depositors an advance dividend equal to 50 percent of the uninsured amount.

Based on preliminary analysis, the estimated cost of the resolution to the Deposit Insurance Fund is between $4 and $8 billion. IndyMac Bank, F.S.B. is the fifth FDIC-insured failure of the year. The last FDIC-insured failure in California was the Southern Pacific Bank, Torrance, on February 7, 2003.

# # #

Congress created the Federal Deposit Insurance Corporation in 1933 to restore public confidence in the nation's banking system. The FDIC insures deposits at the nation's 8,494 banks and savings associations and it promotes the safety and soundness of these institutions by identifying, monitoring

and addressing risks to which they are exposed.

FDIC press releases and other information are available on the Internet via the World Wide Web at www.fdic.gov and may also be obtained through the FDIC's Public Information Center 1-877-275-3342 or (703) 562-2200. **PR-56-2008**

Last Updated 7/14/2008                                                    communications@fdic.gov

**Home**    **Contact Us**    **Search**    **Help**    **SiteMap**    **Forms**
Freedom of Information Act (FOIA) Service Center    Website Policies    USA.gov
FDIC Office of Inspector General

# EXHIBIT C

INSURED DEPOSIT
PURCHASE AND ASSUMPTION AGREEMENT


AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF INDYMAC BANK, FSB
PASADENA, CALIFORNIA, USA

FEDERAL DEPOSIT INSURANCE CORPORATION

and

FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB
PASADENA, CALIFORNIA

DATED AS OF

JULY 11, 2008

ARTICLE I - DEFINITIONS ........................................................................................... 2
   Accounting Records ................................................................................................ 2
   Acquired Subsidiaries ............................................................................................ 2
   Adversely Classified .............................................................................................. 2
   Affiliate .................................................................................................................. 2
   Affiliated Funding ................................................................................................. 2
   Agreement .............................................................................................................. 2
   Assets ..................................................................................................................... 2
   Assumed Deposits .................................................................................................. 2
   Bank Premises ........................................................................................................ 3
   Book Value ............................................................................................................ 3
   Business Day .......................................................................................................... 3
   Chartering Authority .............................................................................................. 3
   Commitment ........................................................................................................... 3
   Credit Documents .................................................................................................. 4
   Credit File .............................................................................................................. 4
   Data Processing Lease ............................................................................................ 4
   Deposit ................................................................................................................... 4
   Failed Bank Advances ........................................................................................... 4
   Fair Market Value .................................................................................................. 4
   Fixtures .................................................................................................................. 5
   Furniture and Equipment ........................................................................................ 5
   Indemnitees ............................................................................................................ 5
   Insured Deposit ...................................................................................................... 5
   Initial Payment ....................................................................................................... 5
   Legal Balance ........................................................................................................ 5
   Liabilities Assumed ............................................................................................... 6
   Lien ........................................................................................................................ 6
   Loans ..................................................................................................................... 6
   Obligor ................................................................................................................... 6
   Payment Date ......................................................................................................... 6
   Person .................................................................................................................... 6
   Primary Indemnitor ................................................................................................ 6
   Put Date ................................................................................................................. 7
   Put Notice .............................................................................................................. 7
   Qualified Financial Contract .................................................................................. 7
   Record .................................................................................................................... 7
   Related Liability ..................................................................................................... 7
   Related Liability Amount ....................................................................................... 7
   Repurchase Price .................................................................................................... 7
   Resolution Date ...................................................................................................... 8
   Safe Deposit Boxes ................................................................................................ 8
   Settlement Date ...................................................................................................... 8
   Settlement Interest Rate .......................................................................................... 8

Subsidiary ....................................................................................................... 8

**ARTICLE II - ASSUMPTION OF LIABILITIES** .......................................... 9
2.1     Liabilities Assumed by Assuming Bank ......................................... 9
2.2     Interest on Deposit Liabilities ...................................................... 11
2.3     Unclaimed Deposits ..................................................................... 11
2.4     Employee Benefit Plans ............................................................... 11

**ARTICLE III - PURCHASE OF ASSETS** ....................................................... 12
3.1     Assets Purchased by Assuming Bank ........................................... 12
3.2     Consideration ................................................................................ 14
3.3     Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. ... 14
3.4     Assets Not Acquired by Assuming Bank ..................................... 14
3.5     Loans Essential to Receiver ......................................................... 15
3.6     Puts of Assets to the Receiver ..................................................... 16
   (a)     Puts Prior to the Settlement Date ........................................... 16
   (b)     Notices to the Receiver ............................................................ 17
   (c)     Purchase by Receiver ............................................................... 17
   (d)     Purchase Price and Payment Date .......................................... 17
   (e)     Servicing .................................................................................... 17
   (f)     Reversals .................................................................................... 17
3.5     Assets Not Purchased by Assuming Bank ................................... 18
3.6     Assets Essential to Receiver ........................................................ 19

**ARTICLE IV - ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS** ............... 19
4.1     Continuation of Banking Business .............................................. 19
4.2     Agreement with Respect to Credit Card Business ....................... 20
4.3     Agreement with Respect to Safe Deposit Business ...................... 20
4.4     Agreement with Respect to Safekeeping Business ....................... 20
4.5     Agreement with Respect to Trust Business. ................................ 20
4.6     Agreement with Respect to Leases. ............................................. 21
   (a)     Option to Assume ..................................................................... 21
   (c)     Facilitation ................................................................................ 21
   (d)     Occupancy ................................................................................. 21
   (e)     Occupancy Costs ....................................................................... 21
   (f)     Certain Requirements as to Furniture, Equipment and Fixtures ...................... 22
   (g)     Vacating Premises ..................................................................... 22
   (h)     Furniture and Equipment and Certain Other Equipment ...................... 23
4.7     Agreement with Respect to Leased Data Processing Equipment ..................... 23
4.8     Agreement with Respect to Certain Existing Agreements ...................... 23
4.9     Informational Tax Reporting ....................................................... 24
4.10    Insurance. ..................................................................................... 24
4.11    Office Space for Receiver and Corporation ................................ 24
4.12    Reserved ....................................................................................... 25
4.13    Agreement with Respect to Interim Asset Servicing and Interim Management .. 25
4.14    Agreement With Respect to Certain Back Room Functions and Certain Data Processing Services ................................................................... 25

**ARTICLE V - DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK 26**
**5.1**    **Payment of Checks, Drafts and Orders** ............................................................. **26**
**5.2**    **Certain Agreements Related to Deposits** ...................................................... **26**
**5.3**    **Notice to Depositors** ................................................................................................ **26**

**ARTICLE VI - RECORDS** ................................................................................................... **26**
**6.1**    **Transfer of Records** .................................................................................................. **26**
**6.2**    **Delivery of Assigned Records** ............................................................................. **27**
**6.3**    **Preservation of Records** ......................................................................................... **27**
**6.4**    **Access to Records; Copies** .................................................................................... **27**

**ARTICLE VII - INITIAL PAYMENT; FINAL DISTRIBUTION** .......................................... **28**
**7.1.**    **Initial Payment** ........................................................................................................ **28**
**7.2.**    **Final Distribution** ................................................................................................... **28**

**ARTICLE VIII - ADJUSTMENTS** ....................................................................................... **28**
**8.1**    **Pro Forma Statement** ............................................................................................. **28**
**8.2**    **Correction of Errors and Omissions; Other Liabilities** ............................ **29**
**8.3**    **Payments** ..................................................................................................................... **29**
**8.4**    **Interest** ......................................................................................................................... **29**
**8.5**    **Subsequent Adjustments** ...................................................................................... **29**

**ARTICLE IX - CONTINUING COOPERATION** ................................................................. **30**
**9.1**    **General Matters** ....................................................................................................... **30**
**9.2**    **Additional Title Documents** ................................................................................ **30**
**9.3**    **Claims and Suits** ...................................................................................................... **30**
**9.4**    **Payment of Deposits** .............................................................................................. **30**
**9.5**    **Withheld Payments** ................................................................................................. **31**
**9.6**    **Proceedings with Respect to Certain Assets and Liabilities** .................... **31**
**9.7**    **Information** .................................................................................................................. **32**

**ARTICLE X - CONDITION PRECEDENT** .......................................................................... **32**

**ARTICLE XI - REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK** ............................................................................................................................................ **32**
**11.1**    **Corporate Existence and Authority** ................................................................. **32**
**11.2**    **Third Party Consents** ............................................................................................. **32**
**11.3**    **Execution and Enforceability** ............................................................................. **32**
**11.4**    **Compliance with Law** ............................................................................................ **32**
**11.5**    **Representations Remain True** ............................................................................. **33**

**ARTICLE XI - INDEMNIFICATION** ................................................................................... **33**
**12.1**    **Indemnification of Indemnitees** ....................................................................... **33**
**12.2**    **Conditions Precedent to Indemnification** ..................................................... **36**
**12.3**    **No Additional Warranty** ....................................................................................... **37**
**12.4**    **Indemnification of Receiver and Corporation** ............................................. **37**

| 12.5 | Obligations Supplemental | 37 |
| 12.6 | Criminal Claims | 38 |
| 12.7 | Limited Guaranty of the Corporation | 38 |
| 12.8 | Subrogation | 38 |

**ARTICLE XII - MISCELLANEOUS** .......................................................... 38

| 13.1 | Entire Agreement | 38 |
| 13.2 | Headings | 38 |
| 13.3 | Counterparts | 38 |
| 13.4 | Governing Law | 39 |
| 13.5 | Successors | 39 |
| 13.6 | Modification; Assignment | 39 |
| 13.7 | Notice | 39 |
| 13.8 | Manner of Payment | 40 |
| 13.9 | Costs, Fees and Expenses | 40 |
| 13.10 | Waiver | 40 |
| 13.11 | Severability | 40 |
| 13.12 | Term of Agreement | 41 |
| 13.13 | Survival of Covenants, Etc | 41 |

SCHEDULE 2.1 - Certain Liabilities Assumed .......................................... 43
SCHEDULE 3.1 - Certain Assets Purchased .............................................. 44
SCHEDULE 3.1(e) - Loans Fully Secured by Assumed Deposits .................. 45
SCHEDULE 3.1(E) Loans Fully Secured by Assumed Deposits ................... 45
SCHEDULE 3.1(v) - Other Real Estate Purchased ..................................... 46
SCHEDULE 3.1(h) - Acquired Subsidiaries ............................................... 47
SCHEDULE 3.2 - Purchase Price of Assets or assets ................................ 48
SCHEDULE 3.5(k) - Securities Not Purchased ......................................... 49
EXHIBIT 3.1(U) -- Valuation of Certain Qualified Financial Contracts ....... 50
Exhibit 4.13 - Interim Asset Servicing Arrangement ................................ 52
INTERIM MANAGEMENT ARRANGEMENT ............................................. 54
EXHIBIT 4.13(a) - Interim Management Arrangement ............................... 54
DEFINITIONS ................................................................................... 54

## INSURED DEPOSIT PURCHASE AND ASSUMPTION AGREEMENT

**THIS AGREEMENT**, made and entered into as of July 11, 2008, by and among the **FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER of INDYMAC BANK, FSB,** Pasadena, California USA (the "Receiver"), **FEDERAL DEPOSIT INSURANCE CORPORATION AS CONSERVATOR FOR INDYMAC FEDERAL BANK, FSB,** organized under the laws of the United States of America, and having its principal place of business in Pasadena, California, USA, (the "Assuming Bank"), and the **FEDERAL DEPOSIT INSURANCE CORPORATION,** organized under the laws of the United States of America and having its principal office in Washington, D.C., acting in its corporate capacity (the "Corporation").

— — — — —

### WITNESSETH:

**WHEREAS,** on Bank Closing, the Chartering Authority closed IndyMac Bank, FSB (the "Failed Bank") pursuant to applicable law and the Corporation was appointed Receiver thereof; and

**WHEREAS,** pursuant to 12 U.S.C. § 1821(d)(2)(F)(i), with respect to savings banks and by application to the OTS, the Receiver may organize a new Federal savings association to take over such assets or liabilities as the Corporation may determine to be appropriate; and

**WHEREAS,** the Assuming Bank is unwilling to assume the Failed Bank's liabilities to certain creditors in consideration for the acquisition by it of certain of the Failed Bank's assets as provided in this Agreement, having concluded that the value of such assets is less than the amount of the liabilities assumed hereunder, and the Assuming Bank has therefore required as a condition to entering into this Agreement that the Corporation (i) agree to undertake the obligations of the Corporation as provided in this Agreement, and (ii) provide indemnification pursuant to Article XII; and

**WHEREAS,** the Assuming Bank desires to acquire certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement; and

**WHEREAS,** pursuant to 12 U.S.C. Section 1823(c)(2)(A), the Corporation may provide assistance to the Assuming Bank to facilitate the transactions contemplated by this Agreement, which assistance may include indemnification pursuant to Article XII; and

**WHEREAS,** the Board of Directors of the Corporation (the "Board") has determined to provide assistance to the Assuming Bank on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS,** the Board has determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that such assistance is necessary to meet the obligation of the Corporation to provide insurance coverage for the insured deposits in the Failed Bank and is the least costly to the deposit insurance fund of all possible methods for meeting such obligation.

**NOW THEREFORE**, in consideration of the mutual promises herein set forth and other valuable consideration, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in this Article I, or elsewhere in this Agreement. As used herein, words imparting the singular include the plural and vice versa.

"**Accounting Records**" means the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.

"**Acquired Subsidiaries**" has the meaning provided in Section 3.1.

"**Adversely Classified**" means, with respect to any Loan or security, a Loan or security which, as of the date of the Information Package, has been designated in the most recent report of examination as "Substandard," "Doubtful" or "Loss" by the Failed Bank's appropriate Federal or State Chartering Authority or regulator.

"**Affiliate**" of any Person means any director, officer, or employee of that Person and any other Person (i) who is directly or indirectly controlling, or controlled by, or under direct or indirect common control with, such Person, or (ii) who is an affiliate of such Person as the term "affiliate" is defined in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Affiliated Funding**" means any form of secured or unsecured funding made to the Failed Bank by the Failed Bank's holding company or by any Subsidiary or Affiliate of the Failed Bank's holding company as of Bank Closing.

"**Agreement**" means this Insured Deposit Purchase and Assumption Agreement by and among the Assuming Bank, the Corporation and the Receiver, as amended or otherwise modified from time to time.

"**Assets**" means all assets of the Failed Bank purchased pursuant to Section 3.1. Assets owned by Subsidiaries of the Failed Bank are not "Assets" within the meaning of this definition.

"**Assumed Deposits**" means Insured Deposits, excluding, however, brokered deposits, as defined by 12 USC 1831(f); and Deposits of public money (other than such liabilities that are Insured Deposits) in the Failed Bank to the extent such Deposits are properly and fully secured .

In the event that a depositor's aggregate Deposits in the Failed Bank are in excess of its Insured Deposit, the Corporation, in accordance with its standard policies and procedures, shall determine which Deposits are assumed.

A Deposit in the form of a negotiable instrument shall not be assumed by or transferred to the Assuming Bank, and any interest with respect thereto as provided in this Agreement shall not accrue or be paid until the owner thereof shall provide proof satisfactory to the Corporation that such negotiable instrument was negotiated to such owner prior to Bank Closing, as provided in 12 C.F.R. Section 330.4(b)(4).

**"Bank Closing"** means the close of business of the Failed Bank on the date on which the Chartering Authority closed such institution.

**"Bank Premises"** means the banking houses, drive-in banking facilities, and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

**"Book Value"** means, with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank. The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Receiver for differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections. The Book Value of an Acquired Subsidiary shall be determined from the investment in subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting. Without limiting the generality of the foregoing, (i) the Book Value of a Liability Assumed shall include all accrued and unpaid interest thereon as of Bank Closing, and (ii) the Book Value of a Loan shall reflect adjustments for earned interest, or unearned interest (as it relates to the "rule of 78s" or add-on-interest loans, as applicable), if any, as of Bank Closing, adjustments for the portion of earned or unearned loan-related credit life and/or disability insurance premiums, if any, attributable to the Failed Bank as of Bank Closing, and adjustments for Failed Bank Advances, if any, in each case as determined for financial reporting purposes. The Book Value of an Asset shall not include any adjustment for loan premiums, discounts or any related deferred income or fees, or general or specific reserves on the Accounting Records of the Failed Bank.

**"Business Day"** means a day other than a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, or a day on which the principal office of the Corporation is closed.

**"Chartering Authority"** means the Office Thrift Supervision.

**"Commitment"** means the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit (or additional advances with respect to a Loan) that was legally binding on the Failed Bank as of Bank Closing, other than extensions of credit pursuant to the credit card business and overdraft protection plans of the Failed Bank, if any.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditor agreements, and all amendments, modifications, renewals, extensions, rearrangements, and substitutions with respect to any of the foregoing.

"**Credit File**" means all Credit Documents and all other credit, collateral, or insurance documents in the possession or custody of the Assuming Bank, or any of its Subsidiaries or Affiliates, relating to an Asset or a Loan included in a Put Notice, or copies of any thereof.

"**Data Processing Lease**" means any lease or licensing agreement, binding on the Failed Bank as of Bank Closing, the subject of which is data processing equipment or computer hardware or software used in connection with data processing activities. A lease or licensing agreement for computer software used in connection with data processing activities shall constitute a Data Processing Lease regardless of whether such lease or licensing agreement also covers data processing equipment.

"**Deposit**" means a deposit as defined in 12 U.S.C. Section 1813(l), and the regulations promulgated thereunder without limitation, outstanding cashier's checks and other official checks and all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"**Failed Bank Advances**" means the total sums paid by the Failed Bank to (i) protect its lien position, (ii) pay ad valorem taxes and hazard insurance, and (iii) pay credit life insurance, accident and health insurance, and vendor's single interest insurance.

"**Fair Market Value**" means (i)(a) "Market Value" as defined in the regulation prescribing the standards for real estate appraisals used in federally related transactions, 12 C.F.R. § 323.2(g), and accordingly shall mean the most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

(1) Buyer and seller are typically motivated;
(2) Both parties are well informed or well advised, and acting in what they consider their

own best interests;

(3) A reasonable time is allowed for exposure in the open market;

(4) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

(5) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale;

as determined as of Bank Closing by an appraiser mutually acceptable to the Receiver and the Assuming Bank; any costs and fees associated with such determination shall be shared equally by the Receiver and the Assuming Bank, and (b) which, with respect to Bank Premises (to the extent, if any, that Bank Premises are purchased utilizing this valuation method), shall be determined not later than sixty (60) days after Bank Closing by an appraiser selected by the Receiver and the Assuming Bank within seven (7) days after Bank Closing; or (ii) with respect to property other than Bank Premises purchased utilizing this valuation method, the price therefor as established by the Receiver and agreed to by the Assuming Bank, or in the absence of such agreement, as determined in accordance with clause (i)(a) above.

"**Fixtures**" means those leasehold improvements, additions, alterations and installations constituting all or a part of Bank Premises and which were acquired, added, built, installed or purchased at the expense of the Failed Bank, regardless of the holder of legal title thereto as of Bank Closing.

"**Furniture and Equipment**" means the furniture and equipment (other than Safe Deposit Boxes, artwork, motor vehicles and leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation automated teller machines, carpeting, furniture, office machinery (including personal computers), shelving, office supplies, telephone, surveillance and security systems, artwork, and motor vehicles (which motor vehicles shall be deemed located at Bank Premises owned by the Failed Bank).

"**Indemnitees**" means, except as provided in paragraph (k) of Section 12.1, (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank other than any Subsidiaries or Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the directors, officers, employees and agents of the Assuming Bank and its Subsidiaries and Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank.

"**Insured Deposits**" means the net amount due to any depositor with respect to its Deposits as determined by the Receiver or the Corporation pursuant to 12 U.S.C. Sections 1813(l) and (m), and the regulations promulgated thereunder.

"**Initial Payment**" shall mean $0. There will be no Initial Payment.

"**Legal Balance**" means the amount of indebtedness legally owed by an Obligor with respect to a Loan, including principal and accrued and unpaid interest, late fees, attorneys' fees and expenses, taxes, insurance premiums, and similar charges, if any.

**"Liabilities Assumed"** has the meaning provided in Section 2.1.

**"Lien"** means any mortgage, lien, pledge, charge, assignment for security purposes, security interest, or encumbrance of any kind with respect to an Asset, including any conditional sale agreement or capital lease or other title retention agreement relating to such Asset.

**"Loans"** means all of the following owed to or held by the Failed Bank as of Bank Closing:

(i) loans, participation agreements, interests in participations, overdrafts of customers (including but not limited to overdrafts made pursuant to an overdraft protection plan or similar extensions of credit in connection with a deposit account), revolving commercial lines of credit, home equity lines of credit, United States and/or State-guaranteed student loans, and lease financing contracts;

(ii) all Liens, rights (including rights of set-off), remedies, powers, privileges, demands, claims, priorities, equities and benefits owned or held by, or accruing or to accrue to or for the benefit of, the holder of the obligations or instruments referred to in clause (i) above, including but not limited to those arising under or based upon Credit Documents, casualty insurance policies and binders, standby letters of credit, mortgagee title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in clause (i) above; and

(iii) all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing;

provided, that there shall be excluded from the definition of Loans (a) any portion of the foregoing which the Failed Bank or the Assuming Bank (or any of their respective Subsidiaries) holds not for its own account but solely as agent or fiduciary for, or otherwise as representative of, any other Person, (b) any loans which have been charged off the Accounting Records of the Failed Bank in whole or in part prior to the date of the Information Package, (c) loans recorded on the Accounting Records of the Failed Bank on "in substance foreclosure" status as of Bank Closing, (d) Commitments and (e) amounts owing under Qualified Financial Contracts.

**"Obligor"** means each Person liable for the full or partial payment or performance of any Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly, or severally.

**"Payment Date"** means the first Business Day after Bank Closing.

**"Person"** means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

**"Primary Indemnitor"** means any Person (other than the Assuming Bank or any of its Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including

payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XII, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Put Date**" has the meaning provided in Section 3.4.

"**Put Notice**" has the meaning provided in Section 3.4.

"**Qualified Financial Contract**" means a qualified financial contract as defined in 12 U.S.C. Section 1821(e)(8)(D).

"**Record**" means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.

"**Related Liability**" with respect to any Asset means any liability existing and reflected on the Accounting Records of the Failed Bank as of Bank Closing for (i) indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting such Asset, (ii) ad valorem taxes applicable to such Asset, and (iii) any other obligation determined by the Receiver to be directly related to such Asset.

"**Related Liability Amount**" with respect to any Related Liability on the books of the Assuming Bank, means the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank (as maintained in accordance with generally accepted accounting principles) as of the date as of which the Related Liability Amount is being determined. With respect to a liability that relates to more than one asset, the amount of such Related Liability shall be allocated among such assets for the purpose of determining the Related Liability Amount with respect to any one of such assets. Such allocation shall be made by specific allocation, where determinable, and otherwise shall be pro rata based upon the dollar amount of such assets stated on the Accounting Records of the entity that owns such asset.

"**Repurchase Price**" means with respect to any Asset or asset, which shall be determined by the Receiver, the lesser of (a) or (b):

(a) the amount paid by the Assuming Bank, decreased by the amount of any money received with respect thereto since Bank Closing and, if the Asset is a Loan or other interest bearing or earning asset, the resulting amount shall then be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of: (i) the contract rate with respect to such Asset, or (ii) the Settlement Interest Rate; net proceeds received by or due to the Assuming Bank from the sale of collateral, any forgiveness of debt, or otherwise shall be deemed money received by the Assuming Bank; or

(b) the dollar amount thereof stated on the Accounting Records of the Assuming Bank as of the date as of which the Repurchase Price is being determined, as maintained in accordance with generally accepted accounting principles, and, if the asset is a Loan, regardless

of the Legal Balance thereof and adjusted in the same manner as the Book Value of a Failed Bank Loan would be adjusted hereunder.

Provided, however, (b), above, shall not be applicable for Loans repurchased pursuant to Section 3.4(a).

If any Asset or asset is purchased as part of a group of Assets or assets for Book Value and/or as a percentage of Book Value, the amount paid by the Assuming Bank, for purposes of (a), above, shall be the Book Value, as of the date of Bank Closing, of the individual Asset or asset being repurchased multiplied, if applicable, by the percentage paid.

**"Resolution Date"** means the date on which the Corporation implements a resolution with respect to the Assuming Bank in accordance with 12 U.S.C. § 1821(n) and/or § 1823(C) or other applicable law, which date shall be determined by the Corporation.

**"Safe Deposit Boxes"** means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all rights and benefits (other than fees collected prior to Bank Closing) under rental agreements with respect to such safe deposit boxes, and all keys and combinations thereto.

**"Settlement Date"** means the first Business Day immediately prior to the day which is three hundred sixty-five (365) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

**"Settlement Interest Rate"** means, for the first calendar quarter or portion thereof during which interest accrues, the rate determined by the Receiver to be equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used. Thereafter, the rate shall be adjusted to the rate determined by the Receiver to be equal to the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

**"Subsidiary"** has the meaning set forth in Section 3(w)(4) of the Federal Deposit Insurance Act, 12 U.S.C. Section 1813(w)(4), as amended.

## ARTICLE II
## ASSUMPTION OF LIABILITIES

**2.1    Liabilities Assumed by Assuming Bank.** The Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):

(a)    Assumed Deposits; provided, that as to any Deposits of public money which are Assumed Deposits, the Assuming Bank agrees to properly secure such Deposits with such of the Assets as appropriate which, prior to Bank Closing, were pledged as security therefor by the Failed Bank, or with assets of the Assuming Bank, if such securing Assets, if any, are insufficient to properly secure such Deposits;

(b)    liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens on or affecting any Assets, if any; provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(c)    borrowings from Federal Reserve Banks and Federal Home Loan Banks, if any, provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the assets securing such liability as determined by the Receiver; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

(d)    ad valorem taxes applicable to any Asset, if any; provided, that the assumption of any ad valorem taxes pursuant to this paragraph shall be limited to an amount equal to the market value of the Asset to which such taxes apply as determined by the Receiver;

(e)    liabilities, if any, for federal funds purchased, repurchase agreements and overdrafts in accounts maintained with other depository institutions (including any accrued and unpaid interest thereon computed to and including Bank Closing); provided, that the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(f)    United States Treasury tax and loan note option accounts, if any;

(g)    liabilities for any acceptance or commercial letter of credit (other than (i) any such obligation to a Subsidiary of the Failed Bank that is not acquired by the Assuming Bank and (ii) "standby letters of credit" as defined in 12 C.F.R. Section

337.2(a)); <u>provided, that</u> the assumption of any liability pursuant to this paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver;

(h)     duties and obligations assumed pursuant to this Agreement including without limitation those relating to the Failed Bank's credit card business, overdraft protection plans, safe deposit business, safekeeping business or trust business, if any; and

(i)     liabilities, if any, for amounts owed to any Acquired Subsidiary.

(j)     liabilities, if any, with respect to Qualified Financial Contracts.

(k)     duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others.

(l)     duties and obligations under any contract pursuant to which the Failed Bank holds mortgage servicing rights;

(m)     such liabilities to trade creditors of the Failed Bank as may be determined by the Assuming Bank;

(n)     duties and obligations, if any, with respect to Loans in the form of loan participations;

(o)     liabilities, if any, to fund Commitments to consumers and Acquired Subsidiaries; and

(p)     liabilities (including liabilities for administration), if any, which have vested on or before Bank Closing under or with respect to any Failed Bank employees' pension, profit sharing or stock ownership plan, in accordance with the terms of any such plan that is determined by the Receiver to be adequately funded as of Bank Closing; <u>provided, that</u> the Assuming Bank shall not assume any liability hereunder with respect to any such plan until such time as the Receiver shall have given the Assuming Bank written notice of its election and determination pursuant to Section 2.4.

Notwithstanding the foregoing provisions of this Section 2.1, the Assuming Bank expressly does not assume under this Agreement any (w) Affiliated Funding, (x) obligation or liability of the Failed Bank to, or incurred on behalf of, any Subsidiary of the Failed Bank other than an Acquired Subsidiary, (except as provided in Section 2.1(j)), (y) certain liabilities with respect to the trust business of the Failed Bank as specified in Section 4.5(a), and (z) any liability for any assessment by the Corporation against the Failed Bank pursuant to 12 U.S.C. Section 1815(e).

Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories.

Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

**22.    Interest on Deposit Liabilities.** The Assuming Bank agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 at a rate(s) it shall determine. With respect to certificates of deposit, the Assuming Bank agrees to offer to enter into a new deposit agreement with the depositor, on the same terms and conditions and maturing on the same date, with respect to the insured amount of such certificate of deposit that existed between the Failed Bank and such depositor; provided, that if such Deposit has been pledged to secure an obligation of the depositor or other party, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge. The Assuming Bank shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay.

**2.3    Unclaimed Deposits.** If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the full amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation a schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits. During such eighteen (18)-month period, at the request of the Corporation, the Assuming Bank promptly shall provide to the Corporation schedules of unclaimed deposits in such form as may be prescribed by the Corporation.

**2.4    Employee Benefit Plans.**

(a) The Assuming Bank agrees to assume, honor, and perform all duties, responsibilities and obligations of the Failed Bank which have vested on or before Bank Closing under or with respect to any Failed Bank employee pension, profit sharing or stock ownership plan, in the event that (i) the Receiver elects to have the Assuming Bank assume such duties, responsibilities and obligations with respect to such plan, and (ii) the Receiver determines in its discretion that such plan is adequately funded as of Bank Closing. The Assuming Bank shall have no obligation under this Section 2.4(a) until such time as the Receiver shall have given the Assuming Bank written notice of such election and determination.

(b) The Assuming Bank agrees to assume, honor and perform all duties and responsibilities of the Failed Bank under any health insurance plan of the Failed Bank with respect to individuals who were employees or former employees of the Failed Bank or any Subsidiary of the Failed Bank eligible for coverage thereunder.

## ARTICLE III
## PURCHASE OF ASSETS

**3.1    Assets Purchased by Assuming Bank**.  Subject to Sections 3.4 and 3.5, and Article VII, the Assuming Bank hereby acquires from the Receiver, and the Receiver hereby, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the following (which, except as otherwise specifically may be provided in this Agreement, initially shall be recorded at Book Value) (such assets referred to as "Assets"):

(a)     cash and receivables from depository institutions, including cash items in the process of collection, plus any accrued interest thereon computed to and including Bank Closing;

(b)     securities (other than the capital stock of Subsidiaries of the Failed Bank), plus any accrued interest thereon computed to and including Bank Closing, if any;

(c)     federal funds sold, if any, including any accrued interest thereon computed to and including Bank Closing;

(d)     Loans;

(e)     credit card business and revolving non-commercial credit plans, if any, subject to Section 4.2;

(f)     Safe Deposit Boxes and related business, safekeeping business and trust business, if any, subject to Sections 4.3, 4.4 and 4.5, respectively;

(g)     Records and other documents as provided in Section 6.1;

(h)     the capital stock of Subsidiaries of the Failed Bank listed on Schedule 3.1(i), if any (the "Acquired Subsidiaries");

(i)     amounts owed to the Failed Bank by any Acquired Subsidiary;

(j)     all insurance policies and agreements and the rights and benefits thereunder (including any prepaid assessments or prepaid insurance premiums, premium refunds derived from cancellation, or any proceeds payable with respect to any of the foregoing) of the Failed Bank with respect to insurance coverage for public liability, casualty, fire, extended coverage, and similar coverage provided with respect to assets of the Failed Bank acquired under this Agreement by the Assuming Bank (including such policies and agreements with respect to owned and leased Bank Premises, owned and leased Furniture and Equipment, Fixtures and Leasehold Improvements, and leased data processing equipment, which the Assuming Bank acquires or as to which the Assuming Bank accepts an assignment of the respective lease or enters into a sublease or negotiates a new lease in accordance with this Agreement;

(k)     the legal or equitable interest in receivables of the Failed Bank, including but not limited to, claims against any Person relating to or arising in connection with: (i) the purported transfer prior to Bank Closing of any asset of the Failed Bank for less than adequate consideration, (ii) improper payment of actual or constructive dividends, (iii) overfunding of any pension plan that is assumed by the Assuming Bank pursuant to Section 2.4, (iv) assessments or premiums paid prior to Bank Closing in connection with any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank, (v) any right of contribution or indemnity in favor of the Failed Bank relating to or arising in connection with the Failed Bank being named as a party with its holding company and/or any Subsidiary or Affiliate of such holding company in any litigation, investigation or other official inquiry, or (vi) severance benefits or similar benefits of any director or officer of the Failed Bank;

(l)     any premium refunds or unearned premiums derived from cancellation of any financial institution bonds, banker's blanket bonds, or any other similar insurance policy of the Failed Bank;

(m)     prepaid regulatory assessments of the Failed Bank, if any;

(n)     amounts reflected on the books of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any with respect to an Asset;

(o)     assets securing any acceptance or commercial letter of credit at the Fair Market Value thereof;

(p)     assets securing Deposits of public money at the Fair Market Value thereof;

(q)     Commitments to consumers and Acquired Subsidiaries;

(r)     owned Bank Premises and owned Fixtures and owned Furniture and Equipment located on owned Bank Premises.

(s)     rights under all ground leases, if any, relating to land on which owned Bank Premises are located;

(t)     Qualified Financial Contracts, at the market value thereof determined in accordance with Exhibit 3.1(u). Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank;

(u)     mortgage servicing rights and related contracts;

(v)     Other Real Estate;

(w)     Federal Home Loan Bank stock, and any rights with respect to such stock relating to borrowings from Federal Home Loan Banks assumed under Section 2.1.

all Loans (not otherwise purchased pursuant to Section 3.1(d) above or pursuant
to any asset sale agreement with the Assuming Bank or any other party) that have
been fully charged-off (including, without limitation, Loans that have been
charged-off to only a nominal Book Value amount) by the Failed Bank prior to
Bank Closing, including, without limitation, Loans, or the residual rights from
any such Loans, that, as of Bank Closing, were reflected on the books and records
of the Failed Bank as judgements or deficiencies; (l)overdrafts of customers
(including but not limited to overdrafts made pursuant to an overdraft protection
plan or similar extensions of credit in connection with a deposit account).

Assets are acquired hereunder by the Assuming Bank subject to all liabilities for indebtedness
collateralized by Liens affecting such Assets to the extent provided in Section 2.1.

**3.2    Consideration.** (a)  As consideration for the acquisition of Assets pursuant to this
Agreement, the Assuming Bank (i) assumes certain liabilities pursuant to Article II, (ii) assumes
certain duties and obligations under this agreement, and (iii) agrees to comply with the
provisions of Article XII.

(b)    The purchase price for securities (other than the capital stock of any Acquired
Subsidiary) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof
as of Bank Closing, which market value shall be (i) the "Mid/Last", or "Trade" (as applicable),
market price for each such security quoted at the close of the trading day effective on Bank
Closing as published electronically by Bloomberg, L.P.; (ii) provided, that if such market price is
not available for any such security, the Assuming Bank will submit a bid  for each such security
within three days of notification/bid request by the Receiver (unless a different time period is
agreed to by the Assuming Bank and the Receiver) and the Receiver, in its sole discretion will
accept or reject each such bid; and (iii) further provided in the absence of an acceptable bid from
the Assuming Bank, each such security shall not pass to the Assuming Bank and shall be deemed
to be an excluded asset hereunder.

**3.3    Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.** THE
CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY
INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT
SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF
SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE
SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES
WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH
RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR
FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY
OTHER MATTERS.

**3.4    Assets Not Acquired by Assuming Bank.**  The Assuming Bank does not
purchase, or obtain an option to purchase under this Agreement:

(a)    any financial institution bonds, banker's blanket bonds, or any other similar
insurance policy of the Failed Bank, or any proceeds with respect to any of the
foregoing;

(b)     any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other similar insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other similar insurance policy of the Failed Bank in force as of Bank Closing;

(c)     any agreement or executory contract for the sale of any branch of the Failed Bank including the assets, liabilities and business related thereto;

(d)     any defensive litigation with respect to which the Failed Bank was a defendant or counter-claimant;

(e)     owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances.

## 3.5     **Loans Essential to Receiver**.

(a) The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to promptly assign, transfer, convey, and deliver to the Receiver, at no cost to the Receiver, all of the Assuming Bank's right, title and interest in and to, any Loan essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Loan that the Receiver determines to be:

(i)  made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii)  the subject of any investigation relating to any claim described in Section 3.4(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii)  made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv)  secured by collateral which also secures any asset owned by the Receiver or any Subsidiary of the Failed Bank that is not an Acquired Subsidiary; or

(v) related to any asset of the Failed Bank not acquired by the Assuming Bank pursuant to this Agreement.

(b)     The Assuming Bank agrees to service and manage each such Loan in accordance with usual and prudent banking standards and practices until each such Loan is transferred to the Receiver. All transfers necessitated by the transfer to the Receiver of any Loan under this Section 3.5 shall be made within seven (7) days after the date of the notice by the Receiver with respect thereto. The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 11.4.

### 3.6    Puts of Assets and Liabilities Assumed to the Receiver.

(a)     **Puts Prior to the Settlement Date.** During the period from Bank Closing to and including the Business Day immediately preceding the Settlement Date, the Assuming Bank shall be entitled to require the Receiver to purchase any Asset that was transferred to the Assuming Bank pursuant to Section 3.1, and to take back any Liabilities Assumed pursuant to Section 2.1. Notwithstanding the foregoing, the Assuming Bank shall not have the right to require the Receiver to purchase any Loan if (i) the Obligor with respect to such Loan is an Acquired Subsidiary, or (ii) the Assuming Bank has:

(A)     made any advance in accordance with the terms of a Commitment or otherwise with respect to such Loan;

(B)     taken any action that increased the amount of a Related Liability with respect to such Loan over the amount of such liability immediately prior to the time of such action;

(C)     created or permitted to be created any Lien on such Loan which secures indebtedness for money borrowed or which constitutes a conditional sales agreement, capital lease or other title retention agreement;

(D)     entered into, agreed to make, grant or permit, or made, granted or permitted any modification or amendment to, any waiver or extension with respect to, or any renewal, refinancing or refunding of, such Loan or related Credit Documents; or

(E)     sold, assigned or transferred all or a portion of such Loan to a third party (whether with or without recourse).

The Assuming Bank shall transfer all such Loans to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Loan, as provided in Section 12.4.

**(b)** **Notices to the Receiver**. In the event that the Assuming Bank elects to require the Receiver to purchase one or more Assets, or take back any Liabilities Assumed, the Assuming Bank shall deliver to the Receiver a notice (a "Put Notice") which shall include:

(i) a list of all Assets that the Assuming Bank requires the Receiver to purchase, or Liabilities Assumed that the Assuming Bank required the Receiver to take back;

(ii) a list of all Related Liabilities with respect to the Assets or Liabilities Assumed identified pursuant to (i) above; and

(iii) a statement of the estimated Repurchase Price of each Asset identified pursuant to (i) above as of the applicable Put Date.

Such notice shall be in the form prescribed by the Receiver or such other form to which the Receiver shall consent. As provided in Section 9.6, the Assuming Bank shall deliver to the Receiver such documents, Credit Files and such additional information relating to the subject matter of the Put Notice as the Receiver may request and shall provide to the Receiver full access to all other relevant books and records.

**(c)** **Purchase by Receiver**. The Receiver shall purchase Loans that are specified in the Put Notice and shall assume Related Liabilities with respect to such Loans, and the transfer of such Loans and Related Liabilities shall be effective as of a date determined by the Receiver, which date shall not be later than thirty (30) days after receipt by the Receiver of the Credit Files with respect to such Loans (the "Put Date").

**(d)** **Purchase Price and Payment Date**. Each Loan purchased by the Receiver pursuant to this Section 3.4 shall be purchased at a price equal to the Repurchase Price of such Loan less the Related Liability Amount applicable to such Loan, in each case determined as of the applicable Put Date. If the difference between such Repurchase Price and such Related Liability Amount is positive, then the Receiver shall pay to the Assuming Bank the amount of such difference; if the difference between such amounts is negative, then the Assuming Bank shall pay to the Receiver the amount of such difference. The Assuming Bank or the Receiver, as the case may be, shall pay the purchase price determined pursuant to this Section 3.4(e) not later than the twentieth (20th) Business Day following the applicable Put Date, together with interest on such amount at the Settlement Interest Rate for the period from and including such Put Date to and including the day preceding the date upon which payment is made.

**(e)** **Servicing.** The Assuming Bank shall administer and manage any Asset subject to purchase by the Receiver in accordance with usual and prudent banking standards and business practices until such time as such Asset is purchased by the Receiver.

**(f)** **Reversals**. In the event that the Receiver purchases an Asset (and assumes the Related Liability) that it is not required to purchase pursuant to this Section 3.4, the Assuming Bank shall repurchase such Asset (and assume such Related Liability) from the Receiver at a price computed so as to achieve the same economic result as would apply if the Receiver had never purchased such Asset pursuant to this Section 3.4.

**3.5**    <u>Assets Not Purchased by Assuming Bank</u>. The Assuming Bank does not purchase, acquire or assume, or (except as otherwise expressly provided in this Agreement) obtain an option to purchase, acquire or assume under this Agreement:

(a)    any financial institution bonds, banker's blanket bonds, or public liability, fire, or extended coverage insurance policy or any other insurance policy of the Failed Bank, or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

(b)    any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank or any Subsidiary of the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; <u>provided</u>, <u>that</u> for the purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(c)    amounts reflected on the Accounting Records of the Failed Bank as of Bank Closing as a general or specific loss reserve or contingency account, if any;

(d)    owned Bank Premises which the Receiver, in its discretion, determines may contain environmentally hazardous substances;

(e)    any amounts owed to the Failed Bank by any Subsidiary of the Failed Bank other than an Acquired Subsidiary;

(f)    any "goodwill," as such term is defined in the instructions to the report of condition prepared by banks examined by the Corporation in accordance with 12 C.F.R. Section 304.4, and other intangibles;

(g)    any security if, in the discretion of the Receiver, the value of such security either cannot be determined or is determined to be zero pursuant to Section 3.2(b), and any security listed on Schedule 3.5(k), if any; and

(h)    any criminal restitution orders issued in favor of the Failed Bank.

The Assuming Bank only acquires assets and rights as provided in this Agreement. The foregoing shall not be construed to imply that any particular asset or right listed otherwise would have been sold or assigned or that any asset or right not listed is sold or assigned.

3.6    **Assets Essential to Receiver**.

(a)    The Receiver may refuse to sell to the Assuming Bank, or the Assuming Bank agrees, at the request of the Receiver set forth in a written notice to the Assuming Bank, to assign, transfer, convey, and deliver to the Receiver all of the Assuming Bank's right, title and interest in and to, any Asset or asset essential to the Receiver as determined by the Receiver in its discretion (together with all Credit Documents evidencing or pertaining thereto), which may include any Asset or asset that the Receiver determines to be:

(i) made to an officer, director, or other Person engaging in the affairs of the Failed Bank, its Subsidiaries or Affiliates or any related entities of any of the foregoing;

(ii) the subject of any investigation relating to any claim with respect to any item described in Section 3.5(a) or (b), or the subject of, or potentially the subject of, any legal proceedings;

(iii) made to a Person who is an Obligor on a loan owned by the Receiver or the Corporation in its corporate capacity or its capacity as receiver of any institution;

(iv) secured by collateral which also secures any asset owned by the Receiver; or

(v) related to any asset of the Failed Bank not purchased by the Assuming Bank under this Article III.

(b)    Each such Asset or asset purchased by the Receiver shall be purchased at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset, in each case determined as of the date of the notice provided by the Receiver pursuant to Section 3.6(a). The Receiver shall pay the Assuming Bank not later than the twentieth (20th) Business Day following receipt of related Credit Documents and Credit Files together with interest on such amount at the Settlement Interest Rate for the period from and including the date of receipt of such documents to and including the day preceding the day on which payment is made. The Assuming Bank agrees to administer and manage each such Asset or asset in accordance with usual and prudent banking standards and business practices until each such Loan is purchased by the Receiver. All transfers with respect to Loans under this Section 3.6 shall be made as provided in Section 9.6. The Assuming Bank shall transfer all such Assets or assets and Related Liabilities to the Receiver without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Asset or asset, as provided in Section 12.4.

## ARTICLE IV
## ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank agrees with the Receiver and the Corporation as follows:

4.1    **Continuation of Banking Business**. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking business day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such

banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

**4.2** **Agreement with Respect to Credit Card Business**. The Assuming Bank agrees to honor and perform, from and after Bank Closing, all duties and obligations with respect to the Failed Bank's credit card business, and/or processing related to credit cards, if any, and assumes all outstanding extensions of credit with respect thereto. Fees related to the credit card business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.3** **Agreement with Respect to Safe Deposit Business**. The Assuming Bank assumes and agrees to discharge, from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes; provided, that the Assuming Bank may relocate the Safe Deposit Boxes of the Failed Bank to any office of the Assuming Bank located in the trade area of the Failed Bank. Fees related to the safe deposit business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

**4.4** **Agreement with Respect to Safekeeping Business**. The Receiver transfers, conveys and delivers to the Assuming Bank and the Assuming Bank accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank assumes and agrees to honor and discharge, from and after Bank Closing, the duties and obligations of the Failed Bank with respect to such securities and items held in safekeeping. The Assuming Bank shall be entitled to all rights and benefits heretofore accrued or hereafter accruing with respect thereto; provided, that, fees related to the safe keeping business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank. The Assuming Bank shall provide to the Receiver written verification of all assets held by the Failed Bank for safekeeping within sixty (60) days after Bank Closing.

**4.5** **Agreement with Respect to Trust Business**.

(a)    The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under trusts, executorships, administrations, guardianships, and agencies, and other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder. Fees related to the trust business collected prior to Bank Closing shall be for the benefit of the Receiver and fees collected after Bank Closing shall be for the benefit of the Assuming Bank.

(b)    The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c)    In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

(d)    The Assuming Bank shall provide to the Receiver written verification of the assets held in connection with the Failed Bank's trust business within sixty (60) days after Bank Closing.

**4.6    Agreement with Respect to Leases**.

(a)    **Option to Assume.** The Receiver hereby grants to the Assuming Bank an exclusive option for the period of one hundred seventy (170) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all leases for leased Bank Premises, leased Furniture and Equipment and leased Fixtures, if any, which have been continuously occupied or utilized by the Assuming Bank from Bank Closing to the date it elects to accept an assignment of the leases with respect thereto, to the extent such leases can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises or other property subject to the lease. If an assignment cannot be made of any such leases, the Receiver may, in its discretion, enter into subleases with the Assuming Bank containing the same terms and conditions provided under such existing leases for such leased Bank Premises or other property. The Assuming Bank shall give notice to the Receiver within the option period of its election to accept or not to accept an assignment of any or all leases (or enter into subleases or new leases in lieu thereof). The Assuming Bank agrees to assume all leases assigned (or enter into subleases or new leases in lieu thereof) pursuant to this Section 4.6.

(c)    **Facilitation.** The Receiver agrees to facilitate the assumption, assignment or sublease of leases or the negotiation of new leases by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation, make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation or commit to any other obligations to third parties.

(d)    **Occupancy.** The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided in Section 4.6(b). Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

(e)    **Occupancy Costs.**

(i) The Assuming Bank agrees to pay to the Receiver, or to appropriate third parties at the direction of the Receiver, during and for the period of any occupancy by it of (x) owned Bank Premises, the market rental value and all operating costs, and (y) leased Bank Premises, all operating costs with respect thereto and to comply with all relevant terms of applicable leases entered into by the Failed Bank, including without limitation the timely payment of all rent. Operating costs include, without limitation all taxes, fees, charges, utilities, insurance and assessments, to the extent not included in the rental value or rent.

(ii) The Assuming Bank agrees during the period of occupancy by it of owned or leased Bank Premises, to pay to the Receiver rent for the use of all leased Furniture and Equipment and Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property owned by the Failed Bank shall be the market rental value thereof, as determined by the Receiver within sixty (60) days after Bank Closing. Rent for such leased property shall be an amount equal to any and all rent and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property.

(f)    **Certain Requirements as to Furniture, Equipment and Fixtures.** If the Assuming Bank accepts an assignment of the lease (or enters into a sublease or a new lease in lieu thereof) for leased Bank Premises as provided in Section 4.6(a) or 4.6(b), or if the Assuming Bank does not exercise such option but within twelve (12) months following Bank Closing obtains the right to occupy such premises (whether by assignment, lease, sublease, purchase or otherwise), other than in accordance with Section 4.6(a) or (b), the Assuming Bank shall (i) accept an assignment or a sublease of the leases or negotiate new leases for all Furniture and Equipment and Fixtures leased by the Failed Bank and located thereon, and (ii) if applicable, accept an assignment or a sublease of any ground lease or negotiate a new ground lease with respect to any land on which such Bank Premises are located; provided, that the Receiver shall not have disposed of such Furniture and Equipment and Fixtures or repudiated the leases specified in clause (ii) or (iii).

(g)    **Vacating Premises**. If the Assuming Bank elects not to accept an assignment of the lease or sublease any leased Bank Premises, the notice of such election in accordance with Section 4.6(b) shall specify the date upon which the Assuming Bank's occupancy of such leased Bank Premises shall terminate, which date shall not be later than the date which is one hundred eighty (180) days after Bank Closing. Upon vacating such premises, the Assuming Bank shall relinquish and release to the Receiver such premises and the Fixtures and the Furniture and Equipment located thereon in the same condition as at Bank Closing, normal wear and tear excepted. By failing to provide notice of its intention to vacate such premises prior to the expiration of the option period specified in Section 4.6(b), or by occupying such premises after the one hundred eighty (180)-day period specified above in this paragraph (ii), the Assuming Bank shall, at the Receiver's option, (x) be deemed to have assumed all leases, obligations and liabilities with respect to such premises (including any ground lease with respect to the land on which premises are located), and leased Furniture and Equipment and leased Fixtures located thereon in accordance with this Section 4.6 (unless the Receiver previously repudiated any such lease), and (y) be required to purchase all Furniture and Equipment and Fixtures owned by the Failed Bank and located on such premises as of Bank Closing.

**(h)**    **Furniture and Equipment and Certain Other Equipment.** The Receiver hereby grants to the Assuming Bank an option to purchase, effective as of the date of Bank Closing, <u>all</u> Furniture and Equipment, including any telecommunications, data processing equipment (including hardware and software) and check processing and similar operating equipment owned by the Failed Bank and located at any owned or leased Bank Premises that the Assuming Bank elects to vacate or which it could have, but did not occupy, pursuant to this Section 4.6; <u>provided</u>, <u>that</u>, the Assuming Bank shall give the Receiver notice of its election to purchase such property at the time it gives notice of its intention to vacate such Bank Premises or within ten (10) days after Bank Closing for Bank Premises it could have, but did not, occupy.

**4.7**    **Agreement with Respect to Leased Data Processing Equipment**.

(a)    The Receiver hereby grants to the Assuming Bank an exclusive option for the period of one hundred seventy (170) days commencing the day after Bank Closing to accept an assignment from the Receiver of any or all Data Processing Leases to the extent that such Data Processing Leases can be assigned.

(b)    The Assuming Bank shall (i) give written notice to the Receiver within the option period specified in Section 4.7(a) of its intent to accept an assignment or sublease of any or all Data Processing Leases and promptly accept an assignment or sublease of such Data Processing Leases, and (ii) give written notice to the appropriate lessor(s) that it has accepted an assignment or sublease of any such Data Processing Leases.

(c)    The Receiver agrees to facilitate the assignment or sublease of Data Processing Leases or the negotiation of new leases or license agreements by the Assuming Bank; <u>provided</u>, <u>that</u> neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation.

(d)    The Assuming Bank agrees, during its period of use of any property subject to a Data Processing Lease, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of the applicable Data Processing Leases entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(e)    The Assuming Bank shall, not later than fifty (50) days after giving the notice provided in Section 4.7(b), (i) relinquish and release to the Receiver all property subject to the relevant Data Processing Lease, in the same condition as at Bank Closing, normal wear and tear excepted, or (ii) accept an assignment or a sublease thereof or negotiate a new lease or license agreement under this Section 4.7.

**4.8**    **Agreement with Respect to Certain Existing Agreements**.

(a)    Subject to the provisions of Section 4.8(b), with respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank, within one hundred seventy (170) days after Bank Closing, the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement. Except as may be otherwise provided in this Article IV, the Assuming Bank agrees to comply

with the terms of each such agreement for a period commencing on the day after Bank Closing and ending on: (i) in the case of an agreement that provides for the rendering of services by the Failed Bank, the date which is ninety (90) days after Bank Closing, and (ii) in the case of an agreement that provides for the rendering of services to the Failed Bank, the date which is sixty (60) days after the Assuming Bank has given notice to the Receiver of its election not to assume such agreement; provided, that the Receiver can reasonably make such service agreements available to the Assuming Bank. The Assuming Bank shall be deemed by the Receiver to have assumed agreements for which no notification is timely given. The Receiver agrees to assign, transfer, convey, and deliver to the Assuming Bank all right, title and interest of the Receiver, if any, in and to agreements the Assuming Bank assumes hereunder. In the event the Assuming Bank elects not to accept an assignment of any lease (or sublease) or negotiate a new lease for leased Bank Premises under Section 4.6 and does not otherwise occupy such premises, the provisions of this Section 4.8(a) shall not apply to service agreements related to such premises. The Assuming Bank agrees, during the period it has the use or benefit of any such agreement, promptly to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of such agreement.

(b)    The provisions of Section 4.8(a) shall not apply to (i) agreements pursuant to which the Failed Bank provides mortgage servicing for others or mortgage servicing is provided to the Failed Bank by others, (ii) agreements that are subject to Sections 4.1 through 4.7 and any insurance policy or bond referred to in Section 3.5(a) or other agreement specified in Section 3.5, and (iii) consulting, management or employment agreements, if any, between the Failed Bank and its employees or other Persons. Except as otherwise expressly set forth elsewhere in this Agreement, the Assuming Bank does not assume any liabilities or acquire any rights under any of the agreements described in this Section 4.8(b).

**4.9    Informational Tax Reporting**. The Assuming Bank agrees to perform all obligations of the Failed Bank with respect to Federal and State income tax informational reporting related to (i) the Assets and the Liabilities Assumed, (ii) deposit accounts that were closed and loans that were paid off or collateral obtained with respect thereto prior to Bank Closing, (iii) miscellaneous payments made to vendors of the Failed Bank, and (iv) any other asset or liability of the Failed Bank, including, without limitation, loans not purchased and Deposits not assumed by the Assuming Bank, as may be required by the Receiver.

**4.10    Insurance**. The Assuming Bank agrees to obtain insurance coverage effective from and after Bank Closing, including public liability, fire and extended coverage insurance acceptable to the Receiver with respect to owned or leased Bank Premises that it occupies, and all owned or leased Furniture and Equipment and Fixtures and leased data processing equipment (including hardware and software) located thereon, in the event such insurance coverage is not already in force and effect with respect to the Assuming Bank as the insured as of Bank Closing. All such insurance shall, where appropriate (as determined by the Receiver), name the Receiver as an additional insured.

**4.11    Office Space for Receiver and Corporation**. The Assuming Bank agrees to provide to the Receiver and the Corporation, without charge, adequate and suitable office space (including parking facilities and vault space), furniture, equipment (including photocopying and telecopying machines) and utilities (including local telephone service) at the Bank Premises occupied by the Assuming Bank for their use in the discharge of their respective functions with

respect to the Failed Bank. In the event the Receiver and the Corporation determine that the space provided is inadequate or unsuitable, the Receiver and the Corporation may relocate to other quarters having adequate and suitable space and the costs of relocation and any rental and utility costs for the balance of the period of occupancy by the Receiver and the Corporation shall be borne by the Assuming Bank.

### 4.12  Reserved

### 4.13  Agreement with Respect to Interim Asset Servicing and Interim Management.

At any time after Bank Closing, the Receiver may establish on its books an asset pool(s) and may transfer to such asset pool(s) (by means of accounting entries on the books of the Receiver) all or any assets and liabilities of the Failed Bank which are not acquired by the Assuming Bank, including, without limitation, wholly unfunded Commitments and assets and liabilities which may be acquired, funded or originated by the Receiver subsequent to Bank Closing. The Receiver may remove assets (and liabilities) from or add assets (and liabilities) to such pool(s) at any time in its discretion. At the option of the Receiver, the Assuming Bank agrees to service, administer, and collect such pool assets in accordance with and for the term set forth in Exhibit 4.13 "Interim Asset Servicing Arrangement" and to manage, administer, collect and liquidate such pool assets in accordance with and for the term set forth in Exhibit 4.13A "Interim Management Arrangement", as such pool assets may be assigned.

### 4.14  Agreement With Respect to Certain Back Room Functions and Certain Data Processing Services.

(a)  Back room or back office functions provided by the Failed Bank prior to Bank Closing to any Affiliate financial institution or Subsidiary financial institution of the Failed Bank or any holding company of the Failed Bank shall be provided by the Assuming Bank to such institutions for no less than nine (9) months after Bank Closing, whether or not any such financial institution becomes in "default" as defined in 12 U.S.C. Section 1813(x)(1) during such period, subject to payment of fair and reasonable compensation to the Assuming Bank for such service.  For purposes of this Section 4.8(a), the term "back room" or "back office" functions (as this term is understood in the banking industry) includes but is not limited to bookkeeping operations, data processing provided pursuant to agreements, practices, customs or arrangements, item and/or deposit processing, and credit or loan processing.

(b)  The Assuming Bank agrees to continue to provide, in accordance with data processing agreements pursuant to which the Failed Bank provided data processing services to financial institutions or to Subsidiaries of the Failed Bank or any holding company of the Failed Bank as of Bank Closing, such services to such entities for a period of one hundred seventy (170) days after Bank Closing.  The Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not assume each such agreement prior to the end of such period.

(c)  The Receiver or the Corporation, in its discretion, may release the Assuming Bank from any obligation to provide services in accordance with paragraph (a) or (b) of this Section 4.8.

## ARTICLE V
## DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

**5.1    Payment of Checks, Drafts and Orders.** Subject to Section 9.5, the Assuming Bank agrees to pay all properly drawn checks, drafts and withdrawal orders of depositors of the Failed Bank presented for payment, whether drawn on the check or draft forms provided by the Failed Bank or by the Assuming Bank, to the extent that the Deposit balances to the credit of the respective makers or drawers assumed by the Assuming Bank under this Agreement are sufficient to permit the payment thereof, and in all other respects to discharge, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to the Deposit balances due and owing to the depositors of the Failed Bank assumed by the Assuming Bank under this Agreement.

**5.2    Certain Agreements Related to Deposits.** Subject to Section 2.2, the Assuming Bank agrees to honor the terms and conditions of any written escrow or mortgage servicing agreement or other similar agreement relating to a Deposit liability assumed by the Assuming Bank pursuant to this Agreement.

**5.3    Notice to Depositors.**

(a)    Within seven (7) days after Bank Closing, the Assuming Bank shall give (i) notice to depositors of the Failed Bank of its assumption of the Deposit liabilities of the Failed Bank, and (ii) any notice required under Section 2.2, by mailing to each such depositor a notice with respect to such assumption and by advertising in a newspaper of general circulation in the county or counties in which the Failed Bank was located. The Assuming Bank agrees that it will obtain prior approval of all such notices and advertisements from counsel for the Receiver and that such notices and advertisements shall not be mailed or published until such approval is received.

(b)    The Assuming Bank shall give notice by mail to depositors of the Failed Bank concerning the procedures to claim their deposits, which notice shall be provided to the Assuming Bank by the Receiver or the Corporation. Such notice shall be included with the notice to depositors to be mailed by the Assuming Bank pursuant to Section 5.3(a).

(c)    If the Assuming Bank proposes to charge fees different from those charged by the Failed Bank before it establishes new deposit account relationships with the depositors of the Failed Bank, the Assuming Bank shall give notice by mail of such changed fees to such depositors.

## ARTICLE VI
## RECORDS

**6.1    Transfer of Records.**

(a)    In accordance with Section 3.1, the Receiver assigns, transfers, conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit liabilities of the Failed Bank assumed by the Assuming Bank under this Agreement, except as provided in Section 6.4:

(i) signature cards, orders, contracts between the Failed Bank and its depositors and Records of similar character;

(ii) passbooks of depositors held by the Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to accounts of depositors;

and the following Records pertaining to the Assets:

(iii) records of deposit balances carried with other banks, bankers or trust companies;

(iv) Loan and collateral records and Credit Files and other documents;

(v) deeds, mortgages, abstracts, surveys, and other instruments or records of title pertaining to real estate or real estate mortgages;

(vi) signature cards, agreements and records pertaining to Safe Deposit Boxes, it any; and

(vii) records pertaining to the credit card business, trust business or safekeeping business of the Failed Bank, if any.

(b)    The Receiver, at its option, may assign and transfer to the Assuming Bank by a single blanket assignment or otherwise, as soon as practicable after Bank Closing, any other Records not assigned and transferred to the Assuming Bank as provided in this Agreement, including but not limited to loan disbursement checks, general ledger tickets, official bank checks, proof transactions (including proof tapes) and paid out loan files.

**6.2    Delivery of Assigned Records**. The Receiver shall deliver to the Assuming Bank all Records described in (i) Section 6.1(a) as soon as practicable on or after the date of this Agreement, and (ii) Section 6.1(b) as soon as practicable after making any assignment described therein.

**6.3    Preservation of Records**. The Assuming Bank agrees that it will preserve and maintain for the joint benefit of the Receiver, the Corporation and the Assuming Bank, all Records of which it has custody for such period as either the Receiver or the Corporation in its discretion may require, until directed otherwise, in writing, by the Receiver or Corporation. The Assuming Bank shall have the primary responsibility to respond to subpoenas, discovery requests, and other similar official inquiries with respect to the Records of which it has custody.

**6.4    Access to Records; Copies**. The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use. inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate and provide to Receiver, in the discretion of the Receiver or the Corporation, any Record electronic records pertaining to Deposit account relationships.  The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate

Records. A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

## ARTICLE VII
## INITIAL PAYMENT; FINAL DISTRIBUTION

**7.1. Initial Payment.** On the Payment Date, the Corporation will pay to the Assuming Bank, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following the day of Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at the Settlement Interest Rate.

**7.2 Final Distribution..**

Upon the realization on the Resolution Date of the value of substantially all of the Assets of the Assuming Bank, the Corporation (i) will pay to the Receiver on behalf of the Assuming Bank, or cause to be paid to the Receiver by the Assuming Bank, the amount, if any, realized in excess of the amount necessary to pay in full all of the obligations of the Assuming Bank (including the amount necessary to fully reimburse the Corporation for any funds it provides to the Assuming Bank unrelated to the Corporation's insurance obligation with respect to Insured Deposits), and (ii) convey on behalf of the Assuming Bank or cause the Assuming Bank to convey, to the Receiver, without recourse, free and clear of any Lien of the Corporation or the Assuming Bank, all of the Assuming Bank's right, title and interest in and to any such remaining Assets.

## ARTICLE VIII
## ADJUSTMENTS

**8.1 Pro Forma Statement.** It is understood that the determination of the Initial Payment is based on the Receiver's best estimate of the Liabilities Assumed and the Assets at Bank Closing. The Receiver, as soon as practicable after Bank Closing, in accordance with the best information then available, shall provide to the Assuming Bank a pro forma statement reflecting any adjustments of such liabilities and assets as may be necessary. Such pro forma statement shall take into account, to the extent possible, (i) liabilities and assets of a nature similar to those contemplated by Section 2.1 or Section 3.1, respectively, which at Bank Closing were carried in the Failed Bank's suspense accounts, (ii) accruals as of Bank Closing for all income related to the assets and business of the Failed Bank acquired by the Assuming Bank hereunder, whether or not such accruals were reflected on the Accounting Records of the Failed Bank in the normal course of its operations, and (iii) adjustments to determine the Book Value of any investment in an Acquired Subsidiary and related accounts on the "bank only" (unconsolidated) balance sheet of the Failed Bank based on the equity method of accounting, whether or not the Failed Bank used the equity method of accounting for investments in subsidiaries, except that the resulting amount cannot be less than the Acquired Subsidiary's recorded equity as of Bank Closing as reflected on the Accounting Records of the Acquired Subsidiary. Any Loan purchased by the Assuming Bank pursuant to Section 3.1 which the Failed Bank charged off during the period following the date

of the Information Package to Bank Closing shall be deemed not to be charged off for the purposes of the pro forma statement, and the purchase price shall be determined pursuant to Section 3.2.

### 8.2    Correction of Errors and Omissions; Other Liabilities.

(a)    In the event any bookkeeping omissions or errors are discovered in preparing any pro forma statement or in completing the transfers and assumptions contemplated hereby, the parties hereto agree to correct such errors and omissions, it being understood that, as far as practicable, all adjustments will be made consistent with the judgments, methods, policies or accounting principles utilized by the Failed Bank in preparing and maintaining Accounting Records, except that adjustments made pursuant to this Section 8.2(a) are not intended to bring the Accounting Records of the Failed Bank into accordance with generally accepted accounting principles.

(b)    If the Receiver discovers at any time subsequent to the date of this Agreement that any claim exists against the Failed Bank which is of such a nature that it would have been included in the liabilities assumed under Article II had the existence of such claim or the facts giving rise thereto been known as of Bank Closing, the Receiver may, in its discretion, at any time, require that such claim be assumed by the Assuming Bank in a manner consistent with the intent of this Agreement. The Receiver will make appropriate adjustments to the pro forma statement provided by the Receiver to the Assuming Bank pursuant to Section 8.1 as may be necessary.

### 8.3    Payments. 
The Receiver agrees to cause to be paid to the Assuming Bank, or the Assuming Bank agrees to pay to the Receiver, as the case may be, on the Settlement Date, a payment in an amount which reflects net adjustments (including any costs, expenses and fees associated with determinations of value as provided in this Agreement) made pursuant to Section 8.1 or Section 8.2, plus interest as provided in Section 8.4. The Receiver and the Assuming Bank agree to effect on the Settlement Date any further transfer of assets to or assumption of liabilities or claims by the Assuming Bank as may be necessary in accordance with Section 8.1 or Section 8.2.

### 8.4    Interest. 
Any amounts paid under Section 8.3 or Section 8.5, shall bear interest for the period from and including the day following Bank Closing to and including the day preceding the payment at the Settlement Interest Rate.

### 8.5    Subsequent Adjustments. 
In the event that the Assuming Bank or the Receiver discovers any errors or omissions as contemplated by Section 8.2 or any error with respect to the payment made under Section 8.3 after the Settlement Date, the Assuming Bank and the Receiver agree to promptly correct any such errors or omissions, make any payments and effect any transfers or assumptions as may be necessary to reflect any such correction plus interest as provided in Section 8.4.

## ARTICLE IX
## CONTINUING COOPERATION

**9.1**    **General Matters**. The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and to effect the purposes hereof.

**9.2**    **Additional Title Documents**. The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of any party hereto, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in the appropriate party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith. The Assuming Bank shall prepare such instruments and documents of conveyance (in form and substance satisfactory to the Receiver) as shall be necessary to vest title to the Assets in the Assuming Bank. The Assuming Bank shall be responsible for recording such instruments and documents of conveyance at its own expense.

**9.3**    **Claims and Suits**.

(a)    The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Receiver has indemnified the Assuming Bank in the same manner and to the same extent as provided in Article XII, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed, which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing. The exercise by the Receiver of any rights under this Section 9.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

(b)    In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district. The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

**9.4**    **Payment of Deposits**. In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made. Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

**9.5**     **Withheld Payments**. At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by the Assuming Bank pursuant to this Agreement does not constitute a "Deposit" (or otherwise, in its discretion, determine that it is the best interest of the Receiver or Corporation to withhold all or any portion of any deposit), and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees to hold such deposit and not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such returned deposit balance. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance the payment of which was withheld pursuant to this Section.

**9.6     Proceedings with Respect to Certain Assets and Liabilities.**

(a)     In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.

(b)     In addition to its obligations under Section 6.4, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of the Acquired Subsidiaries, and (ii) its books and records, the books and records of the Acquired Subsidiaries and all Credit Files, and copies thereof. Copies of books, records and Credit Files shall be provided by the Assuming Bank as requested by the Receiver and the costs of duplication thereof shall be borne by the Receiver.

(c)     Not later than ten (10) days after the Put Notice pursuant to Section 3.4 or the date of the notice of transfer of any Loan by the Assuming Bank to the Receiver pursuant to Section 3.6, the Assuming Bank shall deliver to the Receiver such documents with respect to such Loan as the Receiver may request, including without limitation the following: (i) all related Credit Documents (other than certificates, notices and other ancillary documents), (ii) a certificate setting forth the principal amount on the date of the transfer and the amount of interest, fees and other charges then accrued and unpaid thereon, and any restrictions on transfer to which any such Loan is subject, and (iii) all Credit Files, and all documents, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) maintained by, owned by, or in the possession of the Assuming Bank or any Affiliate of the Assuming Bank relating to the transferred Loan.

**9.7    Information**. The Assuming Bank promptly shall provide to the Corporation such other information, including financial statements and computations, relating to the performance of the provisions of this Agreement as the Corporation or the Receiver may request from time to time, and, at the request of the Receiver, make available employees of the Failed Bank employed or retained by the Assuming Bank to assist in preparation of the pro forma statement pursuant to Section 8.1.

**ARTICLE X**
**CONDITION PRECEDENT**

The obligations of the parties to this Agreement are subject to the Receiver and the Corporation having received at or before Bank Closing evidence reasonably satisfactory to each of any necessary approval, waiver, or other action by any governmental authority, the board of directors of the Assuming Bank, or other third party, with respect to this Agreement and the transactions contemplated hereby, the closing of the Failed Bank and the appointment of the Receiver, the chartering of the Assuming Bank, and any agreements, documents, matters or proceedings contemplated hereby or thereby.

**ARTICLE XI**
**REPRESENTATIONS AND WARRANTIES OF THE ASSUMING BANK**

The Assuming Bank represents and warrants to the Corporation and the Receiver as follows:

**11.1    Corporate Existence and Authority**. The Assuming Bank (i) is duly organized, validly existing and in good standing under the laws of its Chartering Authority and has full power and authority to own and operate its properties and to conduct its business as now conducted by it, and (ii) has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The Assuming Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the performance of the transactions contemplated hereby.

**11.2    Third Party Consents**. No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with the execution, delivery or performance by the Assuming Bank of this Agreement, other than such consents as have been duly obtained and are in full force and effect.

**11.3    Execution and Enforceability**. This Agreement has been duly executed and delivered by the Assuming Bank and when this Agreement has been duly authorized, executed and delivered by the Corporation and the Receiver, this Agreement will constitute the legal, valid and binding obligation of the Assuming Bank, enforceable in accordance with its terms.

**11.4    Compliance with Law**.

(i) Neither the Assuming Bank nor any of its Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the

United States of America, any State, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank or any of its Subsidiaries or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, with respect to the conduct of the business of the Assuming Bank or of any of its Subsidiaries, or the ownership of the properties of the Assuming Bank or any of its Subsidiaries, which, either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the ability of the Assuming Bank to perform, satisfy or observe any obligation or condition under this Agreement.

(ii) Neither the execution and delivery nor the performance by the Assuming Bank of this Agreement will result in any violation by the Assuming Bank of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

**11.5    Representations Remain True**.  The Assuming Bank represents and warrants that all information provided and representations made by or on behalf of the Assuming Bank in connection with this Agreement and the transactions contemplated hereby, are true and correct in all material respects and do not fail to state any fact required to make the information contained therein not misleading.

**ARTICLE XII**
**INDEMNIFICATION**

**12.1    Indemnification of Indemnitees**.  From and after Bank Closing and subject to the limitations set forth in this Section and Section 12.6 and compliance by the Indemnitees with Section 12.2, the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank for which indemnification is provided hereunder in (a) of this Section 12.1, subject to certain exclusions as provided in (b) of this Section 12.1:

(a)

(1) claims based on the rights of any shareholder or former shareholder as such of (x) the Failed Bank, or (y) any Subsidiary or Affiliate of the Failed Bank;

(2) claims based on the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank arising prior to Bank Closing;

(3) claims based on the rights of any present or former director, officer, employee or agent as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank;

(4) claims based on any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers, employees or agents as such, or any Subsidiary or Affiliate of the Failed Bank, or the directors, officers, employees or agents as such of such Subsidiary or Affiliate;

(5) claims based on any malfeasance, misfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business of the Failed Bank, if any;

(6) claims based on any failure or alleged failure (not in violation of law) by the Assuming Bank to continue to perform any service or activity previously performed by the Failed Bank which the Assuming Bank is not required to perform pursuant to this Agreement or which arise under any contract to which the Failed Bank was a party which the Assuming Bank elected not to assume in accordance with this Agreement and which neither the Assuming Bank nor any Subsidiary or Affiliate of the Assuming Bank has assumed subsequent to the execution hereof;

(7) claims arising from any action or inaction of any Indemnitee, including for purposes of this Section 12.1(a)(7) the former officers or employees of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank that is taken upon the specific written direction of the Corporation or the Receiver, other than any action or inaction taken in a manner constituting bad faith, gross negligence or willful misconduct; and

(8) claims based on the rights of any depositor of the Failed Bank whose deposit has been accorded "withheld payment" status and/or returned to the Receiver or Corporation in accordance with Section 9.5 and/or has become an "unclaimed deposit" or has been returned to the Corporation or the Receiver in accordance with Section 2.3;

(9) claims arising from any action or inaction in connection with the administration of an Asset following a transfer to the Receiver of responsibility for such administration under any provision of the Interim Servicing Arrangement, or similar agreement or arrangement pertaining to the management of the Asset;

(10) claims arising in connection with a refusal of the Assuming Bank, acting pursuant to instructions given in writing by the Receiver pursuant to any provision of the Interim Servicing Arrangement, or any similar agreement or arrangement pertaining to the management of an Asset, to advance funds under a Commitment to an Obligor on any Loan managed pursuant to the Interim Servicing Arrangement;

(b)    provided, that, with respect to this Agreement, except for paragraphs (7) and (8) of Section 12.1(a), no indemnification will be provided under this Agreement for any:

(1) judgment or fine against, or any amount paid in settlement (without the written approval of the Receiver) by, any Indemnitee in connection with any action that seeks damages against any Indemnitee (a "counterclaim") arising with respect to any Asset and based on any action or inaction of either the Failed Bank, its directors, officers, employees or agents as such prior to Bank Closing, unless any such judgment, fine or amount paid in settlement exceeds the

greater of (i) the Repurchase Price of such Asset, or (ii) the monetary recovery sought on such Asset by the Assuming Bank in the cause of action from which the counterclaim arises; and in such event the Receiver will provide indemnification only in the amount of such excess; and no indemnification will be provided for any costs or expenses other than any costs or expenses (including attorneys' fees) which, in the determination of the Receiver, have been actually and reasonably incurred by such Indemnitee in connection with the defense of any such counterclaim; and it is expressly agreed that the Receiver reserves the right to intervene, in its discretion, on its behalf and/or on behalf of the Receiver, in the defense of any such counterclaim;

(2) claims with respect to any liability or obligation of the Failed Bank that is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(3) claims with respect to any liability of the Failed Bank to any present or former employee as such of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank, which liability is expressly assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(4) claims based on the failure of any Indemnitee to seek recovery of damages from the Receiver for any claims based upon any action or inaction of the Failed Bank, its directors, officers, employees or agents as fiduciary, agent or custodian prior to Bank Closing;

(5) claims based on any violation or alleged violation by any Indemnitee of the antitrust, branching, banking or bank holding company or securities laws of the United States of America or any State thereof;

(6) claims based on the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank;

(7) claims based on the rights of any present or former shareholder as such of the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(8) claims, if the Receiver determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(9) claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(10) claims based on any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent transfer of any Assets or Liabilities Assumed to any Subsidiary or Affiliate of the Assuming Bank;

(11) except as expressly provided in this Article XII, claims based on any action or inaction of any Indemnitee, and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Receiver, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates;

(12) claims or actions which constitute a breach by the Assuming Bank of the representations and warranties contained in Article XI;

(13) claims arising out of or relating to the condition of or generated by an Asset arising from or relating to the presence, storage or release of any hazardous or toxic substance, or any pollutant or contaminant, or condition of such Asset which violate any applicable Federal, State or local law or regulation concerning environmental protection; and

(14) claims based on, related to or arising from any asset, including a loan, acquired or liability assumed by the Assuming Bank, other than pursuant to this Agreement.

**12.2    Conditions Precedent to Indemnification**. It shall be a condition precedent to the obligation of the Receiver to indemnify any Person pursuant to this Article XII that such Person shall, with respect to any claim made or threatened against such Person for which such Person is or may be entitled to indemnification hereunder:

(a)    give written notice to the Regional Counsel (Litigation Branch) of the Corporation in the manner and at the address provided in Section 13.7 of such claim as soon as practicable after such claim is made or threatened; provided, that notice must be given on or before the date which is six (6) years from the date of this Agreement;

(b)    provide to the Receiver such information and cooperation with respect to such claim as the Receiver may reasonably require;

(c)    cooperate and take all steps, as the Receiver may reasonably require, to preserve and protect any defense to such claim;

(d)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Receiver the right, which the Receiver may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Receiver; provided, that the Receiver shall have notified the Person claiming indemnification in writing that such claim is a claim with respect to which the Person claiming indemnification is entitled to indemnification under this Article XII;

(e)      not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Receiver; provided, that the Receiver shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Receiver;

(f)      not release or settle such claim or make any payment or admission with respect thereto, unless the Receiver consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Receiver shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Receiver; and

(g)      take reasonable action as the Receiver may request in writing as necessary to preserve, protect or enforce the rights of the indemnified Person against any Primary Indemnitor.

**12.3    No Additional Warranty**. Nothing in this Article XII shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any (x) Asset, or (y) asset of the Failed Bank purchased by the Assuming Bank subsequent to the execution of this Agreement by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect thereto.

**12.4    Indemnification of Receiver and Corporation**. From and after Bank Closing, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with any of the following:

(a)      claims based on any and all liabilities or obligations of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank or any Subsidiary or Affiliate of the Assuming Bank, whether or not any such liabilities subsequently are sold and/or transferred, other than any claim based upon any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a); and

(b)      claims based on any act or omission of any Indemnitee (including but not limited to claims of any Person claiming any right or title by or through the Assuming Bank with respect to Assets transferred to the Receiver pursuant to Section 3.4 or 3.6), other than any action or inaction of any Indemnitee as provided in paragraph (7) or (8) of Section 12.1(a).

**12.5    Obligations Supplemental**. The obligations of the Receiver, and the Corporation as guarantor in accordance with Section 12.7, to provide indemnification under this Article XII are to supplement any amount payable by any Primary Indemnitor to the Person indemnified under this Article XII. Consistent with that intent, the Receiver agrees only to make payments pursuant to such indemnification to the extent not payable by a Primary Indemnitor. If the aggregate amount of payments by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, and all Primary Indemnitors with respect to any item of indemnification under this Article XII exceeds the amount payable with respect to such item, such Person being

indemnified shall notify the Receiver thereof and, upon the request of the Receiver, shall promptly pay to the Receiver, or the Corporation as appropriate, the amount of the Receiver's (or Corporation's) payments to the extent of such excess.

**12.6    Criminal Claims**. Notwithstanding any provision of this Article XII to the contrary, in the event that any Person being indemnified under this Article XII shall become involved in any criminal action, suit or proceeding, whether judicial, administrative or investigative, the Receiver shall have no obligation hereunder to indemnify such Person for liability with respect to any criminal act or to the extent any costs or expenses are attributable to the defense against the allegation of any criminal act, unless (i) the Person is successful on the merits or otherwise in the defense against any such action, suit or proceeding, or (ii) such action, suit or proceeding is terminated without the imposition of liability on such Person.

**12.7    Limited Guaranty of the Corporation**.  The Corporation hereby guarantees performance of the Receiver's obligation to indemnify the Assuming Bank as set forth in this Article XII. It is a condition to the Corporation's obligation hereunder that the Assuming Bank shall comply in all respects with the applicable provisions of this Article XII. The Corporation shall be liable hereunder only for such amounts, if any, as the Receiver is obligated to pay under the terms of this Article XII but shall fail to pay. Except as otherwise provided above in this Section 12.7, nothing in this Article XII is intended or shall be construed to create any liability or obligation on the part of the Corporation, the United States of America or any department or agency thereof under or with respect to this Article XII, or any provision hereof, it being the intention of the parties hereto that the obligations undertaken by the Receiver under this Article XII are the sole and exclusive responsibility of the Receiver and no other Person or entity.

**12.8    Subrogation**. Upon payment by the Receiver, or the Corporation as guarantor in accordance with Section 12.7, to any Indemnitee for any claims indemnified by the Receiver under this Article XII, the Receiver, or the Corporation as appropriate, shall become subrogated to all rights of the Indemnitee against any other Person to the extent of such payment.

## ARTICLE XIII
## MISCELLANEOUS

**13.1    Entire Agreement**. This Agreement embodies the entire agreement of the parties hereto in relation to the subject matter herein and supersedes all prior understandings or agreements, oral or written, between the parties.

**13.2    Headings**. The headings and subheadings of the Table of Contents, Articles and Sections contained in this Agreement, except the terms identified for definition in Article I and elsewhere in this Agreement, are inserted for convenience only and shall not affect the meaning or interpretation of this Agreement or any provision hereof.

**13.3    Counterparts**. This Agreement may be executed in any number of counterparts and by the duly authorized representative of a different party hereto on separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same Agreement.

**13.4**     <u>Governing Law</u>. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA, AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE MAIN OFFICE OF THE FAILED BANK IS LOCATED.

**13.5**     <u>Successors</u>. All terms and conditions of this Agreement shall be binding on the successors and assigns of the Receiver, the Corporation and the Assuming Bank. Except as otherwise specifically provided in this Agreement, nothing expressed or referred to in this Agreement is intended or shall be construed to give any Person other than the Receiver, the Corporation and the Assuming Bank any legal or equitable right, remedy or claim under or with respect to this Agreement or any provisions contained herein, it being the intention of the parties hereto that this Agreement, the obligations and statements of responsibilities hereunder, and all other conditions and provisions hereof are for the sole and exclusive benefit of the Receiver, the Corporation and the Assuming Bank and for the benefit of no other Person.

**13.6**     <u>Modification; Assignment</u>. No amendment or other modification, rescission, release, or assignment of any part of this Agreement shall be effective except pursuant to a written agreement subscribed by the duly authorized representatives of the parties hereto.

**13.7**     <u>Notice</u>. Any notice, request, demand, consent, approval or other communication to any party hereto shall be effective when received and shall be given <u>in writing</u>, and delivered in person against receipt therefor, or sent by certified mail, postage prepaid, courier service, telex or facsimile transmission to such party (with copies as indicated below) at its address set forth below or at such other address as it shall hereafter furnish in writing to the other parties. All such notices and other communications shall be deemed given on the date received by the addressee. [[[Notwithstanding the addresses set forth in this Section 13.7, in the context of the administration of Shared-Loss Assets, certain notices to the Receiver and/or Corporation should be given as set forth in Article IV of Exhibit 13.14 to this Agreement.]]]

**<u>Assuming Bank</u>**

Federal Deposit Insurance Corporation as
Conservator for IndyMac Federal Bank, FSB
IndyMac Federal Bank, FSB
888 East Walnut Street
Pasadena, California 91101

Attention: President

with a copy to: General Counsel

**Receiver and Corporation**

Federal Deposit Insurance Corporation,
Receiver of IndyMac Bank, FSB
1601 Bryan St.
Dallas, Texas 75201-4586

Attention: Associate Director, Receivership Operations

with copy to: Regional Counsel (Litigation)

**and with respect to notices under Article XII:**

Federal Deposit Insurance Corporation,
Receiver of IndyMac Ban k, FSB
1601 Bryan St.
Dallas, Texas 75201-4586
Attention: Regional Counsel (Litigation)

    **13.8    Manner of Payment**. All payments due under this Agreement shall be in lawful money of the United States of America in immediately available funds as each party hereto may specify to the other parties; <u>provided, that</u> in the event the Receiver or the Corporation is obligated to make any payment hereunder in the amount of $25,000.00 or less, such payment may be made by check.

    **13.9    Costs, Fees and Expenses**. Except as otherwise specifically provided herein, each party hereto agrees to pay all costs, fees and expenses which it has incurred in connection with or incidental to the matters contained in this Agreement, including without limitation any fees and disbursements to its accountants and counsel; <u>provided, that</u> the Assuming Bank shall pay all fees, costs and expenses (other than attorneys' fees incurred by the Receiver) incurred in connection with the transfer to it of any Assets or Liabilities Assumed hereunder or in accordance herewith.

    **13.10    Waiver**. Each of the Receiver, the Corporation and the Assuming Bank may waive its respective rights, powers or privileges under this Agreement; <u>provided, that</u> such waiver shall be in writing; <u>and further provided, that</u> no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

    **13.11    Severability**. If any provision of this Agreement is declared invalid or unenforceable, then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

13.12 **Term of Agreement**. This Agreement shall continue in full force and effect until the sixth (6th) anniversary of Bank Closing; provided, that the provisions of Section 6.3 and 6.4 shall survive the expiration of the term of this Agreement. Provided, however, the receivership of the Failed Bank may be terminated prior to the expiration of the term of this Agreement; in such event, the guaranty of the Corporation, as provided in and in accordance with the provisions of Section 12.7 shall be in effect for the remainder of the term. Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to any (i) amount which is owing at the time of such expiration, regardless of when such amount becomes payable, and (ii) breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

13.13 **Survival of Covenants, Etc.** The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder.

**[Signature Page Follows]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

**FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF INDYMAC BANK, FSB
PASADENA, CALIFORNIA, USA**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE: Director, Division of Resolutions and Receiverships

**FEDERAL DEPOSIT INSURANCE CORPORATION**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE: Director, Division of Resolutions and Receiverships

**FEDERAL DEPOSIT INSURANCE CORPORATION
AS CONSERVATOR FOR INDYMAC FEDERAL BANK,
FSB**

BY: *Mitchell L. Glassman*
Mitchell Glassman

TITLE: Director, Division of Resolutions and Receiverships

**SCHEDULE 2.1 - Certain Liabilities Assumed**

**SCHEDULE 3.1 - Certain Assets Purchased**

**SCHEDULE 3.1(e) - Loans Fully Secured by Assumed Deposits**

**SEE ATTACHED LIST**

**THE LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF THE LOANS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE REPLACED WITH A MORE ACCURATE LIST POST CLOSING.**

SCHEDULE 3.1(v) - Other Real Estate Purchased

SEE ATTACHED LIST

THE  LIST(S) ATTACHED TO THIS SCHEDULE (OR SUBSCHEDULE(S)) AND THE
INFORMATION THEREIN, IS AS OF THE INFORMATION PACKAGE DATE. IT
WILL BE ADJUSTED TO REFLECT THE COMPOSITION AND BOOK VALUE OF
THE ASSETS AS OF THE DATE OF BANK CLOSING. THE LIST(S) MAY BE
REPLACED WITH A MORE ACCURATE LIST POST CLOSING.

**SCHEDULE 3.1(h) - Acquired Subsidiaries**

**All Subsidiaries, including IndyMac Resources, Inc; IndyMac Financial Services; IndyMac Agency, Inc.;  IndyMac ABS, Inc.; IndyMac MBS, Inc.; IndyMac Retained Assets, Inc.; IndyMac Securities Corporation; Loan Associates, LLC;AMC1 LLC; IndyMac Commercial Lending Corporation; and Financial Freedom Senior Funding Corporation.**

**SCHEDULE 3.2 - Purchase Price of Assets or assets**

SCHEDULE 3.5(k) - Securities Not Purchased

AS SPECIFIED IN SECTION 3.5

### EXHIBIT 3.1(U) -- VALUATION OF CERTAIN
### QUALIFIED FINANCIAL CONTRACTS

**A.**    **Scope**

Interest Rate Contracts - All interest rate swaps, forward rate agreements, interest rate futures, caps, collars and floors, whether purchased or written.

Option Contracts - All put and call option contracts, whether purchased or written, on marketable securities, financial futures, foreign currencies, foreign exchange or foreign exchange futures contracts.

Foreign Exchange Contracts - All contracts for future purchase or sale of foreign currencies, foreign currency or cross currency swap contracts, or foreign exchange futures contracts.

**B.**    **Exclusions**

All financial contracts used to hedge assets and liabilities that are acquired by the Assuming Bank but are not subject to adjustment from Book Value.

**C.**    **Adjustment**

The difference between the Book Value and market value as of Bank Closing.

**D.**    **Methodology**

1    The price at which the Assuming Bank sells or disposes of Qualified Financial Contracts will be deemed to be the fair market value of such contracts, if such sale or disposition occurs at prevailing market rates within a predefined timetable as agreed upon by the Assuming Bank and the Receiver.

2.    In valuing all other Qualified Financial Contracts, the following principles will apply:

(i)    All known cash flows under swaps or forward exchange contracts shall be present valued to the swap zero coupon interest rate curve.

(ii)    All valuations shall employ prices and interest rates based on the actual frequency of rate reset or payment.

(iii)    Each tranche of amortizing contracts shall be separately valued. The total value of such amortizing contract shall be the sum of the values of its component tranches.

(iv)    For regularly traded contracts, valuations shall be at the midpoint of the bid and ask prices quoted by customary sources (e.g., The Wall Street Journal, Telerate, Reuters or other similar source) or regularly traded exchanges.

(v)    For all other Qualified Financial Contracts where published market quotes are unavailable, the adjusted price shall be the average of the bid and ask price quotes from three (3) securities dealers acceptable to the Receiver and Assuming Bank as of Bank Closing. If quotes from securities dealers cannot be obtained, an appraiser acceptable to the Receiver and the Assuming Bank will perform a valuation based on modeling, correlation analysis, interpolation or other techniques, as appropriate.

**EXHIBIT 4.13**
**INTERIM ASSET SERVICING ARRANGEMENT**

    (a)      With respect to each asset (or liability) designated from time to time by the Receiver to be serviced by the Assuming Bank pursuant to this Arrangement (such being designated as "Pool Assets"), during the term of this Arrangement, the Assuming Bank shall:

        (i) Promptly apply payments received with respect to any Pool Assets;

        (ii) Reverse and return insufficient funds checks;

        (iii) Pay (A) participation payments to participants in Loans, as and when received; and (B) tax and insurance bills on Pool Assets as they come due, out of escrow funds maintained for purposes;

        (iv) Maintain accurate records reflecting (A) the payment history of Pool Assets, with updated information received concerning changes in the address or identity of the obligors and (B) usage of data processing equipment and employee services with respect to servicing duties;

        (v) Send billing statements to obligors on Pool Assets to the extent that such statements were sent by the Failed Bank;

        (vi) Send notices to obligors who are in default on Loans (in the same manner as the Failed Bank);

        (vii) Send to the Receiver, Attn: Managing Liquidator, at the address provided in Section 13.7 of the Agreement, via overnight delivery: (A) on a weekly basis, weekly reports for the Pool Assets, including, without limitation, reports reflecting collections and the trial balances, transaction journals and loan histories for Pool Assets having activity, together with copies of (1) checks received, (2) insufficient funds checks returned, (3) checks for payment to participants or for taxes and insurance, (4) pay-off requests, (5) notices to defaulted obligors, and (6) data processing and employee logs and (B) any other reports, copies or information as may be periodically or from time to time requested;

        (viii) Remit on a weekly basis to the Receiver, Attn: Division of Finance, Cashier Unit, Operations, at the address in (vii), via wire transfer to the account designated by the Receiver, all payments received on Pool Assets managed by the Assuming Bank or at such time and place and in such manner as may be directed by the Receiver;

        (ix) prepare and timely file all information reports with appropriate tax authorities, and, if required by the Receiver, prepare and file tax returns and pay taxes due on or before the due date, relating to the Pool Assets; and

        (x)  provide and furnish such other services, operations or functions as may be required with regard to Pool Assets, including, without limitation, as may be required with

regard to any business, enterprise or agreement which is a Pool Asset, all as may be required by the Receiver.

Notwithstanding anything to the contrary in this Section, the Assuming Bank shall not be required to initiate litigation or other collection proceedings against any obligor or any collateral with respect to any defaulted Loan. The Assuming Bank shall promptly notify the Receiver, at the address provided above in subparagraph (a)(vii), of any claims or legal actions regarding any Pool Asset.

(b)      The Receiver agrees to reimburse the Assuming Bank for actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(c)      The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(d)      At any time during the term of this Arrangement, the Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(e)      At the expiration of this Agreement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to paragraph (d) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(f)      At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver and providing to the Receiver or its designee(s) (x) information and data regarding the Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool Assets to another system or systems, and (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets.

**EXHIBIT 4.13A**
**INTERIM MANAGEMENT ARRANGEMENT**

**ARTICLE I**
**DEFINITIONS**

Capitalized terms used in this Interim Management Arrangement (the "Arrangement") not otherwise defined in the Agreement or herein shall have the meanings set forth below. As used herein, words importing the singular include the plural and vice versa.

**"Adjusted Pool Value"** means:

(i) with respect to any of the Pool Assets, exclusive of any Pool Assets constituting trust business or credit card business, an amount (not less than zero) equal to the sum of:

(A) the Base Pool Value of such Pool Asset; <u>plus</u>

(B) the aggregate amount of any advances that are made with respect to such Pool Asset after its transfer to the Pool and that are made in accordance with this Arrangement; <u>plus</u>

(C) the aggregate amount of any Capitalized Expenditures relating to such Pool Asset made after its transfer to the Pool; <u>minus</u>

(D) the aggregate amount of all Collections which are not recognized as income or as offsets to expenses pursuant to the Receivership Accounting Requirements with respect to such Pool Asset after its transfer to the Pool; and

(ii) with respect to any Pool Related Liability, the dollar amount thereof stated on the Pool Records as maintained in accordance with the Receivership Accounting Requirements.

The Adjusted Pool Value of any Pool Asset shall be reduced to zero upon Final Disposition of such Pool Asset.

**"Average Pool Assets"** means for any period the sum of the aggregate Adjusted Pool Values of all Pool Assets for each day of such period divided by the number of days in such period.

**"Base Pool Value"** means, with respect to any Pool Asset or Pool Related Liability, the amount required to be reflected on the Pool Records pursuant to the Receivership Accounting Requirements as of the date such Pool Asset or Pool Related Liability is transferred to the Pool. However, such shall exclude any Pool Assets constituting trust business or credit card business for purposes of the definition of Adjusted Pool Value.

**"Capitalized Expenditure"** means an expense of $25,000 or more (or such other amount approved by the Receiver) which would be capitalized under generally accepted

accounting principles. Expenditures of less than $25,000 do not constitute Capitalized Expenditures.

**"Collections"** mean, subject to the limitations set forth below in this definition, all cash or monetary revenues such as payments of principal and interest, fees, net proceeds of sale, net proceeds of collateral liquidation, and net insurance proceeds received, including by offset or similar exchange, or derived from a Pool Asset or an asset that otherwise would constitute a Pool Asset except for the fact that Final Disposition of such asset has occurred. The following receipts, exchanges, or transactions do not constitute Collections:

(i) the receipt of any promissory note, guarantee, or other obligation;

(ii) the receipt by any Person managing the Pool on behalf of the Receiver of any payments, fees, or other amounts to which such Person is paid, or compensated, by the Corporation or the Receiver under the Agreement, this Arrangement or any other agreement or arrangement; and

(iii) the receipt of consideration from the Assuming Bank or any Affiliate of the Assuming Bank for the purchase of any Pool Asset.

Solely for purposes of Section 5.1 hereof, Collections shall be subject to the following limitations:

(x) cash or monetary revenues derived from a loan that consists of revolving advances, revolving credit facilities, or similar credit arrangements that are received prior to Final Disposition of such loan and that would otherwise constitute Collections shall not constitute Collections until the earlier of (A) Final Disposition of such loan, or (B) the date upon which the duties of the Assuming Bank under this Arrangement are terminated. The amount of such cash or monetary revenues that shall be deemed to constitute Collections for such purpose shall be limited to the excess of the highest Adjusted Pool Value of such loan after its transfer to the Pool over the Adjusted Pool Value of such loan immediately prior to Final Disposition thereof or at the date the Assuming Bank's duties are terminated with respect thereto, as the case may be;

(y) Collections shall be reduced by the amount of gross reductions in Pool Related Liabilities excluding reductions from non-monetary settlements of such Pool Related Liabilities; and

(z) Collections derived from Excluded Subsidiaries shall be limited to those amounts actually paid to the Receiver as dividends or repayment of advances. Collections based on repayment of advances shall be subject to the same limitations as those with respect to loans that consist of revolving advances, revolving credit facilities and other similar credit arrangements as discussed in clause (x) above. Collections derived from any trust business or credit card business shall be excluded.

**"Cost of Carry"** means, for any calendar month, the one year "constant maturity" U.S. Treasury Rate as reported in The Wall Street Journal for the last Business Day of the preceding calendar month.

"**Counsel**" has the meaning set forth in Section 2.2 hereof.

"**Current Settlement Account**" has the meaning set forth in Section 4.2 hereof.

"**Excluded Subsidiary**" means any subsidiary of the Failed Bank designated by the Receiver as a Pool Asset.

"**Final Disposition**" means any event evidencing a legal or economic inability to produce further Collections for a Pool Asset, including full payment of the Legal Balance due under a Credit Document or, to the extent the following are effected in accordance with the procedures in the operations manual provided by the Receiver, a complete performance of final settlement agreements with Obligors, the sale of loans to the Corporation or to any third party or, with the approval of any oversight committee or other body established to oversee the management of the Pool, the voluntary and knowing abandonment of efforts to obtain further Collections.

"**Pool**" means such assets and related liabilities as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement.

"**Pool Assets**" means the assets as determined by the Receiver from time to time for purposes of Section 4.13 of the Agreement, to the extent designated by the Receiver as part of the Pool, including, without limitation, in whole or in part, the capital stock of Excluded Subsidiaries, any credit card business, and any trust business, if so designated, and related liabilities.

"**Pool Records**" means the books and records of the Pool established and maintained as provided in Section 4.1 hereof.

"**Pool Related Liability**" means any liability that is transferred to the Pool because it is a Related Liability with respect to a Pool Asset.

"**Receivership Accounting Requirements**" mean the rules, regulations, policies, procedures and reporting requirements relating to accounting for the Pool as determined by the Receiver, in its sole discretion, and communicated to the Assuming Bank from time to time. Unless otherwise directed by the Receiver, such requirements shall reflect generally accepted accounting principles.

## ARTICLE II
## ASSET MANAGEMENT

**2.1    Agreement with Respect to Management**. The Assuming Bank shall serve as an independent contractor to manage, administer, collect and liquidate the Pool Assets during the term of this Arrangement. The Assuming Bank shall be responsible to the Receiver for the performance of its duties hereunder, shall provide to the Receiver such reports as the Receiver deems advisable, and shall permit the Receiver to oversee, monitor and audit at any time the Assuming Bank's performance of its duties hereunder.

**2.2    Assuming Bank's Duties.** (a) In performance of its duties under this Arrangement, the Assuming Bank shall:

(i) liquidate, collect and manage the Pool Assets solely in the best interest of the Receiver;

(ii) exercise its best business judgment in managing the Pool Assets;

(iii) use its best efforts to maximize the net present value of net Collections with respect to the Pool Assets;

(iv) promptly advise the Receiver and its legal counsel (the "Counsel") of any situation (including but not limited to the initiation of any legal action) that may adversely affect any Pool Asset as provided in Article III hereof;

(v) adopt and implement accounting, reporting, recordkeeping and similar systems with respect to the Pool Assets as provided in Article IV hereof;

(vi) maintain fidelity bond coverage with respect to defalcations by its employees in connection with the services provided hereunder;

(vii) within thirty (30) days after transfer of an asset to the Pool, provide by mail a written notification, in a format acceptable to the Receiver, advising all Obligors with respect to such asset that such asset is held by the Receiver and that checks submitted as payments should be made payable to the Federal Deposit Insurance Corporation as Receiver of the Failed Bank and directing such Obligors to continue making loan payments as instructed in such notification;

(viii) comply in all respects with the operations manual provided by the Receiver;

(ix) permit Persons designated by the Receiver to conduct due diligence review of the Credit Documents of Pool Assets;

(x) provide adequate safekeeping for all Credit Documents of Pool Assets;

(xi) retain sufficient staff to perform its duties hereunder;

(xii) provide to the Receiver clerical or similar support staff as may be reasonably requested by the Receiver for use during the term of this Arrangement; and

(xiii) prepare and timely file all tax returns and information reports with appropriate tax authorities and pay taxes due on or before the due date, relating to the Pool and Pool Assets.

(b)    The Assuming Bank shall manage the Excluded Subsidiaries by (i) designating appropriate employees of the Assuming Bank to serve as officers subject to the approval of the board of directors of the Excluded Subsidiary, (ii) if the Receiver chooses to elect such employees, causing such employees to serve as directors of such Excluded Subsidiaries, and (iii) making such employees available for such periods as may be necessary to fulfill the duties of such offices. The officers of the Excluded Subsidiaries shall, in accordance with the laws of the relevant jurisdictions, manage the Excluded Subsidiaries at the direction of the duly elected directors of such Subsidiaries. Neither the Receiver nor any Excluded Subsidiary shall have any obligation to pay any compensation to the Assuming Bank or any of its employees for services provided pursuant to this Section 2.3(b). The Assuming Bank shall not be obligated under this Section 2.3(b) to pay any expense or liability of any Excluded Subsidiary other than the compensation and employment benefits of any employee of the Assuming Bank who serves as an officer or director of such Excluded Subsidiary pursuant to this Section 2.3(b).

(c)    In connection with the services provided by the Assuming Bank hereunder, the following shall be subject to the prior approval of the Receiver (whether or not reimbursable under Section 5.2 hereof):

(i) all purchases by the Assuming Bank of any Pool Asset and any transaction involving the Pool or any Pool Asset with an Affiliate of the Assuming Bank;

(ii) all compromises or settlements of loans that are Pool Assets, unless ninety percent (90%) or more of the Legal Balance is collected as a result of such compromise or settlement;

(iii) all releases of collateral for a cash payment of less than ninety percent (90%) of the appraised value of the collateral based upon a current, independent appraisal;

(iv) disposition of a Pool Asset that would result in a loss where the Adjusted Pool Value of such Pool Asset exceeds $25,000, other than a disposition which does not require approval as provided in Section 2.2(c)(ii) and (iii) hereof;

(v) restructuring of any loan including but not limited to the waiver of payment defaults or other material defaults, and/or the release of guarantors;

(vi) bulk sales of Pool Assets;

(vii) any expenditure in excess of $100,000, any Capitalized Expenditure, any proposed data processing conversions or changes in any existing data processing capabilities (including computer hardware and software), or any payment of a Pool Related Liability;

(viii) all loan disbursements (whether or not pursuant to a Commitment) with respect to any Pool Asset;

(ix) any subcontracting of the Assuming Bank's duties hereunder;

(x) incurring any obligation on behalf of the Receiver; and

(xi) the use of any employee of the Assuming Bank to (A) manage any Pool Asset for which he or she was the originating loan officer or for which he or she had personal and substantial involvement or responsibility (other than as a loan workout officer) as an employee of the Failed Bank or the Assuming Bank or in any other capacity; or (B) exercise supervisory responsibility over any other employee with respect to a Pool Asset that he or she would be prohibited from managing under clause (A) unless he or she is prohibited from making or influencing decisions with respect to such Pool Asset.

## 2.3    Term and Termination.

(a)    The Assuming Bank shall provide the services described herein for an initial period of ninety (90) days after Bank Closing. At the option of the Receiver, exercisable by notice given not later than ten (10) days prior to the end of such initial period or a renewal period, the Assuming Bank shall continue to provide such services for such renewal period(s) as designated by the Receiver, up to the Settlement Date.

(b)    The Receiver may, upon written notice to the Assuming Bank, remove one or more Pool Assets from the Pool, at which time the Assuming Bank's responsibility with respect thereto shall terminate.

(c)    At the expiration of this Arrangement or upon the termination of the Assuming Bank's responsibility with respect to any Pool Asset pursuant to Section 2.4(b) hereof, the Assuming Bank shall:

(i) deliver to the Receiver (or its designee) all of the Credit Documents and Pool Records relating to the Pool Assets; and

(ii) cooperate with the Receiver to facilitate the orderly transition of managing the Pool Assets to the Receiver (or its designee).

(d)    At the request of the Receiver, the Assuming Bank shall perform such transitional services with regard to the Pool Assets as the Receiver may request. Transitional services may include, without limitation, assisting in any due diligence process deemed necessary by the Receiver in connection with the selection of a permanent servicer for the Pool and providing to the Receiver or its designee(s) (x) information and data regarding the Pool and Pool Assets, including, without limitation, system reports and data downloads sufficient to transfer the Pool and Pool Assets to another system or systems, (y) access to employees of the Assuming Bank involved in the management of, or otherwise familiar with, the Pool Assets, and (z) office space and facilities sufficient to facilitate the due diligence process.

**ARTICLE III**
**LEGAL SERVICES**

    **3.1**    <u>Agreement with Respect to Legal Services</u>. The Assuming Bank shall perform the duties set forth in this Article III with respect to any dispute involving the Pool Assets and shall coordinate such matters with the Counsel.

    **3.2**    <u>Assuming Bank's Duties</u>. (a) Unless otherwise directed by the Counsel or provided herein, the Assuming Bank shall:

        (i) not commence any legal proceeding, or refer any dispute involving the Pool Assets to outside counsel without the prior approval of the Counsel;

        (ii) supervise all existing litigation or other legal proceedings with respect to the Pool Assets and, continue to use outside counsel retained prior to Bank Closing by the Failed Bank with respect to such matters; <u>provided that</u>, the Counsel may at any time direct the Assuming Bank to use only such outside counsel which are on the Corporation's <u>List of Counsel Available</u>;

        (iii) coordinate and oversee all disputes and related matters involving the Pool Assets;

        (iv) whenever the Assuming Bank selects outside counsel under this Arrangement, attempt to refer at least ten percent (10%) of the matters described in clause (i) to minority and women-owned law firms approved by the Corporation or identified in the <u>List of Counsel Available</u>;

        (v) monitor the performance of outside counsel;

        (vi) provide to the Counsel any information that the Counsel may request regarding pleadings, case strategies, the performance of outside counsel and any other information relating to any dispute involving the Pool Assets;

        (vii) immediately notify and forward to the Counsel any summons, complaint or any other legal document or service of process received by the Assuming Bank with respect to any Pool Asset or claim against the Corporation or the Receiver; <u>provided that</u>, the Assuming Bank is not an authorized agent of the Corporation or the Receiver upon which service of process may be made;

        (viii) immediately notify the Counsel of any adverse order or judgment with respect to any Pool Asset and obtain the written approval of the Counsel prior to appealing or taking any other action with respect to such order or judgment;

        (ix) as directed by the Counsel, submit any dispute involving a Pool Asset to binding arbitration or other alternative dispute resolution procedure and immediately thereafter move to dismiss any pending litigation or other legal proceeding relating to such dispute;

(x) to the extent not inconsistent with the terms of this Arrangement, comply with the requirements set forth in the Corporation's Guide For Outside Counsel, and assure that all outside counsel retained by the Assuming Bank pursuant to this Arrangement also comply with such requirements;

(xi) take all necessary action to protect the privileges applicable to the Corporation and the Receiver, including but not limited to attorney-client and work product privileges; and

(xii) preserve and protect the confidentiality of all information and documentation communicated to and received from the Corporation and the Receiver and Counsel and outside counsel.

(b)    The Assuming Bank shall submit to the Counsel on or before the fifteenth (15th) day of the next following calendar month a monthly legal services report which shall describe (i) each new matter referred by the Assuming Bank to outside counsel, including the identity of such outside counsel, the nature of the legal services to be provided and a description of the Pool Asset involved, and (ii) each matter concluded, terminated or otherwise withdrawn.

(c)    Upon written notice from the Counsel, allow the Receiver to audit compliance by the Assuming Bank with this Article III.

**3.3**    **Receiver's Rights.** The Counsel may (a) consult directly with outside counsel regarding any litigation or dispute involving the Pool Assets and/or (b) direct or control, at the Receiver's sole cost and expense and upon written notice to the Assuming Bank, any legal action or services with respect to such litigation or dispute

**ARTICLE IV**
**POOL ACCOUNTING AND REPORTING**

**4.1**    **Pool Records.** The Assuming Bank shall immediately establish and maintain the Pool Records on a separate general ledger and on subsidiary ledgers as appropriate to account for Pool Assets and Pool Related Liabilities with such income and expense classifications as the Receiver may require. As of the end of each calendar month, the Assuming Bank shall deliver to the Receiver a report of the financial condition and operations of the Pool. Such report shall be prepared in accordance with the Receivership Accounting Requirements and include a balance sheet, income statement and cash flow statement, report of Collections, postings to the Current Settlement Account and such additional information as shall be required by the Receiver. The report shall include an invoice in a format acceptable to the Receiver for the amount due from the Receiver as reflected in the Current Settlement Account. The Assuming Bank shall deliver the report to the Receiver on or before the 15th day of the next following calendar month. Pool Assets shall be recorded on the Pool Records at their Base Pool Values, together with Pool Related Liabilities, as of the date of transfer to the Pool. Thereafter, Pool Assets and Pool Related Liabilities shall be reflected at their Adjusted Pool Values. Subsidiary ledgers shall include and permit an accounting for (a) income and expense tracking for each loan with respect to each Obligor, and (b) legal fees paid with respect to each Pool Asset by law firm, attorney and each attorney's hourly rate. All accounting records of the Pool shall be maintained by the Assuming Bank on the cash basis of accounting.

**4.2    Current Settlement Account.** The Assuming Bank shall establish and maintain an account (the "Current Settlement Account") to which the amount of payments due to or from the Receiver shall be posted on a calendar month basis.

**4.3    Funding of Pool Asset Expenses.** The Assuming Bank shall establish a deposit account acceptable to the Receiver for the payment of (a) Pool Related Liabilities (except payments under participation agreements which are paid from Collections) and advances with respect to Pool Assets, in either case to the extent permitted by Section 2.3 hereof, (b) Capitalized Expenditures and (c) other expenses reimbursable under Section 5.2 hereof. Such account shall be maintained in accordance with the operations manual provided by the Receiver. As of the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount funded in accordance with this Section 4.3, together with interest for such period on the average daily balance of the amount of such fundings outstanding at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

**4.4    Payments.** Payment of the invoice accompanying the monthly report provided for in Section 4.1 hereof shall be made no later than fifteen (15) Business Days after the date of receipt of such report by the Receiver. Payment made to the Assuming Bank shall be applied to reduce the amount due to the Assuming Bank pursuant to Section 4.3 hereof on the date of receipt of such payment. The Receiver may withhold payment if, in its judgment, a basis exists for denying eligibility for payment of any amount included in the invoice until the Assuming Bank, after notice by the Receiver, demonstrates that such amount is eligible for payment. Any amount withheld shall be paid by the Receiver no later than fifteen (15) Business Days after the Receiver has approved such payment.

**4.5    Collections.** The Assuming Bank shall establish and maintain in trust for the Receiver a deposit account acceptable to the Receiver to which all Collections shall be immediately deposited upon receipt thereof by the Assuming Bank. All collected funds in such account shall be wire transferred on a daily basis by the Assuming Bank to the bank account designated by the Receiver. Any amounts not promptly remitted to the Receiver pursuant to this Section 4.5 shall bear interest at a rate per annum equal to the Cost of Carry plus fifty (50) basis points (0.50%).

### ARTICLE V
### FEES AND EXPENSES

**5.1    Payment for Services.**

(a)    The Receiver agrees to pay the following monthly fees to the Assuming Bank:

(i) a fee equal to the product of (A) one percent (1%) of the Average Pool Assets during the month and (B) the number of days this Arrangement is in effect during such month divided by three hundred sixty-five (365); and

(ii) a fee equal to six percent (6%) of the amount of Collections during the month;

(iii) with regard to any Pool Asset constituting a trust business, the amount of fees the Failed Bank would have collected attributable to the services rendered by the Assuming Bank, to the extent actually collected;

(iv) with regard to any Pool Asset constituting a credit card business, the actual, reasonable and necessary expenses incurred in connection with the performance of duties pursuant to this Arrangement, including expenses of photocopying, postage and express mail, and data processing and employee services (based upon the number of hours spent performing servicing duties).

(b)    At the end of each calendar month, the Assuming Bank shall post to the Current Settlement Account the amount, if any, of fees due for such month.

### 5.2    **Reimbursable Expenses.**

(a)    The Receiver agrees to reimburse the Assuming Bank for its actual direct asset expenses (i) incurred to secure, maintain or sell any Pool Asset (including legal expenses therefor), or (ii) incurred to enforce any rights under the Credit Documents.

(b)    Any expense otherwise reimbursable under this Section 5.2 shall not be reimbursed if the Receiver determines:

(i) such expense was not incurred (A) in good faith, (B) with the same degree of care that the Assuming Bank would exercise in the collection of troubled assets in its own portfolio, and (C) in accordance herewith;

(ii) such expense was incurred for a product, service, or activity that is of an extravagant nature or design; or

(iii) the approval of the Receiver for the payment of such expense (or for the con-tract or other arrangement under which it was incurred) was required under this Arrangement but was not obtained.

(c)    The following categories of expenses shall not be reimbursable under this Section 5.2:

(i) Federal, State, or local income taxes and expenses related thereto;

(ii) salaries and related benefits of the Assuming Bank's employees, including any bonus or severance arrangements, training, payroll taxes, dues, or travel- or relocation-related expenses;

(iii) the cost of space occupied by the Assuming Bank and its staff, the rental and maintenance of furniture and equipment, and expenses for data processing (including data processing conversions);

(iv) except as otherwise provided herein, fees for accounting, legal and other independent professional consultants (including employees of the Assuming Bank);

(v) out-of-pocket miscellaneous operating expenses incurred by the Assuming Bank or any Affiliate in the management of the Pool Assets;

(vi) expenses related to any trust business except to the extent such are reimbursed by such trusts or third parties;

(vii) expenses related to any credit card business (except as such may be paid under Section 5.1); and

(vi) any other expenses that are not reimbursable under this Section 5.2.

## ARTICLE VI
## ADDITIONAL INDEMNITY

**6.1     Additional Indemnity.** The following additional indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(a) of the Agreement:

(9) claims arising from any action or inaction in connection with the administration of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement following a transfer to the Receiver of responsibility for such administration under any provision of the Arrangement;

(10) claims arising in connection with any refusal of the Assuming Bank, acting pursuant to instructions given in writing by the Receiver pursuant to any provision of the Arrangement, or any similar arrangement pertaining to the management of any asset of the Failed Bank that is not acquired under Section 3.1 of the Agreement or any similar arrangement pertaining to the management of such assets, to advance funds under a commitment to an obligor on any loan included among such assets;

(11) any action or inaction taken or omitted to be taken pursuant to this Arrangement in connection with the administration of any asset or the management of any Subsidiary of the Failed Bank that is not acquired under Section 3.1 of the Agreement (the "Management Services"), if such action or inaction is taken or omitted to be taken in good faith and in a manner reasonably believed to be in the best interests of the Receiver or such Subsidiary; and

(12) any action or inaction in connection with the Management Services which is taken or omitted to be taken upon the specific written direction of the Corporation or the Receiver.

**6.2     Additional Exclusions From Indemnity.** The following additional exclusions from indemnities are provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.1(b) of the Agreement:

(15) claims arising from any action or inaction by the Person claiming indemnification which constitutes bad faith, gross negligence or willful misconduct;

(16) claims that could have been enforced against the Person claiming indemnification if the Assuming Bank had not agreed to perform the Management Services;

(17) claims arising from any violation, as a result of action or inaction by the Assuming Bank, or any Subsidiary or Affiliate of the Assuming Bank of (x) any agreement or instrument to which it is a party or by which it or its assets are bound, or (y) its charter or by-laws.

**6.3**    **Additional Indemnity For Receiver and Corporation.** The following additional indemnity is provided with regard to Pool Assets under this Arrangement in the same manner as if such appeared under Section 12.4 of the Agreement:

(3) claims arising from any action or inaction of any Indemnitee in connection with the Arrangement, if such action or inaction was taken or omitted in a manner constituting bad faith, gross negligence or willful misconduct.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HERMAN GRAVES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 1:08-1140 (EGS) |
| | ) | |
| v. | ) | |
| | ) | |
| AMERICAN BROKERS CONDUIT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

THIS MATTER has come before the Court on a Motion by the Federal Deposit Insurance Corporation ("FDIC"), as the duly appointed Conservator for IndyMac Federal Bank, F.S.B. ("FDIC-Conservator"), and the FDIC as Receiver for Defendant IndyMac Bank, F.S.B. ("FDIC-Receiver") to intervene, substitute, and stay.

UPON CONSIDERATION of the papers and pleadings submitted by the parties, it is

ORDERED that FDIC-Conservator's and FDIC-Receiver's Motion to Intervene, Substitute, and Stay is hereby GRANTED; and it is further

ORDERED that FDIC-Conservator and FDIC-Receiver shall be granted leave to intervene as a matter of right pursuant to Fed. R. Civ. P. 24(a); and it is further

ORDERED that FDIC-Conservator and FDIC-Receiver shall be substituted for Defendant IndyMac Bank, F.S.B. under Fed. R. Civ. P. 25(c), and that IndyMac Bank, F.S.B. shall be dismissed and the case shall be re-captioned to reflect the same; and it is further

ORDERED that pursuant to the request by FDIC-Receiver, this matter shall be stayed for 90 days from the date of entry of this Order, in accordance with 12 U.S.C. § 1821(d)(12)(A)(ii). Upon expiration of the stay, the deadline for FDIC-Receiver and FDIC-Conservator to file a

response to the Plaintiffs' Opposition to Defendant IndyMac Bank, F.S.B.'s Motion to Dismiss

the Complaint, if any, shall be 14 days from the date of the expiration of the stay.

Entered this _____ day of _____, 2008.


_____

Hon. Emmet G. Sullivan, United States District
Court for the District of Columbia